UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
FAT BRANDS INC.,

|  |  |
|---|---|
| Plaintiff, | **Case No.: 19-CV-10497** |
|  |  |
| -against- | **AMENDED COMPLAINT** |
|  |  |
| PPMT CAPITAL ADVISORS, LTD., ROYAL GULF CAPITAL CORPORATION, KARL DOUGLAS, WESLEY RAMJEET, SJ GLOBAL INVESTMENTS WORLDWIDE, LTD., SJ GLOBAL INVESTMENTS LTD, PETER SAMUEL, NEIL WALSH, KRISTINA FIELDS AND MICKEY EDISON. | **(WITH JURY DEMAND)** |
| Defendants. |  |

-----------------------------------------------------------x

**AMENDED COMPLAINT OF FAT BRANDS INC.
AGAINST PPMT CAPITAL ADVISORS, LTD., ROYAL GULF CAPITAL
CORPORATION, KARL DOUGLAS, WESLEY RAMJEET, SJ GLOBAL
INVESTMENTS WORLDWIDE, LTD., SJ GLOBAL INVESTMENTS LTD, PETER
SAMUEL, NEIL WALSH, KRISTINA FIELDS AND MICKEY EDISON.**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

THE PARTIES ..............................................................................................................5

JURISDICTION AND VENUE ......................................................................................7

FACTS ......................................................................................................................10

   I. FAT BRANDS.....................................................................................................10

   II. FAT BRANDS SOUGHT TO RAISE FINANCING.........................................11

   III. FAT BRANDS IS INTRODUCED TO PPMT ................................................12

   IV. KARL DOUGLAS AND PPMT CAPITAL.....................................................12

   V. FAT AND PPMT ENTER INTO A BINDING LETTER OF INTENT .............14

   VI. IN AUGUST 2018, PPMT ADVISED PLAINTIFF THAT THE ROYAL
   FAMILY OF QATAR, THROUGH ROYAL GULF CAPITAL, WISHED TO FUND
   THE TRANSACTION, AND THAT PLAINTIFF'S LAWYERS SHOULD PREPARE
   THE DEFINITIVE DOCUMENTS. .......................................................................16

   VII. THE BOTCHED CLOSING .........................................................................19

   VIII. SEVERAL WEEKS AFTER THE BOTCHED CLOSING, DOUGLAS FIRST
   REVEALED TO FAT BRANDS THAT HE WAS RELYING UPON SJ GLOBAL
   WW FOR THE $100 MILLION IN FUNDING.....................................................21

     a. Before the Botched Closing, Douglas Had Refused to Disclose the Particulars
     Regarding the True Investors into PPMT Fund I ...............................................21

     b. Douglas Told FAT that SJ Global WW Managed an $8 Billion Fund ............22

     c. SJ Global WW Claimed It Had Not Had the Opportunity to Have Its Lawyers
     Review the Deal...................................................................................................23

     d. At a Meeting in Zurich in the End of January, the SJ Global Defendants Tell FAT
     that SJ Global WW Had Never Approved the Deal Structure and Was Interested in a Direct
     Deal With FAT ....................................................................................................24

     e. The SJ Global Defendants Transmitted an Apparently Forged Safe Keeping Receipt
     Purportedly Indicating that the SJ Global Defendants Held $19 Billion in Bearer Bonds
     Issued by the United States Federal Reserve.......................................................24

   IX. THE SJ GLOBAL CONSPIRACY TO DEFRAUD FAT BRANDS ...............25

     a. SJ Global WW and Its Partner PPMT Issued a Number of Misrepresentations Regarding
     the Origins, Legitimacy and Financial Wherewithal Of SJ Global WW.............26

     b.   In or around September 2018, PPMT Entered into a Partnership with SJ Global WW
     under which SJ Global WW Agreed to Serve as the Capital Partner for PPMT's Deals.......28

i

    c.    Over the Course of Months, SJ Global WW and PPMT Formed Entities In Belize, The Cayman Islands and Wyoming to Fund the FAT Brands Transaction in a Tax Advantageous Manner ..................................................................................................................29

    d.    The SJ Global Defendants Had Been Actively Involved in Negotiating and Reviewing the Fat Brands Deal Since At Least September 2018 .........................................................31

    e.    Before PPMT Signed The FAT Brands Transaction Documents in December 2018, Walsh Told PPMT that SJ Global WW Will Imminently Wire the $100 Million to a US Entity ....................................................................................................................33

    f.    After The Botched Closing, SJ Global WW Proffers False Statements to Stall for More Time. ...........................................................................................................................33

    g.    The SJ Global Defendants Referred to Michael J. Edison by the Alias Mickey Eddison to Conceal His True Identity ..................................................................................34

    h.    The SJ Global Defendants' False Claims To Their Holding of $19 Billion in Bearer Bonds Powerfully Confirms Their Conspiracy to Defraud..................................................35

    i.    At a Minimum, Douglas was Willfully Blind to the SJ Global Defendants' Conspiracy to Defraud Based Upon His Professed Sophistication and Deep Relationships With SJ Global WW for Many Months..............................................................................36

  X.   RAMJEET'S RESPONSIBILITY FOR DOUGLAS' AND PPMT'S ACTIONS. ...........38

  XI.  THE DEFENDANTS ARE LIABLE FOR THE INFLICTION OF MILLIONS OF DOLLARS IN DAMAGES UPON FAT..................................................................................43

CLAIMS FOR RELIEF ........................................................................................................44

  COUNT I PROMISSORY ESTOPPEL AGAINST THE PPMT DEFENDANTS..................44

  COUNT II PROMISSORY ESTOPPEL AGAINST THE PPMT DEFENDANTS.................45

  COUNT III FRAUD AND CONSPIRACY TO COMMIT FRAUD AGAINST THE PPMT DEFENDANTS...........................................................................................................46

  COUNT IV FRAUD AND CONSPIRACY TO COMMIT FRAUD AGAINST THE SJ GLOBAL DEFENDANTS ......................................................................................48

  COUNT V AIDING AND ABETTING FRAUD AGAINST DOUGLAS AND PPMT .........49

  COUNT VI NEGLIGENT MISREPRESENTATION DOUGLAS AND PPMT ...................50

  COUNT VII TORTIOUS INTERFERENCE WITH FAT'S CONTRACT WITH ITS SECURED LENDER UNDER CALIFORNIA LAW AGAINST THE PPMT AND SJ GLOBAL DEFENDANTS ...................................................................51

  COUNT VIII  BREACH OF IMPLIED WARRANTY PPMT DEFENDANTS....................51

  COUNT IX LIABILITY UNDER A PARTNERSHIP AGREEMENT AGAINST WESLEY RAMJEET.........................................................................................................................52

  COUNT X NEGLIGENT SUPERVISION AGAINST WESLEY RAMJEET.......................53

COUNT XI APPARENT AUTHORITY WESLEY RAMJEET............................................56

JURY TRIAL DEMAND.......................................................................................57

FAT Brands Inc. ("FAT Brands" or "Plaintiff"), by way of its Complaint against PPMT Capital Advisors, Ltd. ("PPMT"), Royal Gulf Capital Corporation ("Royal Gulf") and Karl Douglas ("Douglas," and collectively with PPMT Capital and Royal Gulf the "PPMT Defendants"), Wesley Ramjeet ("Ramjeet"), SJ Global Investments Worldwide, LTD. ("SJ Global WW"), SJ Global Investments LTD ("SJ Global US"), Peter Samuel ("Samuel"), Neil Walsh ("Walsh"), Kristina Fields ("Fields") and Mickey Edison ("Edison," collectively with SJ Global WW, SJ Global US, Samuel, Fields, Walsh and Edison, the "SJ Global Defendants," and together with the PPMT Defendants and Ramjeet, the "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.     FAT Brands is a global franchising company that strategically acquires, markets and develops fast casual and casual dining restaurant concepts around the world. FAT Brands currently owns eight restaurant brands: Fatburger, Buffalo's Cafe, Buffalo's Express, Hurricane Grill & Wings, Elevation Burger, Yalla Mediterranean and Ponderosa and Bonanza Steakhouses, and franchises over 400 units worldwide.

2.     Fatburger, Plaintiff's most famous brand, was founded in Los Angeles, California in 1947.  Fatburger has maintained its reputation as an iconic, all-American, Hollywood favorite hamburger restaurant.  Celebrities and athletes have owned Fatburger franchises and popularized the brand in social media and in hit songs.  As of December 31, 2018, there were 158 franchised and sub-franchised Fatburger locations across five states and 18 countries.

3.     This case arises out of the Defendants' malfeasance perpetrated in connection with FAT Brands' failed placement of up to $100 million in financing.  FAT Brands sought this financing to replace its existing credit facility and to finance the purchase of two additional brands.

The Defendants understood the importance to FAT Brands of obtaining this financing to be able to close on pending acquisition transactions.  Further, new financing would permit FAT Brands to restructure its prior debt and thus save millions of dollars in interest payments.

4.     Beginning in July 2018, Douglas, PPMT's Chief Investment Officer, presented himself to FAT Brands as a reputable and established dealmaker.  Douglas claimed he represented a Middle Eastern family office connected to the Royal Family of Qatar, who had committed hundreds of millions of dollars to invest in PPMT's Fund.  Douglas claimed that this family office, through its corporate vehicle, the Royal Gulf Corporation, had committed to providing this $100 million in financing to FAT.

5.     Before Douglas conveyed his alleged client's commitment to the deal, FAT had paid a $100,000 fee to subsidize Douglas' conducting due diligence on behalf of his "client."  Douglas said he needed to review a data room filled with FAT Brands' sensitive financial information and business plans.

6.     Over the course of 4-5 months, FAT Brands incurred hundreds of thousands of dollars of direct fees and expenses to fully structure and document an investment transaction with PPMT, which was signed by PPMT in December 2018.  FAT Brands undertook these expenses in reliance upon the PPMT Defendants' representations to have procured a definitive commitment from the Royal Family of Qatar to fund this investment first directly through the Royal Gulf Corporation and then as private investors into the PPMT Fund I to be operated by PPMT.

7.     After PPMT failed to close in December 2018, PPMT revealed to Plaintiff that it had not procured a binding commitment from the Al Thani Family, the Royal Family of Qatar, to invest in Plaintiff.  After the failed closing, PPMT first revealed that its alleged investor was a dubious entity called SJ Global WW, which Douglas claimed was affiliated with the Samuel Jones

family office.  Douglas advised Plaintiff that the SJ Global family office had more than $8 billion in assets under management and that SJ Global WW served as the private equity arm of the family office.  Douglas assured Plaintiff that he had taken steps to perform customary and reasonable due diligence with SJ Global WW as a possible funding source.  Douglas stated that the due diligence included spending days visiting them several times in their London office.

8.      In response to FAT Brands pressing for proof of SJ Global WW's source of funds, SJ Global WW produced a screenshot of phony documentation evidencing its alleged possession of $19 billion in "Bearer Bonds."  SJ Global claimed it possessed 38 bearer bonds issued by the United States Federal Reserve in the amount of $500,000,000 each even though the Federal Reserve had never issued bonds in such an extremely large denomination.

9.      The PPMT Defendants' lies completely unraveled within weeks of them first revealing to Plaintiff that SJ Global WW was their supposed funding source.  First, Plaintiff has since discovered that Douglas is a bankrupt who owes millions of dollars in back taxes and other debts due to business failures, and who completely misrepresented the experience, qualifications and resources of the PPMT Defendants to procure the financing needed by FAT.  Second, Douglas misrepresented that he had a firm commitment from the Al Thani Family to invest in FAT Brands from August 2018 through December 2018.  Third, Douglas lied when describing SJ Global WW as a legitimate and credible private investment firm backed by an affiliated family office with more than $8 billion in assets under management.

10.     At all times, Douglas knew or was willfully blind to the falsity of SJ Global WW's misrepresentations.  Since July 2018, or earlier, Douglas had been falsely representing to various companies and financial institutions that SJ Global WW would invest more than a billion dollars in various investments.  Not once did SJ Global WW ever fund a deal, and withdrew from

transactions when due diligence materials or proof of funds was demanded.  On November 1, 2018, Douglas told SJ Global WW that Defendants should expect FAT Brands to sue if the deal did not close because PPMT had "committed" to do the deal based upon SJ Global WW's representations but PPMT had already pushed back the closing by a month.  Nevertheless, Douglas continued to assure FAT Brands for another seven weeks that his fund – with its supposed secret investor affiliated with the Al Thani family – would fund the deal.  In short, Douglas' denials of knowledge of SJ Global WW's wrongdoing are not tenable in light of Douglas' own misconduct, his professed financial sophistication, and the length of time over which he was so deeply involved with SJ Global WW.

11.     Due to this scheme, FAT Brands and its shareholders suffered millions of dollars of losses through, among other things, a significant decline in its stock price, inability to refinance high-cost borrowings and the loss of specific acquisition opportunities.

12.     Accordingly, Plaintiff brings claims against the PPMT Defendants for breach of the duty to negotiate in good faith, promissory estoppel, fraud, aiding and abetting fraud, negligent misrepresentation, breach of an implied warranty, and tortious interference with FAT Brands' contract with its then existing senior lender.  FAT Brands also brings claims against the SJ Global Defendants for fraud and conspiracy to commit fraud and tortious interference with FAT Brands' contract with its then existing senior lender.  Additionally, FAT Brands seeks to hold Ramjeet vicariously liable for these torts perpetrated by the PPMT Defendants, and in which Ramjeet personally participated, under his partnership agreement with Douglas, negligent supervision and apparent authority.

## THE PARTIES

13.     At all relevant times, the plaintiff **FAT Brands** was and still is a corporation, duly organized and existing under and by virtue of the laws of the State of Delaware, maintaining its principal place of business at 9720 Wilshire Blvd, Suite 500, Beverly Hills, California, 90212.

14.     The Defendant **PPMT** was formed in July 2017 as a New York corporation with its headquarters located at 1001 Avenue of the Americas, 2nd Floor, New York, New York 10018.

15.     At all relevant times, the Defendant **Royal Gulf** was a New York corporation with its headquarters located at 1001 Avenue of the Americas, 2nd Floor, New York, New York 10018.

16.     At all relevant times, the Defendant **Karl B. Douglas**, upon information and belief, is an individual residing at 1304 Ridge Road, Laurel Hollow, NY, 11791.

17.     At all relevant times, upon information and belief, the Defendant **Wesley Ramjeet**, was an individual residing in Florida.  Ramjeet operated the PPMT family of companies and helped Douglas organize PPMT.  Ramjeet subsidized the operation of PPMT and served as its CFO and Treasurer upon its formation.  Douglas described Ramjeet as his "partner" in operating PPMT.

18.     Upon information and belief, the Defendant **SJ Global WW** is a British Corporation, with offices located at 34-40 Prince of Wales Road, Norwich, NR1, 1LG United Kingdom.

19.     At the direction of Neil Walsh and SJ Global, the Defendant **SJ Global USA** was incorporated by PPMT as a Wyoming company on December 21, 2018.  According to public records, SJ Global USA maintained its offices at 1001 Avenue of the Americas, 2nd Floor, New York, New York 10018.  Walsh directed Onur Tatliadim, a Managing Director of PPMT, to incorporate SJ Global USA and to list Mr. Tatliadim as the owner of the shares in SJ Global USA with the understanding that Mr. Tatliadim would transfer all of the shares to Mr. Walsh after the bank accounts were opened.  Mr. Walsh claimed that this was necessary to speed up any Know

5

Your Customer and Anti-Money Laundering diligence performed by U.S. banks before the opening of any bank accounts. Upon information and belief, Mr. Walsh served as the Managing Director of SJ Global USA. The SJ Global Defendants formed SJ Global USA with the purported purpose of it serving as SJ Global WW's remittance or transfer agent in the United States and to thereby allow SJ Global WW to supposedly "onshore" up to $250 million to invest in FAT Brands and in other deals originated by PPMT Capital.

20.     Upon information and belief, the Defendant **Peter Samuel** is a citizen of a foreign country. Mr. Samuel conspired with the other SJ Global Defendants to defraud FAT Brands. Mr. Samuel claimed to be the Chairman of a trust with more than $50 billion in assets ("SJ Global Trust" or "Trust"). According to Mr. Samuel and the other SJ Global Defendants, this Trust derived its wealth from the founders of the Samuel Jones and Company. That company supposedly was involved in the paper and glue manufacturing business in London in the 1800's and early 1900's before venturing into financial services. Samuel claimed that SJ Global WW was the private equity arm of the Trust. Curiously, Mr. Samuel resigned from SJ Global WW's Board of Directors and transferred all ownership interest in SJ Global WW to Kristina Fields in or around October 2017 (thereby forfeiting his ability to earn a part of the management fees and profits supposedly earned by SJ Global WW on the investment of billions of dollars for the Trust). Strikingly, in a March 13, 2020 Declaration filed with this Court, Samuel averred that his connection to SJ Global WW consisted of serving as an "advisor to" SJ Global WW and related entities, thereby admitting that Samuel's prior claim to serving as the Chairman of the $50 billion SJ Global Trust was a hoax.

21.     Upon information and belief, the Defendant **Neil Walsh**, at all relevant times, served as the Managing Director (effective CEO) of SJ Global WW. Upon information and belief, Mr.

Walsh is a citizen of a foreign country. In November 2018, Neil Walsh owned fifty percent of SJ Global WW. Neil Walsh conspired with the other SJ Global Defendants to defraud FAT Brands.

22.     Upon information and belief, the Defendant **Kristina Fields**, at all relevant times, served as the Chief Financial Officer and as a Director of SJ Global WW. Upon information and belief, Ms. Fields is a citizen of a foreign country. In November 2018, Ms. Fields owned fifty percent of SJ Global WW. Ms. Fields conspired with the other SJ Global Defendants to defraud FAT Brands, as evidenced by her transmitting to FAT Brands the screenshot of phony documents purportedly showing SJ Global WW's holding of $19 billion in phony bearer bonds.

23.     Upon information and belief, the Defendant **Mickey Edison**, conspired with the other SJ Global Defendants to harm FAT Brands. During the relevant time period, Mr. Edison, whose full name is Michael J. Edison, used the alias "Mickey Eddison" to conceal his prior felony convictions. During the relevant time period, Mr. Edison, Mr. Walsh, Mr. Samuel and Ms. Fields represented that Mickey Edison was one of the trustees of the SJ Global Trust. Strikingly, in a March 13, 2020 Declaration filed with this Court, Mr. Edison avers that his connection to SJ Global WW consisted of serving as "an independent consultant" to SJ Global WW, thereby admitting that Edison's prior claim to serving as a trustee of the $50 billion SJ Global Trust was a hoax. Upon information and belief, Mr. Edison now resides in Zurich, Switzerland.

## JURISDICTION AND VENUE

24.     This Court has original jurisdiction over this case pursuant to 28 U.S.C. §1332(a)(3) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States and citizens or subjects of a foreign state are additional parties.

25.     For purposes of federal court jurisdiction, FAT is a citizen of California, where it maintains its principal place of business, and Delaware where it is incorporated.  None of the Defendants are citizens of either Delaware or California.

26.     Venue is proper in this judicial district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district where the PPMT corporate defendants maintained their headquarters and where the PPMT individual defendants maintained their offices.

27.     Personal jurisdiction exists in New York over the Defendants SJ Global USA and Royal Gulf, which maintained their headquarters within PPMT's offices within New York

28.     SJ Global WW and Walsh are subject to personal jurisdiction in this district under CPLR 302(a)(1) because they transacted business within the state and the claims arise out of those transactions.

29.     As explained in the following sections of the Amended Complaint, SJ Global WW and PPMT entered into a partnership agreement under which SJ Global WW agreed to serve as PPMT's exclusive capital partner for deals requiring an investment of more than $1 billion.

30.     Under the SJ Global WW and PPMT partnership, PPMT served as the general partner of the partnership by originating and negotiating the transactions, forming and operating entities, dealing with lawyers, accountants and other professionals and opening bank accounts for the partnership entities.  However, given Douglas' desperate need for investments, SJ Global WW exercised significant control over the partnership between the parties by promising to advance hundreds of millions of dollars to the partnership.

31.     SJ Global WW, through Walsh, entered into written and oral agreements with PPMT concerning the operation of this partnership generally, including but not limited to an investment of $100 million into FAT Brands.

32.     Walsh signed the PPMT Fund 1 Limited Partnership Agreement (which was operated out of PPMT's New York offices), into which SJ Global WW had agreed to invest hundreds of millions dollars by funneling the money through other entities of which he would serve as the Managing Director and which listed PPMT's New York office as its ostensible headquarters.

33.     Walsh directed phone calls and emails to New York on a daily basis, or sometimes numerous times per day, and visited the PPMT offices on several occasions.

34.     SJ Global WW, Samuel, Walsh, Fields and Edison are subject to personal jurisdiction in New York under CPLR 302(a)(2) by committing tortious acts within the state through their agents, partners and co-conspirators the PPMT Defendants.

35.     SJ Global WW agreed to serve as the exclusive capital partner for deals being developed by Douglas and PPMT involving the investment by SJ Global WW of up to $1 billion in FAT Brands, several energy deals and a bond purchase from a Qatari real estate entity.

36.     Based upon its agreement to provide such an extraordinary amount of capital to PPMT, SJ Global WW directed Douglas and PPMT on a daily basis over the course of months to make a number of representations to FAT Brands, banks, accounting firms, law firms and other target companies.  SJ Global WW directed PPMT to form entities to be operated from New York which would serve as "transfer or remittance agents" to allow SJ Global to supposedly onshore hundreds of millions of dollars while Walsh served as the Managing Director of the entities.

37.     Walsh, as the Managing Director, and Fields, as the CFO, exerted extensive control over SJ Global WW and this scheme and participated in daily communications with each other, Samuel, Edison and Douglas in furtherance of their conspiracy.

38.     SJ Global WW also represented that a related trust, operated by Edison and Samuel, supposedly provided the billions of dollars of investment funds to SJ Global WW, its private equity arm.  Edison and Samuel issued directives to PPMT and Douglas directly and exerted control over this scheme given their purported control over a $50 billion trust.

39.     SJ Global WW, Samuel, Walsh, Fields and Edison are subject to personal jurisdiction in New York under CPLR 302(a)(3) by committing tortious acts without the state because their fraudulent misrepresentations regarding their intent and ability to provide $100 million in financing rendered PPMT's fund, operated out of its New York offices, insolvent and unable to fulfill its contractual obligations to FAT.  The SJ Global Defendants all claimed to have earned significant amounts of money through international business and engaged in a persistent course of conduct directed towards New York.

<u>**FACTS**</u>

I.     <u>**FAT BRANDS**</u>

40.     FAT Brands was formed on March 21, 2017 as a wholly owned subsidiary of Fog Cutter Capital Group Inc.

41.     On October 20, 2017, FAT Brands completed an initial public offering and issued additional shares of common stock representing 20 percent of its ownership. The Company's common stock trades on the Nasdaq Capital Market under the symbol "FAT."

42.     Andrew Wiederhorn has served as a director and President and Chief Executive Officer of FAT Brands since its formation.

43.     FAT Brands maintains an independent Board of Directors.  Edward H. Rensi, the retired President and Chief Executive Officer of McDonald's USA, serves as FAT Brands's Chairman of the Board of Directors.

44.     On November 2017, FAT Brand's stock, a month after its IPO, was trading at about $9 per share.  In September 2018, FAT Brand's stock traded mostly between $8 -$9 per share. Due to the Defendants' scheme, FAT Brands' stock lost almost half of its value.

45.     On March 9, 2020, FAT Brands announced that it had completed a $40 million whole business securitization, despite the massive harm inflicted upon the Plaintiff by the Defendants a year earlier.  The offering included $40 million in Series 2020-1 Fixed Rate Asset-Backed Notes.  The transaction will significantly lower FAT Brands' marginal cost of capital to 7.75%, its weighted average cost of capital to 8.49%, and will lower its net interest expense by almost $2 million per year.  Absent the Defendants' fraud, FAT Brands would have achieved these savings more than a year earlier.

## II.     FAT BRANDS SOUGHT TO RAISE FINANCING

46.     FAT is a multi-brand restaurant franchising company that develops, markets and acquires predominantly fast casual restaurant concepts around the world.  As a franchisor, FAT generally does not own or operate restaurant locations, but rather generates revenue by charging franchisees an initial franchise fee as well as ongoing royalties.  FAT cross-sells to its franchisees the various brands contained in the FAT portfolio.  The acquisition of additional brands and restaurant concepts as well as the expansion of its existing brands are key elements of FAT's growth strategy.

47.     In April 2018, FAT retained two investment advisory firms registered with FINRA as broker-dealers to assist FAT in raising financing from their New York offices through the efforts of brokers registered in New York.

48.     FAT sought additional financing for two purposes.  First, FAT desired to replace its then

existing $16 million credit facility with a fifteen percent (15%) annual interest rate with new debt

had a lower interest rate.  Secondly, FAT needed the additional funding to purchase two additional

brands: Elevation Burger and another well-known brand.

### III.     FAT BRANDS IS INTRODUCED TO PPMT

49.     With Douglas's knowledge, Plaintiff's investment bankers advised FAT Brands that PPMT

was a successful money manager for a number of wealthy family offices in the Middle East and

that PPMT was interested in and had clients lined up with the capacity to finance the deal.

50.     Based upon these representations, on or about June 8, 2018, FAT created a "data room" to

allow PPMT to review Plaintiff's confidential financial information and business plans.

### IV.     KARL DOUGLAS AND PPMT

51.     PPMT represents on its website that it is a "multi-family office" that sources and structures

transactions on behalf of our family office clients.  PPMT claims that its clients are primarily Asian

and Middle Eastern Family Offices and small institutions.

52.     PPMT further proclaims that: "We are proud to represent an exclusive group of quite

literally some of the most prestigious private families, foundations and small institutions in the

world, on a wide range of alternative asset strategies. Our clients include single-family offices, PE

managers, and independent wealth advisers."

53.     PPMT boasts that it has completed "over $300M" in direct investments in the last 24

months and currently has mandates for nearly $1.5 billion in specified investments.

54.     Karl Douglas serves as the Managing Partner and Chief Investment Officer of PPMT.

55.     Karl Douglas maintains a prolific internet presence in which he aggressively touts his deal-making prowess and sterling track record in articles and blogs written by him for PPMT's website and for websites maintained by affiliated PPMT entities.

56.     On or about September 7, 2017, Karl Douglas had filed a Chapter 11 Voluntary Petition for Bankruptcy in the United States Bankruptcy Court for the Eastern District of New York.

57.     In his bankruptcy filings, Mr. Douglas admitted that he owed $5,240,000 in federal and state taxes due to his failure to pay taxes from 2005 through 2015.

58.     In his bankruptcy filing, Mr. Douglas described his employment as a "consultant" to PPMT Strategic Group.   Douglas did not state that he served as the Managing Partner and Chief Investment Officer of PPMT, which he had incorporated two months earlier.   He further admits that his bankruptcy filing, and inability to pay taxes for a decade, were due to his business failures.

59.     In his publicly available LinkedIn profile, Mr. Douglas advertised that from October 2004 through October 2014 he had served as Head of Merchant Banking for Terra Nova Capital, Inc., a FINRA registered broker dealer.

60.     However, Douglas last registered with FINRA in January 2011 as a broker at European American Equities Securities, an affiliate of Terra Nova Capital.

61.     Douglas withdrew from FINRA rather than disclosing on a Form U-4, as FINRA requires the disclosure of the existence of any tax liens, unsatisfied judgments, bankruptcies and compromises with creditors.   His misleading biography was designed to further conceal this negative information from investors.

62.     Specifically, by early 2012, the IRS and others had filed more than $2 million in liens against Douglas.   In 2011, Wells Fargo filed an action to foreclose upon Douglas' home.

63.      It is implausible that a Merchant Bank, subject to the Bank Secrecy Act and supervision by FINRA and the Office of the Comptroller, would retain as the Head of Merchant Banking an individual who withdrew from FINRA while owing millions of dollars in taxes for years due to business failures.

64.      In a profile posted on Pitchbook[1], Douglas claims to have earned a business degree from Harvard, and on the website houzz.com claimed to be a Harvard graduate, even though Mr. Douglas only once attended a summer course at Harvard.

65.      PPMT is one of at least fifteen entities operating with the PPMT name.  Ramjeet serves as the Chief Executive Officer of each of the PPMT companies, other than PPMT and Royal Gulf, and exercises control over the PPMT family of companies.

66.      Onur Tatliadim was hired by Douglas as an independent contractor to work for PPMT in September 2017, or a few months after Douglas formed PPMT.  PPMT's website listed Mr. Tatliadim as a Managing Director.  PPMT bounced several checks for salary issued to Tatliadim in the end of 2017, and stopped paying his salary altogether by April 2018, because PPMT never closed a single deal while Tatliadim worked there from September 2017 through June 2019.

## V.      FAT AND PPMT ENTER INTO A BINDING LETTER OF INTENT

67.      On July 3, 2018, FAT Brands, as the borrower, entered into a loan and security agreement with FB Lending, LLC, as the lender ("FB Loan").  Under the FB Loan, FAT borrowed $16 million with an interest rate of fifteen percent per annum.

68.      Upon learning of the FB Loan, Douglas advised FAT that PPMT was interested in lending up to $60 million to FAT and offering FAT a lower interest rate than FB Lending through a "whole

---

[1] Pitchbook claims to provide the preferred Financial Database for private and public capital market data.

business securitization" transaction, similar to transactions that have been successfully completed by other restaurant companies, including YUM Brands, Dunkin' Brands and Wendy's.

69.     Douglas explained that a family office in the Middle East, backed by the Royal Family of Qatar, would provide the capital for the loan through Royal Gulf.  Douglas represented that Royal Gulf was owned and controlled by the Royal Family and used by it for investment purposes.

70.     Douglas further boasted he was representing a family foundation, with $8.5 billion in assets, based in the Middle East with offices located in London.

71.     Douglas represented that he had cleared the terms of a proposed deal with the family office before he began drafting a proposed term sheet for the provision of $60 million in debt financing.

72.     On August 7, 2018, PPMT entered into a Binding Letter of Intent with FAT pertaining to Royal Gulf lending up to $60 million to FAT.  A copy of the Binding Letter of Intent is attached hereto as Exhibit A ("LOI").  Douglas executed the LOI as PPMT's Chief Investment Officer "on behalf of one or more of its affiliates and/or advised funds or accounts."

73.     The LOI outlines the terms for a complex transaction under which: i) FAT will form a new company: Fat Brands Licensing, LLC ("FBL"); ii) FBL will pay $44 million to FAT for an irrevocable license to use all of FAT's intellectual property; iii) FBL will provide an additional $16 million to FAT for additional acquisitions; iv) FAT will pay annual license fees to FBL of $6 million per year for a period of five and one-half years; and v) after five and one-half years, FAT will be obligated to pay $60 million plus $1.2 million per year to repurchase the assets from FBL.

74.     The LOI states that the "parties understand and agree that the provisions of this Letter of Intent are not intended to constitute, nor will they be construed as an offer subject to acceptance and other than the provision of exclusivity, will not become legally binding on the parties unless

and until the execution and delivery by the parties of, and then only to the extent reflected in, mutually acceptable Definitive Agreements, as hereinafter defined."

75.    The LOI further clarifies that the "parties each understand that this Letter of Intent constitutes a firm proposal.  The parties shall be bound to a standstill but will not incur obligations with respect to the Transaction until the Definitive Agreements have been negotiated, executed and approved as expressly provided herein."

76.    The LOI provides PPMT with the option to notify FBL that it wishes to complete the transaction.  LOI states that in that event, "the parties shall complete the Definitive Agreements and the Transaction shall be closed on or before 5:00 o'clock p.m. EST on September 30, 2018 (the "Closing Date" "Exclusivity Period") unless extended by mutual agreement."

77.    The LOI required FAT to "fund an expense deposit of $100,000 to fund completion of legal due diligence, prepare closing documents and establish the Grantor Trust" ("due diligence fee"). On August 9, 2019, FAT paid the $100,000 due diligence fee and provided PPMT with access to a data room containing FAT's confidential financial information.

## VI.    IN AUGUST 2018, PPMT ADVISED PLAINTIFF THAT THE ROYAL FAMILY OF QATAR, THROUGH ROYAL GULF CAPITAL, WISHED TO FUND THE TRANSACTION, AND THAT PLAINTIFF'S LAWYERS SHOULD PREPARE THE DEFINITIVE DOCUMENTS

78.    By no later than August 19, 2018, PPMT advised FAT Brands that Royal Gulf wished to complete the transaction and that FAT Brands should prepare the definitive documents and take the other steps necessary to effectuate the proposed securitization.

79.    Over the next several months, Douglas repeatedly assured Plaintiff that he had procured a $500 million commitment from the Al Thani family, the ruling family of Qatar, through its Royal Gulf, to invest in FAT Brands and in oil and energy investments in the United States.

80.     On August 31, 2018, Wiederhorn told Karl Douglas that he wanted to make sure everyone was on board before the lawyers ran up large bills drafting the complex agreements.

81.     On September 4, 2018, Mr. Douglas confirmed that "both sides are in conceptual agreement on structure."

82.     On or about September 12, 2018, Wiederhorn met with Ramjeet, Douglas and Tatliadim at PPMT's office in New York.  During the meeting, Tatliadim and Ramjeet corroborated Douglas's boasts regarding his procurement of a firm commitment from the Royal Family to invest in FAT Brands and in other deals.  Ramjeet and Tatliadim further confirmed that the client investing in FAT Brands had more than $8 billion in assets.

83.     Throughout September 2018, Douglas continued to advise FAT Brands as to the detailed terms to be included in the transaction documents for the whole business securitization.

84.     By the end of September 2018, FAT's counsel, Loeb and Loeb LLP ("Loeb"), had prepared a draft credit agreement and schedules comprising more than 100 pages along with [dozens of] ancillary documents, to document and structure the complex deal proposed by PPMT.  In addition, Loeb prepared and executed a complex restructuring of FAT in order to prepare it for the proposed securitization transaction.  Loeb also researched and drafted two highly technical legal opinions to be delivered at the closing, including a 60-page "Non-Consolidation and True Sale Opinion", which is customarily given by issuer's counsel in securitization transactions.

85.     Additionally, to be able to close the deal, FAT's counsel invested significant resources to prepare an early termination of FAT's existing credit facility, and to consolidate and license FAT's extensive library of trademarks for FAT to be properly structured for the securitization transaction.

86.     Throughout October and November, the PPMT Defendants continued to exhaustively negotiate the detailed terms of the transaction documents, through the retention of a sophisticated national law firm, while vouching for their desire and capacity to close the deal.

87.     The PPMT Defendants, based upon their actions, extended the LOI's exclusivity period.

88.     At all times, PPMT and its counsel conducted themselves and dealt with FAT and Loeb as if the securitization transaction was certain to close, and did not raise any red flags or indicate that funding of the transaction was uncertain or might not be committed from reputable sources.

89.     On October 12, 2018, Fat Brands prepared a Letter of Intent for Mr. Al Thani, care of Karl Douglas, to purchase London franchises of FAT.  Since August 2018, Douglas had indicated that the Limited Partners in Royal Gulf also were interested in purchasing FAT franchises in London.

90.     On October 25, 2018, Loeb advised FAT's existing lender: "We've been working intensely on the documents with [PPMT's counsel], and are now looking at closing in two weeks (Nov 9). Things have taken a bit longer than expected due to third parties (paying agent, servicer, etc.) and the legal opinions, but we're still on track.  Our next call with [PPMT's counsel] is tomorrow."

91.     On November 12, 2018, in a recorded call, PPMT told FAT that "Andy/FAT and PPMT have an agreement on all of the business terms" pertaining to the $60 million loan to FAT with the issue to "tackle is the documentation."  PPMT reiterated during the call that "we need to get the legal side of things in line" but "everything has been agreed upon from a business point of view."

92.     On or about November 15, 2018, Douglas, in his capacity as the Chief Investment Officer of Royal Gulf Capital received a Quality of Earnings report for FAT Brands.

93.     In November 2018, Douglas advised FAT that Royal Gulf wished to increase its investment by purchasing $40 million in a new series of preferred stock from FAT, in addition to consummating the securitization transaction to lend $60 million to FAT.

94.     In November 2018, Karl Douglas advised Plaintiff that PPMT Fund I, LP should be substituted for Royal Gulf as the counterparty.

95.     Douglas represented that capital for the PPMT Fund still would be provided by several of the wealthy Middle East family offices that he represented, including the Al Thani family.

96.     Douglas protested that he could not disclose the specific investors in the PPMT Fund until after the closing of the deal but vouched for the PPMT Fund's ability and intent to close upon the finalization of the transaction documents.

97.     On or about December 3, 2018, Douglas and Tatliadim met with Wiederhorn in New York to negotiate the terms for the equity purchase.

### VII.     THE BOTCHED CLOSING

98.     Over the course of four months, the PPMT Defendants caused FAT to spend hundreds of thousands of dollars in legal fees in drafting the complex credit agreement, ancillary documents, legal opinions and other lengthy documents, in negotiating and revising these agreements, in negotiating an early termination and forbearance with FAT's current lender and in restructuring FAT's portfolio of trademarks.

99.     The parties had negotiated a Credit Agreement, Intellectual Property Security Agreement, Management Agreement, Contribution Agreement, multiple license agreements, Registration Rights Agreement, Subscription Agreement, Warrant Agreement and others (collectively, the "Transaction Documents").

100.    By early December, PPMT had agreed to all of the language contained in the Transaction Documents, on behalf of themselves and their supposed investors, and agreed to schedule a "closing" of the transaction for December 20, 2018, at which point the deal would be funded.

101.   On December 17, 2018, Karl Douglas told Wiederhorn to "not worry, it's funding next couple days 100%."

102.   At a December 20, 2018 conference call regarding the closing, with counsel participating, the parties agreed to exchange photocopies of their signatures to the various agreements to demonstrate their commitment to closing, even though the agreements were not to become binding until the original signatures were formally released by counsel upon the funding of the transaction.

103.   The 102-page long Credit Agreement is executed by Mr. Tatliadim as the Authorized Signatory of: i) PPMT Strategic Group, Inc. as the Paying Agent; ii) PPMT Strategic Group, Inc. as the Administrative Agent and Lender; and iii) PPMT Fund I GP, LLC, the General Partner of the Lender PPMT Fund I, LP. Mr. Tatliadim's signature appears on the Subscription Agreement relating to the equity investment.

104.   On December 21, 2018, PPMT advised FAT that the $100 million is available to be "wired today" but first needs to be converted from Euros to dollars.

105.   Mr. Tatliadim refused to disclose the name of the family office supposedly funding the transaction but again swore that they had the money.

106.   On December 21, 2018, Douglas threatened FAT in response to FAT's raising PPMT's failure to fund the transaction.

> Threats and language such as 'failure to fund' will not be considered productive by us, and may be considered cause to withdraw from this transaction completely…

> The transaction can be closed, but you need to consider whether you want a completed deal or a protracted Nd [sic] expensive litigation…

> I can assure you if the Trustees get wind of this they will [sic.] withdrwaw.  It's an $8.5 billion trust.  They litigate all the time…

107.   On December 31, 2018, Douglas represented "I got definitive word.  We will fund on Tuesday the 8th at the latest."

108.    To date, FAT has not received a single penny of the $100 million in financing that was required to be paid under the executed Transaction Documents.

### VIII.   SEVERAL WEEKS AFTER THE BOTCHED CLOSING, DOUGLAS FIRST REVEALED TO FAT BRANDS THAT HE WAS RELYING UPON SJ GLOBAL WW FOR THE $100 MILLION IN FUNDING

109.    For weeks after the botched closing, PPMT promised FAT that PPMT's investor would be wiring the funds imminently to the United States.  Due to pressure from FAT Bands, Douglas finally identified SJ Global WW (and not the Al Thani family), the supposed private equity arm of the alleged Samuel Jones Trust, as the investor that supposedly had committed $500 million to PPMT's fund.  Within just a few weeks, the Defendants' fraud schemes unraveled.

### a.   Before the Botched Closing, Douglas Had Refused to Disclose the Particulars Regarding the True Investors into PPMT Fund I

110.    Douglas had instructed Onur Tatliadim not to reveal that SJ Global was providing the funding for the FAT transaction.  Douglas told Tatliadim that he needed to keep confidential the source of funding out of concern that FAT Brands, or one of the investment bankers, would circumvent PPMT and seek funding directly from SJ Global WW.

111.    Douglas told Tatliadim that he did not want to mention that the Qatari family was not funding until necessary.

112.    In December 2018, Adam Kinzer, one of the registered brokers who had introduced FAT to PPMT Capital, called Tatliadim and Douglas in a panic to demand that PPMT reveal the identity of the funding source, and for proof of that client's ability to fund the transaction, upon learning in December that the closing was being delayed due to difficulties in transferring the $100 million to the United States.

113.    On December 21, 2018, Wiederhorn wrote to Douglas to demand "the disclosure of the investor and proof of funds" in light of PPMT's failure to fund the transaction.  Wiederhorn offered

to "agree to non-circumvention" and a non-disclosure agreement to address Douglas' objections to providing "transparency" as to the source of the funds "or the ultimate investor."

114.    Before December 21, 2018, PPMT's emails only referred to PPMT's "lender," or "investor" or the "family office" or "client" providing the $100 million in financing.

115.    On December 21, 2018, Wiederhorn had a telephone conversation with Onur Tatliadim in which Mr. Tatliadim refused to disclose the name of the family office supposedly wiring the funds other than to swear the family office has the money.

### b.  Douglas Told FAT that SJ Global WW Managed an $8 Billion Fund

116.    Not until on or about January 5, 2019, did Douglas finally reveal that SJ Global WW was the supposed funding source for PPMT.

117.    Douglas misrepresented to FAT Brands that SJ Global WW was a legitimate private investment firm based in London.  Douglas explained that SJ Global WW was funded by a trust or family office with over $8 billion in assets and which had invested hundreds of millions of dollars worldwide.

118.    Douglas told FAT that SJ Global WW had committed $500 million to invest in his PPMT Fund on behalf of the Trust.

119.    Douglas vouched for the bona fides of SJ Global.

120.    Douglas claimed he had performed customary and reasonable due diligence into SJ Global WW's legitimacy and finances, including by visiting with them multiple times.

### c.  SJ Global WW Claimed It Had Not Had The Opportunity to Have Its Lawyers Review the Deal

121.    On December 31, 2018, PPMT claimed that it had obtained "definitive word" that its client would wire the $100 million in funds by no later than January 8, 2019.

122.    On January 11, 2019, Walsh and Samuel advised FAT Brands that the wire would be sent within a few days.

123.    On January 15, 2019, Douglas spoke with Walsh about their "lack of credibility" because they had been representing repeatedly that the funds were ready to be wired.  Douglas advised Walsh that the "banks, companies and lawyers" believe this is some sort of stalling tactic because SJ Global WW does not have the money or the deal was never approved.  Douglas forewarned Walsh: "In the event we don't close the ramifications for everyone will be disastrous.  We'll be in depositions for years."

124.    On January 16, 2019, Douglas advised FAT that SJ Global WW had retained Andrew Tucker from Womble, Bond and Dickinson LLP, a transatlantic law firm with more than 1,000 lawyers in 27 offices located, to review the FAT Brands transaction on its behalf before closing.

125.    SJ Global WW announced that it had retained an internationally respected law firm to create the misimpression that it intended to fund the transaction in good faith.

126.    Douglas claimed that Peter Samuel, the Chairman of the Samuel Jones Trust, had the funds to close the deal, but "Mickey Eddison [sic.]," one of the trustees of the SJ Global Trust, was insisting that SJ Global's own law firm review the transaction documents.

127.    Douglas knew that this statement was false when issued because Douglas had been reviewing the investment terms with SJ Global WW since September.

>    **d.   At a Meeting in Zurich in the End of January, the SJ Global Defendants Tell FAT Brands that SJ Global WW Had Never Approved the Deal Structure and was Interested in a Direct Deal With FAT Brands.**

128.    On January 27, 2019, FAT's CEO, Wiederhorn, met in Zurich with Douglas and the alleged principals of SJ Global: Peter Samuel, Neil Walsh, Mickey Edison and his wife Debra.

129.    During the meeting, SJ Global claimed that it had never committed in writing or otherwise to PPMT to invest in FAT through its PPMT Fund.  SJ Global further claimed that it did not approve of the deal's structure and would be interested instead in a "direct deal" with FAT.

130.    Douglas knew that these statements were false when issued because the SJ Global Defendants executed the Limited Partnership agreement for the PPMT Fund I, through a Cayman Island entity that SJ Global WW had asked PPMT to create for it.  Additionally, Walsh served as the Managing Director of SJ Global USA, which he had directed PPMT to form for the purpose of enabling SJ Global WW to onshore the funds to be invested into PPMT Fund I.

> **e.    The SJ Global Defendants Transmitted an Apparently Forged Safe Keeping Receipt Purportedly Indicating That the SJ Global Defendants Held $19 Billion in Bearer Bonds Issued by the United States Federal Reserve**

131.    After the Zurich meeting, SJ Global finally agreed to provide FAT Brands with proof that it had sufficient funds to close the transaction in response to FAT Brands' repeated demands for the same for over a month.

132.    Specifically, Kristina Fields, on behalf of the SJ Global Defendants, represented that SJ Global WW was the lawful holder of 38 bearer bonds totaling $19 billion. When transmitting this information internationally through "text message," Ms. Fields proclaimed "These Bonds we have monetized and this is just a taster."

133.    Ms. Fields sent to FAT a purported "Safe Keeping Receipt" from SGS Security & Logistik Gesellschaft (Schweiz) GmbH ("SGS"), for the benefit of "SJ Global Investments." SGS's purported Safe Keeping Receipt purports to verify that SGS is holding "38 Federal Reserve Nominal Value of each Bond USD 500,000,000 (Five Hundred Million USD)" with a "Total Face Value of all 38 Bonds is USD $19,000,000 (Nineteen Billion)."

134.     This alleged Safe Keeping Receipt, a copy of which is attached to the Complaint as **Exhibit**

**B**, is a fraud for a multitude of reasons, including but not limited to the following:

- Two spelling errors appear in SGS's name at the bottom of the first page. Specifically, whoever forged or altered the document, added the letter "c" to "Logistick" and omitted the letter "l" by improperly spelling the name as "Geselschaft." In the header of the document, Security & Logistik Gesellschaft is properly spelled;

- The photograph of the bearer bonds themselves was not provided;

- The Safe Keeping Receipt did not provide the CUSIP number, the interest rate or the maturity date of the bonds;

- There is no printed name of an SGS employee who purportedly signed the Receipt;

- The Federal Reserve has issued multiple warnings about scams "involving high denomination Federal Reserve notes and bonds, often in denominations of 100 million or 500 million dollars." *See, e.g.*, www.newyorkfed.org/banking/ FRBNY_archived_fraud_alerts.html;

- The Federal Reserve never issued bearer bonds in $500 million denominations. *See, e.g.*, www.newyorkfed.org/banking/FRBNY_archived_fraud_alerts.html and https://www.bep.gov/uscurrency/denomsabove100.html;

- The Tax Equity and Fiscal Responsibility Act of 1982 phased bearer securities out of U.S. markets because of their susceptibility to financial crimes, and imposed sanctions and tax penalties that made it difficult to use or deposit such certificates at a U.S. bank;

- The purported $19 billion in bearer bonds do not appear in SJ Global Investment's publicly filed balance sheets.

## IX.     THE SJ GLOBAL CONSPIRACY TO DEFRAUD FAT BRANDS

135.     As even Douglas now admits, the SJ Global Defendants were engaged in a criminal scheme

to harm Plaintiff consisting of issuing a series of misrepresentations regarding the origins,

legitimacy and financial wherewithal of SJ Global WW to fund the FAT transaction.  The SJ

Global Defendants issued these misrepresentations to FAT: i) from August 2018 through January

2019 through their agents and partners Douglas and PPMT and ii) directly to FAT in January 2019.

136.     PPMT and SJ Global WW had represented to Plaintiff that SJ Global WW was funding the transaction from the multi-billion dollar Trust.  Upon information and belief, this Trust did not exist at all, or if it did exist in some form, the SJ Global Defendants had greatly misrepresented its origins and resources.  The SJ Global Defendants intended to replace PPMT by finding a capital source and greatly reducing or eliminating PPMT's share.  Hence, the SJ Global Defendants issued a series of phony excuses to string along the negotiations in the hopes of i) finding a funding source and ii) extracting more concessions from Plaintiff due to the harm caused by the delayed funding.

137.     Upon information and belief, the SJ Global Defendants intended to launder funds by transferring millions of dollars from some foreign source through SJ Global WW then through a web of entities created by PPMT to receive back legitimate dollars earned through Plaintiff.

> **a.    SJ Global WW and Its Partner PPMT Issued a Number of Misrepresentations Regarding the Origins, Legitimacy and Financial Wherewithal of SJ Global WW**

138.     When finally communicating directly with FAT Brands in January 2019, Walsh and Samuel claimed that SJ Global WW served as the private equity arm of the Samuel Jones & Co. family office or trust.  In these conversation, Walsh and Samuel claimed that Walsh served as the Managing Director (or effective CEO) of SJ Global WW and Kristina Field served as the CFO of SJ Global WW.  Samuel was described as the Chairman of the family office or trust (which funded SJ Global WW) or alternately as the Chairman of SJ Global.  Mickey Edison was described as one of the Trustees of the Trust, or alternately as a Board Member of SJ Global WW.

139.     Douglas directed his associate, Onur Tatliadim, to transmit the following false description of SJ Global WW to several banks when trying to open accounts:[2]

---

[2] PPMT transmitted this same description of the origins of SJ Global WW to multiple parties, but never sent it to FAT Brands.  However, the description is relevant to show PPMT's knowledge of SJ Global WW's actions and SJ Global WW's scheme to defraud.

> *PPMT Capital has entered into a fund management agreement with SJ Global Investments, Inc., a Delaware entity that is an administrative agency for Samuel Jones & Co (Holdings). The holding company is a very private family business that evolved from paper and glue manufacturing in the 1800's and early 1900's, to financial services under the guidance of the former chairman David Goldsmith. David Goldsmith died several years ago, and then Peter Samuel was appointed Chairman of the trust. There is not a significant amount of information available publicly about the trust, but here's a link to the origins of the trust.*

> https://protect2.fireeye.com/url?k=4827710b-14369ef6-48275880-0cc47a6a52da-0801f32c700a0cc5&u=https://www.gracesguide.co.uk/Samuel_Jones_and_Co

> *Neil Walsh is the current Managing Director for SJ Global entities worldwide. Neil reports directly to Peter Samuel. He is also the nominee owner and director of SJ Global Investments, Inc. as well as the signatory in all accounts opened. Some of the preliminary KYC material is attached and listed below, please let us know if you need any additional information.*

140.    This link directs to a page from "Grace's Guide," which claims to be "the leading source of historical information on industry and manufacturing in Britain."  Grace's Guide provides a history of "Samuel Jones and Co." from 1810 through 1982 that is inconsistent with the summary set forth in the email.  The Grace's Guide summary does not mention David Goldsmith.  Further, Grace's Guide indicates that back in 1966 that Samuel Jones and Co became part of the Wiggins Tea Group and, in turn, part of Princeton Packing.  The last entry in the Grace's Guide indicates that in 1982 the "firm left the Camberwell area."

141.    The SJ Global Defendants purposefully selected names that implied an association with Samuel Jones, one of the heirs to the Shell Oil Fortune.  For example, SJ Global possesses a 50% ownership stake in Samuel Jones Ltd., an entity formed in October 2018.  The SJ Global Defendants endeavored to create confusion as to their affiliation with the Samuel Jones family to bolster the credibility of their misrepresentations as to their resources and legitimacy.

142.    Walsh and Douglas told Tatliadim that the Trust had in excess of $50 billion in assets. Douglas had told FAT Brands it was an $8 billion trust.

143.    There is a complete lack of publicly available information such as press releases, filings with the Securities and Exchanges Commission or other regulatory agencies to confirm that the SJ Global Trust possessed $8 billion in assets.

144.    The aforementioned representations were false, and Douglas knew them to be false when made, or was willfully blind to their falsity when made.

145.    Certainly, if Douglas had conducted the customary due diligence into the SJ Global Defendants that he had claimed that he had performed he would have learned of the fraud earlier.

       **b**.    **In or around September 2018, PPMT Entered into a Partnership With SJ Global WW under which SJ Global WW Agreed to Serve as the Capital Partner for PPMT's Deals**

146.    On August 15, 2018, Douglas wrote to Walsh, Samuel and Timothy McGarvey from SJ Revolution Capital (an entity apparently related to SJ Global WW) about a potential $1 billion bond purchase from Ezdan Holdings, a real estate entity affiliated with the Royal Family of Qatar. In the email, Douglas references his meeting in London with the "SJ team," which was a "credit to Peter's exceptional organization."

147.    Between August 2018 through November 2018, Douglas flew to London 2-3 times to meet with the SJ Global principals.

148.    By October 2018, Douglas only discussed SJ Global WW as a source of capital for PPMT's deals, and Douglas had stopped discussing Middle Eastern families or the Qatari Royal family.

149.    By the fall of 2018, Douglas proposed real estate and bond transactions with the Qatari Royal family had fallen apart.

150.    Onur Tatliadim, who quarterbacked the FAT Brands deal under Douglas' supervision, never participated in a conversation with a representative of the Al Thani family (in person, by telephone or email) regarding the FAT Brands deal.

151.    As of the fall 2018, SJ Global WW and PPMT had formed a partnership under which SJ Global WW would serve as the capital partner and PPMT would be the general partner.  However the SJ Global Defendants in actuality had exerted tremendous control over the partnership, based upon its supposed provision of the funding desperately needed by Douglas, as evidenced by Neil Walsh being appointed the Managing Director of many of the joint entities created by the Partnership.

152.    As of the fall 2018, Douglas and Tatliadim referred to SJ Global WW as its capital partner when discussing potential deals with people outside of PPMT or SJ Global WW.

      c.    **Over the Course of Months, SJ Global WW And PPMT Formed Entities in Belize, The Cayman Islands and Wyoming to Fund the FAT Brands Transaction in a Tax Advantageous Manner**

153.    Over the course of several months, Douglas spoke on a nearly daily basis with the SJ Global Defendants about establishing a series of entities for the purposes of purportedly investing in Plaintiff, and in other deals originated by Karl Douglas, in a tax advantageous manner.

154.    On September 28, 2018, Douglas wrote to Samuel, Walsh and others to confirm their discussion about forming a "new Belize entity" to "become the 50/50 joint venture between SJG and PPMT."  Douglas suggested the name "SJG PPMT Holdings 1 Limited."

155.    In his September 28, 2018 email, Douglas advised that SJG PPMT Holdings 1 Limited will be utilized for the $60 million credit facility for FAT Brands plus the investment of an additional $150 million by SJ Global WW into two other deals.  Douglas and Walsh discussed forming other entities for other deals.

156.    PPMT and SJ Global WW created an extremely byzantine labyrinth of entities – including multiple offshore entities located in tax havens – to minimize the amount of United States taxes owed.

29

157.    At SJ Global's direction, PPMT arranged for these entities to be formed, and PPMT's offices were designated as the headquarters for the entities.

158.    None of these entities were ever funded, and never engaged in any activities, except for serving as an instrumentality of the Defendants' fraud.

159.    Under the originally contemplated structure, SJ Global WW directed PPMT to form an entity called SJ Global Investments, Inc. to make the capital contributions into PPMT Fund I LP as the remittance agent for SJ Global WW.

160.    PPMT Fund I LP is the entity that signed the Credit Agreement with FAT Brands.  Douglas purported to operated PPMT Fund I LP out of PPMT's New York office.  However, the entity was never funded and the entity is now defunct.

161.    PPMT and SJ Global WW determined for tax reasons that a Wyoming entity, SJ Global Investments, Ltd. (Wyoming), should serve as SJ Global WW's remittance or transfer agent to allow SJ Global WW to onshore funds to an entity owned or controlled by it before funding PPMT Fund 1 on behalf of SJG PPMT Holdings 1 LTD.

162.    In December 2018, Neil Walsh, as the Managing Director of SJ Global WW, requested that PPMT form SJ Global Investments, Ltd. on the behalf of SJ Global WW.

163.    As an accommodation to SJ Global WW, Onur Tatliadim originally was identified as the incorporator or primary interest holder in SJ Global Investments, Ltd. and in other entities, to facilitate the opening of bank accounts in the United States.  Walsh had demanded that he be listed as the Managing Director and that the shares be transferred to him after the banks had completed their diligence.

### d. The SJ Global Defendants Had Been Actively Involved in Negotiating and Reviewing the FAT Brands Deal Since At Least September 2018

164. The SJ Global Defendants' claims raised in Zurich that they had not approved investing in FAT Brands through PPMT's Fund, and that the deal terms had only been presented to them recently were false. Rather, the SJ Global Defendants had been directing Douglas to commit to the FAT Brands deal since September 2018 and had promised Douglas to fund the deal.

165. On September 28, 2018, Douglas wrote to Walsh, Samuel and others to discuss SJ Global WW investing $60 million in FAT Brands, in addition to $150 million in two other projects.

166. On September 28, 2018, Douglas furnished links to DropBox folders containing FAT Brands' sensitive financial information and business plans to SJ Global WW to enable it to perform due diligence on the proposed $60 million loan to FAT Brands. Douglas explained that "full due diligence has been completed by my team, third party domain experts and the legal teams."

167. On September 28, 2018, Douglas advised SJ Global that PPMT had retained the law firm of Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") to review the "legal documents for the FAT Brands closing" because of its "particular expertise in whole business securitizations."

168. On September 28, 2018, Plaintiff's counsel in New York delivered to Kramer Levin in New York the first draft of a complicated credit agreement that the law firms had been negotiating for weeks with instructions from Douglas.

169. On September 28, 2018, Douglas advised Walsh and Samuel that a member of SJ Global's legal team could liaise with Kramer Levin "on SJ's behalf as a 'check the box' review."

170. On September 28, 2018, Douglas advised Walsh and Samuel that: "Our general process is to have the other side pay their lawyer to draft documents along the agreed terms. Drafting is the more expensive component. Our counsel review [sic.] and comment to make sure the documents conform to our agreed terms and structure."

171.    On September 29, 2018, Walsh responded that "I agree with you on your general process to have the other side pay their lawyer to draft documents along the agreed terms."

172.    Kramer Levin billed $250,000 to PPMT for its role in reviewing the documents, and the revisions thereto, that Douglas and SJ Global WW demanded to be made to the transaction documents.

173.    On October 15, 2018, Douglas told the SJ Global Defendants that the FAT Brands transaction will be ready close by October 29th.

174.    On October 31, 2018, Douglas told Walsh "I have FAT Brands with a boot on my neck bro."  Douglas further warned that there "will be major issues if we cannot close" because "PPMT had made commitments to do these deals based on Samuel's word."  Douglas stated that PPMT relied on Samuel having "committed to close" by September 29th.

175.    On November 1, 2018, Douglas told Walsh in a voicemail that his response to his message that he would speak with Samuel was "bizarre."  Douglas forewarned "if we don't close we are going to have a lawsuit" because PPMT had "made representations to FAT based on" PPMT's dealings with SJ Global.  Douglas further estimated that FAT Brands had probably spent $300,000 in legal fees.

176.    Douglas met with Walsh, Samuel and other members of SJ Global WW on or around November 12, 2018 in London to discuss the FAT Brands transaction and other investments being negotiated by SJG PPMT Holdings.

177.    In November 2018, SJ Global WW told PPMT that it wished to expand the FAT Brands transaction to also provide for the purchasing of $40 million in stock in FAT based upon the belief that the loan will inflate the value of the stock.

178.    At Walsh's instruction, PPMT negotiated at a meeting held in New York with FAT Brands the purchase of $40 million in equity.

   **e.    Before PPMT Signed The FAT Brands Transaction Documents in December 2018, Walsh Told PPMT That SJ Global WW Will Imminently Wire The $100 Million to a US Entity**

179.    On December 17, 2018, Douglas told FAT Brands that to "not worry, it's funding next couple days 100%."

180.    On numerous occasions before the scheduled December closing, Walsh and Samuel told PPMT that SJ Global will wire $100 million to a US bank account to fund PPMT Fund 1.

181.    Walsh and Samuel made these statements with knowledge of the scheduled closing.

182.    When FAT raised PPMT's failure to fund, Walsh directed Douglas to threaten to terminate the deal and embroil FAT Brands in an expensive and protracted litigation with an $8 billion fund.

   **f.    After the Botched Closing, SJ Global WW Proffers False Statements to Stall for More Time**

183.    In the weeks before and after the scheduled closing, SJ Global WW directed PPMT to tell FAT Brands that a $100 million wire or a $250 million wire will arrive in an entity in the United States imminently.  On each occasion, the funds were not wired.

184.    Upon Douglas revealing its identity, SJ Global WW then claimed that the closing had to be delayed because its lawyers had not had the opportunity to review the transaction documents.

185.    These claims were false as the SJ Global Defendants repeatedly promised that the $100 million was in the process of being wired to the PPMT Fund to finance the FAT Brands transaction. Additionally, PPMT Capital had been forwarding files of information to SJ Global since September 2018 and had authorized SJ Global to liaise directly with its counsel, Kramer Levin.

186.    Tellingly, when Plaintiff's counsel called SJ Global's counsel at PPMT's invitation, Walsh left a voicemail message for Tatliadim threatening that the deal will be terminated if anybody were to call SJ Global's counsel without his explicit advanced approval.

g.    **The SJ Global Defendants Referred to Michael J. Edison by the Alias Mickey Eddison to Conceal His True Identity**

187.    After the Zurich meeting, FAT discovered that "Mickey and Debra Eddison" were truly Mickey and Debra Edison – two US felons convicted for operating an investment fraud scheme and then conspiring to obstruct justice through the fabrication of documents.

188.    On October 14, 2008, Mickey Edison pled guilty in the United States District Court for the Northern District of California to two counts of mail fraud, three counts of wire fraud, a charge for the conspiracy to obstruct justice and obstruction of justice.  Edison was convicted of engaging in two different schemes involving his making of false statements to his victims about providing financial services for them, and once obtaining his victims' money using the money for himself. Edison stole more than $2.4 million dollars.

189.    After Mickey Edison was arrested for his investment schemes, he wrote from prison to his wife Debra, who was in Zurich, in a letter which started with the words, "Read and Destroy."  The letter provided detailed instructions on how Debra, while remaining in Zurich, should fabricate certain documents to make it appear that one of the victims had loaned to Mickey Edison the money he was then indicted and ultimately convicted for stealing.

h.    The SJ Global Defendants' False Claims to Their Holding of $19 Billion in Bearer Bonds Powerfully Confirms Their Conspiracy to Defraud

190.    The SJ Global Defendants' criminal scheme to defraud is powerfully confirmed by their act in transmitting to FAT Brands phony documentation to support their outrageously false claim to possessing $19 billion in bearer bonds issued by the United States treasury.

191.    Neil Walsh was one of the architects of this conspiracy.  He perpetrated a number of overt acts in furtherance of the conspiracy including but not limited to: i) issuing numerous false misrepresentations to PPMT, FAT Brands, other companies and financial institutions regarding the origins, legitimacy and finances of SJ Global; ii) directing PPMT to open a number of entities in the US (to be headquartered within PPMT's offices) to further this scheme; iii) appointing himself as the Managing Director of these entities; and iv) directing the opening of bank accounts in the names of these entities which were never funded.

192.    Peter Samuel played an integral role in this scheme since its inception by falsely claiming to serve as the Chairman of a Trust that had $8 billion in assets under management (or up to $50 billion in assets as told to Onur Tatliadim).  Samuel participated in regular communications with Douglas and Walsh over the course of months in furtherance of this scheme.

193.    Kristina Fields, as the CFO of SJ Global, actively participated in this scheme since its inception, and stood to benefit tremendously if the scheme was accomplished as the part owner of SJ Global WW.  Ms. Fields confirmed her integral role in the scheme by transmitting the forged document relating to the purported $19 billion in bearer bonds. Ms. Fields, as SJ Global's CFO, advised Walsh on the structuring of the deals and the negotiations with PPMT and FAT Brands.

194.    Mickey Edison played an integral role in the scheme since at least October 2018.  Edison served as a financial advisor to the other SJ Global Defendants and advised on deal terms relating to the FAT Brands transaction and other transactions.  Edison also issued false representations

directly to FAT and PPMT, and encouraged, solicited and participated in the other SJ Global Defendants issuing false representations to FAT and PPMT regarding the bona fides of SJ Global and the Samuel Jones Trust along with proffering patently false excuses for the repeated delaying of the closing of the transaction.

195.    The fraud perpetrated by Edison, Samuel, Walsh and Fields is imputed to SJ Global WW and SJ Global USA.  Additionally, SJ Global USA is the alter ego of SJ Global WW. SJ Global USA was never funded.  SJ Global USA existed solely for the purpose of allowing SJ Global WW to represent that it was opening bank accounts in the United States for the purpose of onshoring funds that did not actually exist.  Hence, SJ Global USA existed solely as an instrumentality of the SJ Global Defendants' fraud.

### i.    At a Minimum, Douglas Was Willfully Blind to the SJ Global Defendants' Conspiracy to Defraud Based Upon His Professed Financial Sophistication and Deep Relationships with SJ Global WW for Many Months

196.    Douglas now claims that the SJ Global Defendants made "countless misrepresentations to PPMT" and that the SJ Global Defendants conspired with each other to harm FAT (D.E. 89, ¶19). Douglas has alleged that he was unaware of the "fraudulent nature of SJ Global" until February 2019 when SJ Global presented "fake US Treasury Bonds" which Douglas reported to "the Secret Service of the United States Treasury as well as UK regulatory authorities."

197.    As set forth below, these claims are incredible given Douglas' own misrepresentations as well as Douglas' deep and long-term relationship with the SJ Global Defendants.

198.    Douglas claims that PPMT had no reason to suspect the SJ Global Defendants' fraud before February 2019 despite Douglas having performed reasonable and customary due diligence upon SJ Global (*See, e.g.*, D.E. 89, ¶133).  These claims are false.

199.    Douglas' protestations of ignorance are not tenable given: i) his touted sophistication and decades of experience in the financial services industry: ii) his extensive dealings with SJ Global WW over more than a 6 month period; iii) his agreement to rely upon SJ Global WW as the exclusive capital partner of PPMT formed back in or around September 2018; iv) his alleged reliance upon SJ Global WW to purportedly fund more than $1 billion in investments into 4 separate deals; and v) SJ Global WW's failure to ever fund a deal or to provide proof of funds.

200.    Douglas was aware back in September 2018 of all of the red flags for fraud that raised concerns for FAT Brands and others in January 2019 including the sketchy, uncorroborated and implausible claims as to how SJ Global WW controlled up to $50 billion in assets.

201.    As an experienced and sophisticated financial professional, Douglas should have been alarmed by SJ Global's extreme demands for secrecy.  For example, when one energy company asked Douglas in January 2019 for more information on SJ Global WW, or their source of funds, Douglas refused to reveal more information.  Specifically, Douglas responded "The source is the fund, which is PPMT Fund LLC.  SJ is our limited LP, and that shouldn't be mentioned.  In addition to privacy concerns, SJ never releases financials, so it's a dead end.  The fund can provide financials if it comes to that."

202.    Besides FAT Brands, PPMT extensively negotiated several other deals that fell apart just before signing because SJ Global WW did not fund the deal or refused to furnish due diligence information.  Nevertheless, Douglas continued to press forward with his partnership with SJ Global WW, either because he was their co-conspirator or because he was blind to the wrongdoing due to his financial duress.

203.    On January 29, 2019, Douglas wrote to Edison and Samuel to congratulate them on the "well architected negotiation" they conducted in Zurich.  Douglas wrote that "Buffet himself

couldn't have done better."  These statements are incredible in light of Douglas' knowledge that

Edison and Samuel lied when claiming in Zurich that SJ Global WW had never committed to

investing in FAT Brands through the PPMT fund.

204.    In the same email, Douglas addressed SJ Global WW's purported interest in doing a deal

directly with FAT:

> As you're aware, doing this deal outside of the fund structure essentially means I'm losing
> $2M per year in much needed revenue as well as 50% carried interest as was agreed with
> Peter when we started the process.  In fact originally I was a 50% shareholder in the Belize
> holding company.  We elected to go down the fund route.  We have a large and costly
> origination platform that allows us to be highly selective.  FAT Brands was selected after
> careful review of hundreds of opportunities.  The cost of origination is high when your
> selection rate is 1%.  We spent six months and over $300,000 in legal to procure and
> prepare this transaction for SJ.  Had we known back in October when we met, that this deal
> would not be in the fund, we'd have opted to go another route.  Clearly at this late stage,
> our options are limited.
>
> All that being said, and despite the significant change, we see the value of the SJ Global
> client relationship, and I personally have a "lot of love" for brother Peter.  So we look
> forward to developing this relationship…

205.    This email thread confirms that Douglas was willing to continue with the SJ Global WW

relationship with knowledge of their willingness to lie to FAT Brands.

206.    Only after FAT Brands and others began raising questions about the suspicious documents

transmitted by Fields purportedly showing SJ Global WW held $19 billion in bearer bonds did

Douglas purportedly report SJ Global WW to the authorities in the United States and in England.

In short, Douglas only acted to disassociate himself from the SJ Global WW fraud after: i) learning

that SJ Global WW was trying to squeeze him out of any deal; and ii) SJ Global WW's fraud had

been uncovered by others.

## X.    RAMJEET'S RESPONSIBILITY FOR DOUGLAS' AND PPMT'S ACTIONS

207.    As set forth below, and in Claims for relief IX – XI, Ramjeet bears responsibility for

Douglas' and PPMT's wrongdoing because: i) As Douglas' "partner," Ramjeet agreed to

subsidize, promote and legitimize Douglas' operation of PPMT as a company within the PPMT Family of companies in exchange for Douglas agreeing to remunerate Ramjeet if PPMT closed any of its lucrative deals; ii) Ramjeet knew of Douglas' reckless behavior in entering into a partnership with SJ Global WW; iii) Ramjeet knew of Douglas' financial duress: iv) Ramjeet held himself out generally, and to FAT Brands in particular, as exercising supervisory authority over Douglas, in his role as the Chairman of the PPMT Family of companies and v) Ramjeet personally participated in the wrongdoing by corroborating Douglas' misrepresentations made at a meeting with FAT Brands.

208.    Mr. Ramjeet is the founder and CEO of a number of companies within the PPMT family of companies such as PPMT Strategic Group, Inc., PPMT Medtech Partners I, LLC, PPMT Strategic Group LLC, Profit Planners Management, Inc. and Profit Planners, Inc.

209.    Ramjeet advertises on the PPMT Strategic Group, Inc. website that he "has over 20 years of experience in Accounting, Taxation and Business Advisory, with specialized focus of SEC consulting, and M&A, Integration, Budgeting and Financial management."

210.    PPMT Strategic claims to be a business and accounting consultancy geared towards both entrepreneurs raising capital and family offices seeking investment opportunities.

211.    Ramjeet also claims to be the Chairman of 3A Media, Inc., Golden Age Medical, MicroCap Review, Inc. and on the Board of Directors of several other companies.  Ramjeet also claims that he is a Founding Member of the Board of Directors of the Universal Hip Hop Museum alongside multiple celebrities.

212.    Upon information and belief, Ramjeet and Douglas had known each other since at least around 2010 and had worked together under the PPMT umbrella since around 2014.  At first, Douglas worked as a consultant to PPMT Strategic Advisors, an entity operated by Ramjeet.

213.    Upon information and belief, Ramjeet knew that Douglas had been facing severe financial difficulties for many years before filing for personal bankruptcy protection in September 2017.

214.    In July 2017, Ramjeet helped Douglas form PPMT.

215.    Ramjeet allowed Douglas to attempt to legitimize PPMT by representing it to be part of the PPMT family of companies.

216.    Ramjeet was appointed the Treasurer and CFO of PPMT upon its formation.

217.    On October 4, 2018, Douglas told Walsh that Ramjeet was a partner in PPMT.

218.    Ramjeet allowed Douglas to display photographs of Ramjeet on PPMT Capital's website and on its social media accounts.

219.    Ramjeet allowed Douglas to create a website for PPMT that was very similar in design to the websites belonging to the other PPMT Companies.

220.    Although Karl Douglas did not appear by name on the PPMT Strategic Website (undoubtedly due to his bankruptcy), Douglas is featured in multiple photographs across the website.

221.    Ramjeet also caused media publications controlled by him to publish articles about investing authored by Douglas to promote Douglas.  For example, Stock News Now, which lists Wesley Ramjeet as its CFO, published an article by Douglas on family office investing.  Further, Microcap Review, which was registered by Ramjeet and is a stock news publication, featured articles authored by Douglas.

222.    Ramjeet provided PPMT with several offices located within office space that Ramjeet had leased at 1001 Avenue of the Americas for the PPMT entities operated by Ramjeet.

223.    Ramjeet agreed to participate in meetings scheduled by Douglas with PPMT's prospective clients to accredit Douglas and to make his operation appear more substantial.

224.    On an almost daily basis, Ramjeet discussed with Tatliadim, PPMT's Managing Director, the status of PPMT's negotiations with SJ Global WW, FAT Brands and other projects.

225.    On an almost daily basis, Ramjeet discussed with Douglas the status of PPMT's negotiations with SJ Global WW, FAT Brands and other projects.

226.    Ramjeet knew that PPMT had severe financial difficulties from its inception in July 2017 due to its failure to have closed any deals.

227.    After Douglas hired Mr. Tatliadim as an independent contractor in or around September 2017, PPMT bounced three checks issued to Mr. Tatliadim in November and December 2017.

228.    During the relevant time period, Mr. Tatliadim was the only employee or independent contractor who regularly reported to work for PPMT Capital.

229.    In April 2018, PPMT stopped making its scheduled bi-monthly payments to Mr. Tatliadim.

230.    In the second half of 2018, Mr. Douglas asked Mr. Tatliadim for personal loans.

231.    Ramjeet knew that Douglas had not paid Mr. Tatliadim and had asked him for loans.

232.    Ramjeet knew that the representation on PPMT's website that PPMT had originated $300 million in deals was false and misleading.  It would have been quite miserly of Douglas to bounce checks to Tatliadim in the fall of 2017, and to stop paying him wages altogether in April of 2018, if PPMT had originated $300 million in deals after its July 2017 formation.

233.    Ramjeet also knew that the representations on PPMT's website that PPMT had current "mandates" to invest more than $450 million were misleading.   During Mr. Tatliadim's employment, PPMT never had any firm commitment or agreement to invest or manage money from anyone other than SJ Global WW, who by Douglas' own admission lacked the funds.

234.    In exchange for Ramjeet's legitimizing and subsidizing PPMT, Douglas and Ramjeet worked out a deal by which Douglas would compensate Ramjeet if PPMT closed any deals.

235.   Upon information and belief, Ramjeet and Douglas had agreed that if Douglas struck any deals with the Royal Family of Qatar or SJ Global WW to invest up to $1 billion that Douglas (who stood to make tens of millions of dollars if such deals were real) would hire one or more of Ramjeet's entities to provide services on the deal and pay Ramjeet a commission or fee.

236.   Ramjeet knew that PPMT had entered into a partnership with SJ Global WW under which SJ Global WW purported to serve as the sole capital partner for PPMT's deals.  Given Ramjeet's financial sophistication, Ramjeet knew or should have known that Douglas' conduct in dealing with SJ Global WW was reckless.

237.   Douglas told Walsh that Ramjeet's uncle, Oscar Ramjeet, was the former Solicitor General of Belize, and that Ramjeet can use his connections to assure that PPMT and SJ Global are able to set up their entities in Belize for the purpose of investing in FAT in a tax advantageous manner.

238.   On or about September 12, 2018, Wiederhorn met with Ramjeet, Douglas and Tatliadim at PPMT's office to discuss the proposed FAT Brands transaction.

239.   With Ramjeet's knowledge and consent, Douglas included Ramjeet in the meeting to lend credibility to Douglas and PPMT.

240.   During the meeting, Douglas presented Ramjeet as the Chief Executive Officer of the PPMT family of companies.

241.   During the meeting, Ramjeet, by his actions, words and acquiescence to Douglas' statements, conveyed to Wiederhorn that Ramjeet, as the head of the PPMT family of companies, exercised supervisory authority over PPMT, including with respect to the FAT Brands transaction.

242.   During the meeting, Ramjeet corroborated Douglas' boasts that he had procured a firm commitment from the Royal Family of Qatar to invest in FAT Brands and in other deals.

243.    During the meeting, Ramjeet corroborated Douglas' claims that PPMT's client investing in PPMT's deals had more than $8 billion in assets.

244.    Ramjeet knew or should have known that these statements were false and misleading.

### XI.    THE DEFENDANTS ARE LIABLE FOR THE INFLICTION OF MILLIONS OF DOLLARS IN DAMAGES UPON FAT

245.    The Defendants knew at all times that their misconduct would inflict millions of dollars in damages upon FAT.  In August 2018, FAT had paid $100,000 to PPMT to enable PPMT to perform due diligence by reviewing FAT's sensitive financial information and business plans.

246.    Nevertheless, the Defendants wantonly inflicted the following damages upon FAT:

- Payment of $100,000 diligence fee to PPMT;

- Payment of nearly one million dollars to the law firm of Loeb & Loeb LLP to: i) advise on the structure of the PPMT deal and prepare the transaction documents; ii) represent FAT with respect to its existing lender, JMB Lending, in the planned early termination of its $20 million credit facility to be replaced by PPMT and with respect to JMB Lending calling defaults caused by PPMT's failure to fund; iii) representing FAT in procuring an emergency new credit facility in January 2019 from the Lion Fund;

- Fees and penalties paid to JMB Lending including: i) a prepayment penalty of $1.36 million, ii) an upfront waiver fee of $80,000, iii) a deferred waiver fee of $400,000, iv) JMB's $80,000 legal bill; and v) default interest at 20%, instead of the normal 15% rate, on a $16 million loan for 3-4 months, or about $800,000;

- FAT paid $100,000 to the Lion Funds as a "Work Fee" and $135,000 to Latham and Watkins as Lion's outside counsel;

- Millions of dollars in damages due to FAT's inability to refinance high-cost borrowings, and the imposition of higher cost borrowings due to the fraud. PPMT Fund had contracted to lend money to FAT at a 10% interest rate, which was significantly lower than the 15% interest charged by JB Lending. Instead, FAT paid 20% default interest to JMB Lending from October through January and subsequently FAT has been paying 20% interest to Lion.

- With the accelerated repayment of the JMB Loan, FAT recognized approximately $944,000 non-cash expenses related to the accelerated amortization of the debt discount and accelerated amortization of debt offering costs. While these are non-cash expenses,

they represent approximately $0.08 in earnings (loss) per share on FAT's financial statements.

• Millions of dollars in lost profits due to the nine month delay in FAT's ability to buy Elevation Burger and the lost opportunity to buy another well-known brand. PPMT's LOI acknowledged that the purpose of the funding was, in part, to enable FAT's acquisition of other brands.

• Tens of millions dollars due to a precipitous decline in the value of FAT's 11.5 million shares of stock. After signing the binding Letter of Intent, FAT announced during an August 2018 Earnings Call its anticipation that it would be procuring new and cheaper financing by October. By September 12, 2018, FAT's stock had risen in value by more than $2 per share to $9.20 per share. During a November 7, 2018 Earnings Call, FAT was grilled by investors about the lack of new financing, as FAT's stock had dropped to $6 per share due to the failure to procure the financing by the end of September as originally planned. During the November 2018 Earnings Call, FAT stated (based on the Defendants' misrepresentations) that "we are actively in the middle of an additional financing that will significantly lower our cost of capital. We hope to close that very soon." Predictably, when the new financing was not procured, and then FAT instead entered into a higher interest rate loan on a temporary basis, FAT's stock price nosedived to $4.24 per share.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF THE DUTY TO NEGOTIATE IN GOOD FAITH
### AGAINST PPMT

247. FAT repeats and realleges the factual allegations set forth in the above paragraphs as if fully set forth herein.

248. FAT Brands and PPMT entered into a valid and binding contract, i.e., the Letter of Intent ("LOI").

249. FAT Brands performed any and all of its obligations under the LOI that were a precondition to PPMT's performance of its obligations under the LOI.

250. PPMT requested that FAT Brands prepare complex and lengthy transaction documents to consummate an alleged $100 million financing while the parties were bound to a "standstill" and period of exclusivity. PPMT then extended the period of exclusivity.

251.    FAT Brands fulfilled its obligations to negotiate in good faith including by paying hundreds of thousands of dollars in legal fees to draft definitive documents, which were executed by the parties, and by engineering a complex restructuring of FAT at PPMT's insistence.

252.    As Douglas had admitted to Walsh back on November 1, 2018, PPMT had "committed" to the FAT Brands deal and had induced FAT Brands to spend hundreds of thousands of dollars in legal fees based upon PPMT's representations.

253.    In a recorded phone call in November 2018, PPMT told FAT Brands, after the parties' counsel had exchanged multiple revisions of a complicated credit agreement, that FAT Brands and PPMT are in complete agreement on all business terms relating to the $60 million loan.

254.    FAT Brands' deal with PPMT did not close solely due to the fact that PPMT's fund had no ability to fund the transaction.

255.    PPMT failed to negotiate the consummation of the transaction in good faith by misrepresenting the identity and wherewithal of the "client" supposedly funding the transaction.

256.    PPMT's failure to negotiate in good faith has damaged FAT Brands and prevented it from receiving the benefit it was to receive under the LOI.

257.    PPMT's failure to negotiate in good faith caused FAT Brands to suffer significant out of pocket, benefit-of-the-bargain and consequential damages.

## COUNT II
## PROMISSORY ESTOPPEL
## AGAINST THE PPMT DEFENDANTS

258.    FAT Brands repeats and realleges the factual allegations set forth in the above paragraphs as if fully set forth herein.

259.    The PPMT Defendants issued sufficiently clear and unambiguous promises that its supposed client had the wherewithal to fund the $100 million financing and had firmly committed to the transaction.

260.    PPMT reassured FAT Brands in a November 2018 call that the parties had agreed on all business terms relating to the $60 million loan, with the only remaining condition to funding was the lawyers resolving certain technical legal terms.

261.    FAT Brands reasonably relied upon these false promises to its detriment.

262.    FAT Brands suffered injury caused by the reliance.

**COUNT III**
**FRAUD AND CONSPIRACY TO COMMIT FRAUD**
**AGAINST THE PPMT DEFENDANTS**

263.    FAT repeats and realleges the factual allegations set forth in the above paragraphs as if fully set forth herein.

264.    Douglas recklessly and/or deliberately issued a number of false statements of material facts to induce PPMT to enter into the Letter of Intent, and then to cause FAT to exclusively bargain with PPMT for more than four months while spending hundreds of thousands of dollars in legal fees to prepare lengthy agreements and to restructure FAT.

265.    Douglas issued materially false statements of fact, and omitted material facts, regarding PPMT's ability and resources to fund the $100 million transaction, including: i) PPMT's procurement of a firm commitment from the Royal Family of Qatar to invest with PPMT; ii) the availability of $100 million to fund the investment into FAT; iii) concealing that the true proposed counter party to the transaction was SJ Global WW; iv) that Douglas had conducted customary due diligence upon SJ Global WW which confirmed SJ Global WW's ability to fund the $100

million transaction and SJ Global's trustworthiness as a business partner; and v) that Douglas had obtained a firm and binding commitment from SJ Global WW to fund the $100 million transaction.

266.    Douglas also fraudulently concealed from FAT that he was a bankrupt that owed more than $5 million in taxes due to his failure to have paid taxes for a decade.   Douglas also actively misrepresented his qualifications and background.   Douglas was sufficiently sophisticated to know that such information was highly material to FAT's decision to enter into a Letter of Intent with PPMT and to negotiate exclusively with PPMT and Douglas for four months.

267.    Douglas bears responsibility for the torts perpetrated by Royal Gulf and PPMT based on his participation in their wrongdoing while serving as officers and agents of those entities operated out of PPMT's offices.   Likewise, Douglas' fraud is imputable to PPMT and Royal Gulf.

268.    Douglas and PPMT Capital are liable for the fraudulent misrepresentations made by the SJ Global Defendants to FAT Brands, both directly and through PPMT, when PPMT and Douglas were acting as agents for the SJ Global Defendants.

269.    Douglas and PPMT conspired with the SJ Global Defendants.

270.    Douglas knew by November 1, 2018 that the SJ Global Defendants' claims regarding their intent and ability to fund the FAT Brands deal themselves were false and if exposed would subject PPMT to liability.   Nevertheless, Douglas continued to perpetrate the scheme for three more months.

271.    The PPMT Defendants knowingly made false affirmative misrepresentations and intentional omissions of material fact to FAT Brands.   The PPMT Defendants "had a duty to disclose the concealed material facts because Douglas and PPMT: i) had superior knowledge with respect to the true circumstances; and ii) knew that their misrepresentations to FAT were materially misleading absent the omitted information.

272.    The PPMT Defendants made material misrepresentations and omissions of facts to FAT Brands which were reckless as to their veracity, were made with gross disregard as to Plaintiff's reliance on them and Plaintiff did in fact justifiably rely on them.  Their refusal to see the obvious, or their reckless failure to investigate the doubtful, was sufficiently gross to furnish evidence leading to an inference of fraud so as to impose liability.

273.    By reason of the above, Plaintiff is entitled to an award of compensatory, consequential and benefit-of-the-bargain damages in an amount to be determined at trial.

274.    The aforementioned acts were done maliciously, oppressively and with an intent to defraud, and Plaintiff is entitled to punitive damages in an amount to be determined at trial.

### COUNT IV
### FRAUD AND CONSPIRACY TO COMMIT FRAUD
### AGAINST THE SJ GLOBAL DEFENDANTS

275.    FAT repeats and realleges the factual allegations set forth in the above paragraphs as if fully set forth herein.

276.    As set forth above, the SJ Global Defendants were involved in a criminal conspiracy to harm FAT.

277.    The SJ Global Defendants, as the principals, directed their agents, Douglas and PPMT, to issue the aforementioned fraudulent misrepresentations of fact, and material omissions, regarding the supposed "client" behind PPMT's fund supposedly transacting with FAT Brands.

278.    The SJ Global Defendants made fraudulent misrepresentations of fact regarding their ability to fund the $100 million transaction with FAT Brands, both directly to FAT Brands and through the PPMT Defendants, including but not limited to the presentation of $19 billion in phony bearer bonds.

279.    The SJ Global Defendants conspired with each other to defraud FAT Brands.

280.    The SJ Global Defendants conspired with Douglas and PPMT to defraud FAT Brands.

281.    The SJ Global Defendants knowingly made false affirmative misrepresentations and intentional omissions of material fact.  The SJ Global Defendants had a duty to disclose the concealed material facts because they: i) had superior knowledge with respect to the true circumstances; and ii) knew that their misrepresentations to FAT were materially misleading absent the omitted information.

282.    The SJ Global Defendants made material misrepresentations and omissions of facts to FAT Brands which were reckless as to their veracity, were made with gross disregard as to Plaintiff's reliance on them and Plaintiff did in fact justifiably rely on them.  The SJ Global Defendants' refusal to see the obvious, or their reckless failure to investigate the doubtful, was sufficiently gross to furnish evidence leading to an inference of fraud so as to impose liability.

283.    By reason of the above, Plaintiff is entitled to an award of compensatory and consequential damages in an amount to be determined at trial.

284.    The aforementioned acts were done maliciously, oppressively and with an intent to defraud, and Plaintiff is entitled to punitive damages in an amount to be determined at trial.

**COUNT V**
**AIDING AND ABETTING FRAUD**
**AGAINST DOUGLAS AND PPMT**

285.    FAT repeats and realleges the factual allegations set forth in the above paragraphs as if fully set forth herein.

286.    PPMT and Douglas had actual knowledge of SJ Global's scheme to defraud.

287.    PPMT and Douglas knowingly aided SJ Global's scheme to defraud by vouching for their ability to fund the transaction and by concealing their true identity for four months.

288.    Douglas' and PPMT's aiding and abetting fraud was a substantial factor in bringing about the injury and loss discussed above.

289.    The PPMT Defendants' conduct in aiding and abetting the SJ Global Defendants' fraud was intentional, malicious and undertaken in willful disregard of Plaintiff's rights.

## COUNT VI
## NEGLIGENT MISREPRESENTATION
## DOUGLAS AND PPMT

290.    FAT repeats and realleges the factual allegations set forth in the above paragraphs as if fully set forth herein.

291.    Douglas and PPMT were negligent and careless in representing to FAT Brands the wherewithal and commitment by their unidentified client to fund the $100 million transaction.

292.    Douglas and PPMT had superior knowledge as to the identity of their unidentified client and knew that FAT Brands was relying upon the veracity of their representations regarding their unidentified client.

293.    At the time that Douglas and PPMT made these negligent misrepresentations, they had induced FAT Brands to agree to exclusively negotiate with PPMT for the completion of the transaction, and FAT Brands was incurring hundreds of thousands of dollars in legal fees in detrimental reliance upon the accuracy of the PPMT Defendants' supposedly good faith representations.

294.    Accordingly, Douglas and PPMT had the duty to provide accurate and truthful information to FAT Brands.

295.    By reason of the above, Plaintiff is entitled to an award of compensatory damages in an amount to be determined at trial.

## COUNT VII
## TORTIOUS INTERFERENCE WITH FAT'S CONTRACT
## WITH ITS SECURED LENDER UNDER CALIFORNIA LAW
## AGAINST THE PPMT AND SJ GLOBAL DEFENDANTS

296.    FAT repeats and realleges the factual allegations set forth in the above paragraphs as if fully set forth herein.

297.    At all relevant times, there has been a valid agreement between FAT Brands and FB Lending, a California entity.  Both FAT Brands and FB Lending were headquartered in California.

298.    The PPMT Defendants and SJ Global Defendants at all relevant times knew of the agreement between FAT Brands and FB Lending.  The PPMT Defendants had falsely represented to FAT that the PPMT Fund would replace the FB Lending loan and become the first secured lien holder of FAT's assets.

299.    Defendants' misconduct interfered with and disrupted Plaintiff's performance of its contract with its existing secured lender, and rendered FAT's performance to be more expensive and burdensome.

300.    By reason of the above, Plaintiff is entitled to an award of out-of-pocket and consequential damages in an amount to be determined at trial.

## COUNT VIII
## BREACH OF IMPLIED WARRANTY
## PPMT DEFENDANTS

301.    FAT repeats and realleges the factual allegations set forth in the above paragraphs as if fully set forth herein.

302.    By purporting to make contracts, guarantees and representations on behalf of Royal Gulf, SJ Global, and the Al Thani family, that Douglas and PPMT were not authorized to make, Douglas and PPMT provided an "implied warranty of authority to [FAT] and [are] subject to liability to [FAT] for damages for loss caused by breach of that warranty, including loss of the benefit

expected from performance by the" purported principals.  *See* Restatement Third of Agency §6.10, "Agent's Implied Warranty of Authority."

303.    By reason of the above, Plaintiffs are entitled to an award of out-of-pocket, benefit-of-the-bargain and consequential damages in an amount to be determined at trial.

**COUNT IX**
**LIABILITY UNDER A PARTNERSHIP AGREEMENT**
**AGAINST WESLEY RAMJEET**

304.    FAT repeats and realleges the factual allegations set forth in the above paragraphs as if fully set forth herein.

305.    Upon information and belief, Ramjeet and Douglas entered into a partnership concerning Douglas' operation of PPMT.

306.    PPMT and Douglas committed the following torts against FAT Brands: breach of the duty to negotiate in good faith, promissory estoppel, fraud, aiding and abetting fraud, negligent misrepresentation, tortious interference with contract and breach of implied warranty.

307.    Based upon their partnership agreement, Ramjeet is personally responsible for the torts perpetrated by Douglas.

308.    Douglas told SJ Global WW that Ramjeet was his "partner" in PPMT.

309.    Additionally, Ramjeet  personally participated in the commission of these torts because he issued fraudulent misrepresentations to FAT Brands during a meeting held at PPMT's office at which he corroborated Douglas' false statements vouching for the wherewithal and commitment from PPMT's unidentified "client" to close the transaction.

310.    Before Douglas filed for bankruptcy in September 2017 for his failure to pay taxes and other debts, Ramjeet employed Douglas as a consultant and advisor for several of his entities.

311.    In the Summer of 2017, Ramjeet and Douglas entered into an agreement under which Ramjeet agreed to support, promote, subsidize and legitimize Douglas in his establishment and operation of PPMT, which was to be operated as one of the PPMT Family of Companies.  Ramjeet sought to minimize exposure to his other PPMT companies from Douglas' legal problems while still hoping to profit if Douglas struck any big deals.

312.     In return, Douglas agreed to compensate Ramjeet by hiring one or more of Ramjeet's companies to provide services on any completed transaction and by giving Ramjeet a percentage of the profits.

313.    Ramjeet knew that if Douglas procured $1 billion in investments from the Al Thani family or SJ Global WW, that Douglas and PPMT stood to make tens of millions of dollars.  Upon information and belief, Ramjeet's deal with Douglas included an agreement that Douglas and or PPMT would pay Ramjeet a fee if PPMT earned millions of dollars off of FAT Brands, much less SJ Global WW or the Royal Family of Qatar investing more than a billion dollars.

314.    Hence, Ramjeet agreed to subsidize and legitimize PPMT and Douglas, while Ramjeet turned a blind eye towards the foreseeable potential adverse consequences to FAT Brands and others from PPMT's conduct, in the hopes of profiting handsomely if PPMT ever closed a deal.

315.    As discussed above, Douglas' actions caused severe harm to FAT Brands, which Ramjeet is responsible for under their partnership agreement.

**COUNT X**
**NEGLIGENT SUPERVISION**
**AGAINST WESLEY RAMJEET**

316.    Plaintiff repeats and realleges each of the foregoing and following allegations as if fully set forth her in.

53

317.    PPMT and Douglas committed the following torts against FAT Brands: breach of the duty to negotiate in good faith, promissory estoppel, fraud, aiding and abetting fraud, negligent misrepresentation, tortious interference with contract and breach of implied warranty.

318.    At all relevant times, Wesley Ramjeet acted as the CEO of the PPMT Group of companies, and served as the de facto Chairman of PPMT.

319.    Upon PPMT's formation, Ramjeet served as PPMT's Treasurer and CFO.  This was necessary for PPMT to be able to address any concerns raised by investors in entrusting potentially tens of millions of dollars to someone who was in personal bankruptcy for having failed to pay millions of dollars in taxes for many years.

320.    Ramjeet and Douglas entered into a financial arrangement under which Ramjeet supported, promoted, subsidized and legitimized Douglas and PPMT and in return Douglas and PPMT would compensate Ramjeet if Douglas and or PPMT closed any deals.

321.    Ramjeet allowed Douglas to display photographs of Ramjeet prominently on the PPMT Capital website to confirm Ramjeet's supervisory role over PPMT Capital.

322.    Ramjeet allowed Douglas to promote PPMT Capital as one of the companies within the PPMT family of companies supervised by Ramjeet.

323.    Ramjeet agreed to attend meetings with PPMT's new and prospective clients as a matter of practice to legitimize Douglas and PPMT Capital and to assure the client that he personally was supervising and responsible for PPMT's operation.

324.    Ramjeet personally participated in the wrongdoing by attending a meeting with Douglas and FAT Brands, and was copied on an extensive amount of correspondence between the parties.

325.    During the meeting, Ramjeet acted as the CEO of the PPMT family of companies with supervisory authority over Douglas and PPMT.

326.    Ramjeet undertook a duty generally, and in particular with respect to the FAT Brands transaction, to supervise Douglas' activities.

327.    Ramjeet regularly discussed with Douglas and Tatliadim the progression of the FAT Brands transaction, along with PPMT's partnership with SJ Global.

328.    Ramjeet knew or should have known of Douglas' propensity to harm FAT Brands.

329.    Ramjeet knew or should have known that Douglas' representations on the PPMT Capital website were false and misleading.

330.    Ramjeet knew of the financial pressure on Douglas stemming from his bankruptcy.

331.    Ramjeet knew or should have known that Douglas' statements issued to FAT Brands during the meeting were false and misleading regarding Douglas' procurement of hundreds of millions of dollars to invest in his fund from the Qatari Royal family and the confirmed interest of the Qatari Royal family in structuring a deal with FAT Brands.

332.    Ramjeet knew or should have known that SJ Global WW was not legitimate and posed a threat to FAT Brands and to PPMT, but nevertheless allowed Douglas to enter into an exclusive funding arrangement and partnership with SJ Global.

333.    In spite of his knowledge of Douglas' misrepresentations, financial duress and reckless behavior, Ramjeet continued to authorize Douglas to operate PPMT without adequate supervision.

334.    As discussed above, Douglas' actions caused significant harm to FAT, which was reasonably foreseeable at all times to Ramjeet.

335.    Had Ramjeet adequately supervised Douglas, Douglas would not have been able to carry out the above mentioned torts, and FAT Brands would not have suffered the aforementioned harm.

**COUNT XI**
**APPARENT AUTHORITY**
**WESLEY RAMJEET**

336.    Plaintiff repeats and realleges each of the foregoing and following allegations as if fully set forth herein.

337.    PPMT and Douglas committed the following torts against FAT Brands: breach of the duty to negotiate in good faith, promissory estoppel, fraud, aiding and abetting fraud, negligent misrepresentation, tortious interference with contract and breach of implied warranty.

338.    By virtue of the actions described above, Ramjeet created for FAT Brands the appearance that Douglas had the authority to carry out the FAT Brands transaction with Ramjeet's approval and under his supervision.

339.    Due to the aforementioned actions of Ramjeet, FAT Brands reasonably believed that Douglas had the authority to carry out the FAT Brands transaction with Ramjeet's approval and under his supervision.

340.    FAT Brands reasonably relied upon Ramjeet's representations and actions in negotiating the FAT Brands transaction with Douglas and PPMT Capital.

341.    Ramjeet is responsible to FAT Brands under the doctrine of apparent authority.

**WHEREFORE,** Plaintiff demands judgment against the Defendants as follows:

    A.    An award of compensatory damages against all Defendants in an amount to be determined at trial;

    B.    An award of prejudgment interest under CPLR 5001 from the earliest ascertainable date that the cause of action existed at the rate of 9% per annum;

    C.    Awarding Plaintiff attorneys' fees and costs;

    D.    Awarding Plaintiff punitive and exemplary damages;

56

E.      Awarding Plaintiff such other and further relief as the Court may deem equitable,

just and proper to remedy the Defendants' unlawful conduct.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. Rule 38, Plaintiff hereby demands a trial by jury.

Dated: April 3, 2020
       New York, New York

KAGEN & CASPERSEN PLLC

By: _____

Russell Bogart, Esq.
Stuart Kagen, Esq.
757 Third Avenue, 20th Fl.
New York, NY 10017
Telephone: (212) 880-2045
Fax: (646) 304-7879
rbogart@kagencaspersen.com
