UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| FAT Brands, Inc. | : | DOCKET NO. 19-cv-10497 |
| , | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| PPMT Capital Advisors, Inc., | : | |
| Royal Gulf Capital Corporation, | : | |
| Karl Douglas, | : | |
| | : | |
| Defendants. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### ANSWER OF DEFENDANT KARL DOUGLAS, PPMT Capital Advisors, Ltd., Royal Gulf Capital Corporation

Defendants Karl Douglas ("Mr. Douglas"), PPMT Capital Advisors, Ltd. and Royal Gulf Capital Corporation, as Pro Se, for their Answer to the Amended Complaint dated April 3, 2020 (the "Complaint") filed by Plaintiff , FAT BRANDS, INC. (the "FAT"), states as follows:

1.     The defendant does not know whether the other information in paragraph 1 of the complaint is true or false. The defendant does not know whether the other information in paragraph 1 of the complaint is true or false.

2.     The defendant does not know whether the other information in paragraph 2 of the complaint is true or false. The defendant does not know whether the other information in paragraph 2 of the complaint is true or false.

3.     Denies the allegations of paragraph 3, including specifically that (i) any malfeasance was perpetrated, (ii) the contemplated financing was for $100,000,000, (iii) that

"At all relevant times, the defendant understood the importance to Fat Brands of procuring the financing". The contract between the defendant and the plaintiff ( "Letter of Intent") specifically states *"The parties understand and agree that the provisions of this Letter of Intent are not intended to constitute, nor will they be construed as an offer subject to acceptance and other than the provision of exclusivity, will not become legally binding on the parties unless and until the execution and delivery by the parties of, and then only to the extent reflected in, mutually acceptable Definitive Agreements, as hereinafter defined".* Agreements were never delivered to Fat Brands, and therefore no requirement to fund was established. Plaintiff's statement regarding *"understood the importance"* implies that the Defendant was a service provider to the Plaintiff. This was not the case in this transaction. In fact, the Defendant was intended to be the manager for the investor with the intent being PPMT Capital would manage the loan on behalf of the investor, SJ Global. Lender act on behalf of their investors, not on behalf of borrowers. So other than through lender liability, which cannot be the case since no loan was established, PPMT Capital could have no liability to the Plaintiff. Pre-closing concern about the interests of the borrower, Fat Brands, would have been the responsibility of their investment bank.

4.      Denies the allegations of paragraph 4, except admits that the defendants represented certain Middle Eastern, as well as other investors that were considering an investment in FAT Brands. When the Defendant was introduced to Plaintiff PPMT was presented as a multi family office manager with several relationships with families in the Middle East, the United States and Europe. The Al Thani Family was disclosed as a reference as one of the Defendants potential investors nothing more.

5.      Denies the allegations of paragraph 5. Plaintiffs allegation is false. There was never any representation of a commitment to the deal. The Plaintiff paid $100,000 as a routine and customary due diligence deposit to allow PPMT to complete revenue due diligence using third parties and to employ legal experts to assist with potential transactions structures. Fat Brands was aware, at all times, that the transaction was subject agreement on a structure and to completion of Definitive Documents executed by the investor. There was no standard established or implied that required the investor to execute a definitive document.  Further, any investor put forth by the defendant had final approval of any transaction structure or documents negotiated on their behalf. The plaintiff was aware that any expense incurred by Fat Brands was at their own risk. The PPMT Capital website disclosed that client relationships are not discretionary.

6.      Denies the allegations of paragraph 6, Plaintiff undertook legal expenses at their own risk and without any form of commitment formal or otherwise. The Plaintiff was under significant pressure with several failed attempts to raise capital, numerous investor class action lawsuits, and a public a stock under significant downward pressure. Mr. Weiderhorn was grasping at straws. PPMT conducted preliminary due diligence with some of its investors which resulted in most of the Middle Eastern investors refusing the deal because of several due diligence findings. PPMT realized that if the transaction was converted from a corporate loan transaction to a bankruptcy remote securitization, other investors within the PPMT client universe would have interest because a securitized structure eliminated much of the corporate risk issues presented by the Fat Brands governance structure and its management. That structure was presented to Weiderhorn and his investment banker. And with limited alternatives Fat Brands signed a  letter of intent. The Letter of Intent was also specific that the counterparty

would be assigned at closing. The Defendant never offered any commitment from any specific investor. And the Defendant undertook significant legal expenses well in excess of the initial deposit.

7.      Denies the allegations of paragraph 7. The plaintiffs statement is false: "PPMT failed to close in December 2018, PPMT revealed". Mr. Weiderhorn was aware that the investor was a UK family office as of November. The second Plaintiff statement is false: No statement was made by Karl Douglas regarding customary and reasonable due diligence. Investor due diligence on behalf of Fat Brands was the responsibility of the Plaintiff's investment bank, not its prospective lender. When asked, Mr. Douglas indicated that he took several trips to London and met with SJ Global in their offices. Mr. Douglas never represented verification of bank balances or any other form of formal due diligence. When requested by Mr. Weiderhorn and his investment banker, Mr. Douglas requested bank balance information on behalf of Fat Brands on several occasions. Fat Brands offered to send SWIFT bank balance verifications on many occasions but they did not comply. The Plaintiffs investment banker was also given the name of the Goldsmiths family, who Peter Samuel claimed was his backer. The investment banker and Weiderhorn conducted various internet inquiries of their own. However nothing was discovered by the Plaintiff or PPMT until a lack of funds forced the issue to the surface.

8.      Defendant confirms paragraph 8. When Fat Brands finally presented the source of funds, the Defendant had no knowledge of the validity of the bonds. When the Defendant discovered the fraud, the defendant notified the United States Treasury and also the U.K. authorities. Any allegation that PPMT had knowledge of the fraudulent nature of the bonds is totally false.

9.     Denies allegations in paragraph 9. There was no "unraveling of lies". Fat Brands would like to paint a picture that they were offered a firm commitment financing from an identified investor, the Al Thani family. This fantasy is not reflected in any documentation. Fat Brands was aware that funding could come from a number of sources subject to the approval of that source. And because there was no implied approval, let alone commitment, the letter of intent was specific that it did not constitute an offer or commitment. There was never any representation written or oral of a firm commitment from the Al Thani family. As to the first, Mr Douglas' bankruptcy also has no relevance to the case having completed several hundred million dollars of investment for clients during the same period. The Plaintiff should note also that back taxes and bankruptcy do not impact ability to perform in business. Mr Weiderhorn himself should know this since in June 2009, July 2010, November 2010, and April 2016, Wiederhorn filed petitions in U.S. Tax Court disputing the amount of taxes owed.  According to media reports, Wiederhorn reached a settlement in April 2011 regarding $3.1 million in unpaid taxes for years 2004, 2005, 2006, 2007 and 2008.  In addition, Wiederhorn alleged a $2 million fine he was ordered to pay after pleading guilty to Federal criminal charges in 2004 was a "work related fine," and therefore, tax deductible. As to the third, the plaintiffs statement is totally false. Douglas could not have lied because he had no knowledge or suspicion of SJ Global's fraud.

10.     Denies the allegations of paragraph 10. Plaintiff misconstrued text statements sent to SJ Global by Douglas. The statement about being sued was intended to push SJ Global along in terms of reviewing materials and opening bank accounts. The statement was also in response to the aggressive timeline being put forward by Weiderhorn. Having a verbal approval from SJ Global, the Defendant pushed to advance the deal to closing. This included obtaining a signed

fund management agreement. Logically, the Defendant would not have advanced the transaction any further if SJ Global simply stated they did not want to move forward with the deal. They had every right as did the defendant at November 1, and in fact up to closing, to walk from the deal. Around the same date, SJ Global had indicated that accounts would be opened in order to fund the transaction. The statement about misconduct is false and obviously intended to perpetuate the Plaintiff's fiction. This whole narrative was invented by Wiederhorn to support the lies that he told his board and shareholders, presumably that he had the funding was done. Weiderhorn himself is a sophisticated finance professional, far more so than the Defendant, and he had his suspicions that the transaction would not get done. Weiderhorn has a long track record of misconduct and felony offenses involving finance. The Plaintiff has chosen to besmirch Douglas by throwing out words like bankruptcy to support their false narrative. Douglas has business failures which led to bankruptcy and financial difficulties which are "par for the course" in the world of entrepreneurship and finance, but he has never had a single FINRA violation (during his registered periods as both series 7 representative and series 24 principal), SEC violation, felony, or investor lawsuit in thirty three years of practice.

11.     Defendant denies paragraph 11. FAT Brands was already in multiple class action lawsuits prior to signing with the Defendant. Fat Brands, at the time they signed the letter of intent, was a distressed company with a stock price that was roughly half of its Series A "IPO" offering price, paying high interest rates on debt and preferred stock, and unable to secure financing from traditional sources due to Mr. Weiderhorn's criminal background, poor corporate governance and incestuous corporate ownership which at the time was 80% of the company owned through an "arms length trust" that was effectively controlled by trustees close to Weiderhorn. A publicly held company on NASDAQ being 80% owned by its CEO, through a

sophisticated series of "arms length" entities is unprecedented. The Defendant did not cause FAT Brands to lose any acquisition opportunities because the Defendant never issued a commitment letter binding the Defendant to fund. Fat Brands management acted on their own accord. Further additional lenders suitable to fund acquisitions on the terms being offered by the Defendant were not available at the time. In fact, Fat Brands was unable to obtain acquisition level funding until 9 months from the date SJ Global failed to fund. And even then they used the same structure the PPMT created, which has to be rated by a ratings agency in order to finally fund. Additionally, the company was able to develop their business over the nine months and recruit a strategic equity investor. Those are all significant steps that were needed to complete a successful debt raise, and which were not in place in 2018. So in the absence of the PPMT funding which was novel as whole company securitization, FAT Brands would not have and did not complete a funding until critical issues were resolved. Therefore acquisitions would not have been completed and were not. Had PPMT issued a binding commitment letter this would be a different story.

12.     Defendant categorically denies the allegations in Paragraph 12. The Plaintiff entered into a letter of intent with the Defendant. The Letter of Intent was not binding as to any requirement to fund. Further, Defendant never represented that any specific investor would be the source of funds. When the Defendant received the approval from Peter Samuel and Neil Walsh to negotiate a deal on behalf of SJ Global it was with the understanding that they were a credible funding group. The Defendant was not acting in the capacity as a broker dealer and had no obligation contractually or implied to represent the interests of Fat Brands or conduct due diligence on the investor on behalf of Fat Brands. Fat Brands was represented by an investment bank that offered those protections. The Defendant was not a service provider to Fat Brands.

Had the investment been funded, the Defendant would have been the investment manager on behalf of SJ Global by virtue of a fund management contract. The Defendant does not dispute that SJ Global committed fraud, but that was not with the knowledge of the Defendant. Further the Defendant had no contact at any time with the senior lender of the Plaintiff, so we deny any allegation of tortious interference. It was incumbent upon FAT Brands to correspond with their lender. And they should have communicated that they we not in possession of a commitment letter, which is a standard practice when proof of closing is needed. Mr. Weiderhorn could have asked for a commitment letter at any time for the benefit of his lender and board. At that point, the Defendant would have asked SJ Global to provide a binding commitment. That was never asked or offered. Further, Plaintiff makes reference to certain agreements between Douglas and Ramjeet of which Defendant is unfamiliar. Ramjeet had no supervisory responsibility for PPMT Capital Advisors, Ltd. He was the "tax matters manager" at formation of the entity and that role concluded in 2017 well before any involvement with the Plaintiff. Ramjeet was not involved in management of PPMT Capital Advisors. He was not a principal or director and had no authority.

13.    Defendant confirms the statement in Paragraph 13

14.    Defendant confirms the statement in Paragraph 14.

15.    Defendant confirms to the statement in Paragraph 15.

16.    Defendant confirms to the statement in Paragraph 16.

17.    Defendant does not have sufficient knowledge to confirm the statements in Paragraph 17 related to Mr. Ramjeet's residency. PPMT Capital Advisors, Ltd. was not affiliated with any other PPMT companies. Ramjeet's role was an accommodation for the

formation in 2017 and terminated at the end of 2017. There as no defined term "partner" and there was no formalized relationship between Ramjeet and PPMT Capital after 2017.

18.     The defendant does not know whether the information in paragraph 18 of the complaint is true or false.

19.     The defendant believes the information in paragraph 19 of the complaint is true.

20.     The defendant does not know whether the information in paragraph 20 of the complaint is true or false.

21.     The defendant does not know whether the information in paragraph 21 of the complaint is true or false.

22.     The defendant does not know whether the information in paragraph 22 of the complaint is true or false.

23.     The defendant does not know whether the information in paragraph 23 of the complaint is true or false.

24.     The defendant does not know whether the information in paragraph 24 of the complaint is true or false.

25.     The defendant does not know whether the information in paragraph 25 of the complaint is true or false.

26.     The defendant does not know whether the information in paragraph 26 of the complaint is true or false.

27.     The defendant does not know whether the information in paragraph 27 of the complaint is true or false.

28.     The defendant does not know whether the information in paragraph 28 of the complaint is true or false.

29.     The defendant does not know whether the information in paragraph 29 of the complaint is true or false.

30.     Denies the allegations of paragraph 30 as to the disparagement "Douglas desperate need for investments". Again the plaintiff seeks to paint a picture that Douglas was desperate to support Plaintiff's fantastic claims that Defendant somehow conspired with SJ Global. At no time was the Defendant aware of the fraud nature of SJ Global's funding (or lack of funding). The Defendant was at no time asked to break any law by SJ Global Defendants. And at no time did the Defendant knowingly perpetuate the false claims of the SJ Global defendants. All structures under the management agreement were created using standard investment management structures. All principals were vetted according to standard AML procedures utilizing the US banks that were to be the recipient of funds. All principals we also checked on OFAC. It is reasonable to assume that a limited partner (or investor) in a first time fund manager would exercise a fair amount of control. However those controls were limited to the fund management agreement.

31.     Paragraph 31 is affirmed by defendant.

32.     Paragraph 32 is denied by defendant. Walsh signed the PPMT Fund 1 agreement. However the source of funds was to come from SJ Global accounts of which the Defendant has no knowledge. Any entities utilizing the PPMT address were not sources of funds, they were special purpose vehicles to house each investment, so they would have been recipients of funds from PPMT Fund 1. The use of "funnel" is not a recognized term.

33.     Paragraph 33 is false. Walsh visited the PPMT briefly office on two occasions at the time bank accounts were being established to received the funds to complete the intended FAT Brands closing. The phrase "directed emails and calls to New York" implies PPMT conducted business on behalf of Walsh, which is false. Walsh corresponded with PPMT via email. Text and telephonically regarding the establishment of PPMT Fund 1 and business related to the fund, e.g. FAT Brands.

34.     The defendant lacks sufficient knowledge to know whether the information in paragraph 34 of the complaint is true or false.

35.     The defendant lacks sufficient knowledge to know whether the information in paragraph 35 of the complaint is true or false. The limits of the relationship between SJ Global and PPMT were specified in the PPMT Fund 1 management agreement. Defendant denies that the relationship was exclusive.

36.     Paragraph 36 is false. Defendants was not instructed to make any representations by SJ Global. PPMT was an autonomous entity making representations based on its own knowledge, observations and understanding, which it believed to be true at the time. SJ Global also did not instruct PPMT to form entities for its own purposes. Defendant made recommendations as to the appropriate legal entity structure to meet the supposed investment requirements of SJ Global.

37.     Paragraph 37 is false. Douglas denies any knowledge of any conspiracy. During meetings in London, Douglas observed other investors meeting with SJ Global and also supposed trustees meeting with Peter Samuels and Walsh. At times conversations were overheard by Douglas referring to movement of large amounts of money. Many people

participated in these meetings, so it was impossible to conclude that the entire exercise was a rouse for the Defendants benefit. Basically these grifters put on a very good show. Alleging that the Defendant conspired is patently false and the plaintiff knows that. There was no daily conversation with Edison. Defendant met Edison on three occasions, twice in London and once in Zurich. Conversation with Field and Samuel was also infrequent. Walsh was the handler and there was short correspondence on an almost daily basis.

38.     Paragraph 38 is false. Samuel and Edison issued no directives to PPMT. Their entity, SJ Global was intended to be a client with activities defined in the PPMT Fund 1 management agreement. No SJ Global officer exercised any control over PPMT actions.

39.     The defendant lacks sufficient knowledge to know whether the information in paragraph 39 of the complaint is true or false.

40.     The defendant lacks sufficient knowledge to know whether the information in paragraph 40 of the complaint is true or false.

41.     The defendant lacks sufficient knowledge to know whether the information in paragraph 41 of the complaint is true or false.

42.     The defendant lacks sufficient knowledge to know whether the information in paragraph 42 of the complaint is true or false.

43.     The defendant lacks sufficient knowledge to know whether the information in paragraph 43 of the complaint is true or false.

44.     The defendant lacks sufficient knowledge to know whether the information in paragraph 44 of the complaint is true or false.

45.     The defendant lacks sufficient knowledge to know whether the information in paragraph 45 of the complaint is true or false.

46.     The defendant lacks sufficient knowledge to know whether the information in paragraph 46 of the complaint is true or false.

47.     The defendant lacks sufficient knowledge to know whether the information in paragraph 47 of the complaint is true or false.

48.     The defendant lacks sufficient knowledge to know whether the information in paragraph 48 of the complaint is true or false.

49.     Defendant affirms Paragraph 49.

50.     Defendant affirms Paragraph 50.

51.     Defendant affirms Paragraph 51.

52.     Defendant affirms Paragraph 52.

53.     Defendant affirms Paragraph 53.

54.     Paragraph 54 is false.

55.     The defendant lacks sufficient knowledge to know whether the information in paragraph 55 of the complaint is true or false.

56.     Defendant confirms Paragraph 56

57.     Defendant confirms Paragraph 57

58.     Paragraph 58 is denied by defendant. Douglas reported that he was an officer of PPMT Capital Advisors, Ltd. He received W2 wages from PPMT Capital Advisors, Ltd, which was necessary for bankruptcy tax compliance and which was reported on bankruptcy filings and

paid in the Chapter 11 DIP account. Douglas was not a consultant to PPMT Strategic and received no income from PPMT Strategic.

59.     Defendant confirms Paragraph 59. However, Merchant banking, which involves investing as a principal is not a registered activity and does not require an active registration.

60.     Paragraph 60 is affirmed by defendant.

61.     Paragraph 61 is denied by defendant. How could the Plaintiff have any knowledge allege Defendants motivation for withdrawing registration? This is Plaintiff's attempt to disparage the Douglas to perpetuate a fantastic and baseless story that they were defrauded by PPMT, even though they were only counterparty to a non-binding letter of intent. In fact, Douglas worked overseas from 2011 to 2014 on a private equity investment and registration was not required.

62.     Paragraph 38 is affirmed by defendant.

63.     Paragraph 63 is denied by defendant.

64.     Paragraph 64 is false. Defendant never claimed to have a business degree from Harvard and never instructed Pitchbook to make such a claim. Defendant only became aware of a Houzz profile which was not established by Defendant after receiving the Plaintiff complaint. Apparently, Houzz is a website for home decorators and Douglas has never been a home decorator. Defendant has asked Houzz to remove the profile and is unclear as to who created the false profile.

65.     Defendant lacks sufficient knowledge to confirm the statements in Paragraph 65.

66.     Paragraph 66 is false.

67.     Paragraph 67 is false.

68.     Paragraph 68 is false.

69.     Paragraph 69 is false.

70.     Paragraph 70 is false.

71.     Paragraph 71 is false.

72.     Paragraph 72 is affirmed by defendant with the exception that it is misleading to refer to the letter of intent was "binding". The letter of intent was specifically not binding in terms of a required funding.

73.     Paragraph 73 is affirmed by defendant.

74.     Paragraph 74 is confirmed by defendant.

75.     Paragraph 75 is confirmed by defendant.

76.     Paragraph 76 is confirmed by defendant.

77.     Paragraph 77 is confirmed by defendant.

78.     Paragraph 78 is denied by defendant.

79.     Paragraph 79 is denied by defendant.

80.     Paragraph 80 is denied by defendant. It was Weiderhorn that pushed an agenda to complete the transaction on an unrealistic timeframe. Defendant never suggested Plaintiff should run ahead an prepare documents.

81.     Paragraph 81 is denied by defendant. Defendant is not aware of what both sides means. The structure was syndicated among several potential investors and there was "general agreement" that a securitization structure would be feasible.

82.     Paragraph 82 is denied by defendant. Neither Ramjeet nor Tatliadim has sufficient knowledge to make such a claim.

83.     Paragraph 83 is denied by defendant.

84.     Paragraph 84 is denied by defendant. Weiderhorn pushed counsel to prepare draft documents. However these documents required significant modification as the structure was not finalized when they were prepared.

85.     Defendant lacks sufficient knowledge to confirm the statement in Paragraph 85.

86.     Paragraph 86 is confirmed by Defendant.

87.     Paragraph 87 is denied by the Defendant.

88.     Paragraph 88 is denied by defendant.

89.     Paragraph 89 is denied by defendant. Frankly the Defendant found it shocking that FAT Brands submitted a letter addressed to Mr. Al Thani. No interest was expressed to buy the London franchises by Al Thani family and the Defendant never made that claim. Weiderhorn was advised that the UK family office had expressed interest in funding FAT Brands and that they wanted to purchase the two franchises.

90.     Defendant lacks sufficient knowledge to confirm the statements in Paragraph 90.

91.     Paragraph 91 is confirmed by defendant.

92.     Paragraph 92 is confirmed by defendant.

93.     Paragraph 93 is confirmed by defendant.

94.     Paragraph 94 is confirmed by defendant. However, it was always clear to the Plaintiff that the final funding entity would change as provided for in the LOI.

95.     Paragraph 95 is denied by defendant.

96.     Paragraph 96 is denied by defendant.

97.     Paragraph 97 is confirmed by defendant.

98.     Paragraph 98 is denied by defendant.

99.     Paragraph 99 is denied by defendant only to the extent that SJ Global as a party had a right of approval of the documents and they did not grant their approval.

100.    Paragraph 100 is denied by defendant. SJ Global management were briefed on the terms, however they did not grant final approval. In fact post the closing date SJ Global asked to conduct a re-read of the documents using their own counsel. The Defendant did not have the authority to bind SJ Global or any other client, which is why the LOI requires final agreement, execution and delivery of the documents, which was never done

101.    Paragraph 101 is denied by defendant. However assurances were given based on the feedback from SJ Global.

102.    Paragraph 102 is confirmed by defendant.

103.    Denies knowledge or information sufficient to form a belief as to the allegations of paragraph 103.

104.    Paragraph 104 is affirmed by defendant.

105.    Defendant lacks sufficient knowledge to confirm the statement in Paragraph 105.

106.    Paragraph 106 is denied by defendant. Douglas was not threatening anyone, the intent was to counsel Fat Brands and specifically Weiderhorn that making threats against SJ Global would potentially result in SJ Global walking away. Walsh has indicated as such on a few occasions. And at that time, we all assumed SJ Global was a real business capable for closing.

107.   Paragraph 107 is confirmed by defendant. At this stage the Defendant was nothing more than a messenger relaying the promises of SJ Global.

108.   Paragraph 108 is affirmed by defendant.

109.   Paragraph 109 is denied by defendant.

110.   Paragraph 110 is denied. There was no risk of FAT Brands going directly to SJ Global for funding because of the management agreement.

111.   Paragraph 111 is denied by defendant.

112.   Paragraph 112 is denied by defendant by the defendant. All parties were aware of SJ Global as the investor by the beginning of December 2018.

113.   Paragraph 113 is denied by Defendant.

114.   Defendant lacks sufficient knowledge as to the statements in Paragraph 114.

115.   Defendant lacks sufficient knowledge as to the statements in Paragraph 115.

116.   Paragraph 116 is denied by defendant.

117.   Paragraph 117 is denied by defendant. Douglas had no knowledge of the true nature of SJ Global.

118.   Paragraph 118 is affirmed by defendant.

119.   Paragraph 119 is denied by defendant. Douglas provided information about SJ Global which the Plaintiff was able to verify for themselves.

120.   Paragraph 120 is denied by defendant.

121.   Paragraph 121 is denied by defendant. Defendant didn't "claim" anything. Defendant relayed the information provided by SJ Global..

122.   Paragraph 122 is affirmed by defendant

123.   Paragraph 123 is affirmed by defendant.

124.   Paragraph 124 is affirmed by defendant.

125.   Defendant lacks specific knowledge to comment on or form a belief about the intent of SJ Global at that time as stated in Paragraph 125.

126.   Paragraph 126 is affirmed by the defendant. This claim was based upon the statements of Walsh and Samuel.

127.   Paragraph 127 is denied by Defendant.

128.   Paragraph 128 is confirmed by Defendant however Weiderhorn met with Walsh and certain other SJ Global princpals prior to the meeting with Douglas.

129.   Paragraph 129 is confirmed. Prior to the meeting, Walsh, who had represented on multiple occasions that the deal was approved both to Douglas, Tatliadim and Weiderhorn, and who also confirmed various dates on wiring of funds both to Douglas, Tatliadim, and to Weiderhorn, approached Douglas nervously prior to the meeting and said "Just sit quiet and the deal will get done but a lot is going to change". At the meeting it was like PPMT didn't exist, and as if SJ Global had made no commitments to send wires, and that Walsh never signed any documents. SJ Global just sat there and negotiated a direct deal with Weiderhorn. Edison was the lead negotiator in the meeting while Samuel sat in silence. Edison even smugly made the comment that SJ Global wouldn't pay a placement fee to PPMT and that Douglas would have to negotiate something with Weiderhorn.  At that point, and in complete shock and amazement Douglas simply stated whatever it takes to get this closed for FAT Brands.

130.   Defendant confirms the statements in Paragraph 130.

131. Defendant confirms Paragraph 131.

132. Defendant lacks specific knowledge to confirm the statement in Paragraph 132.
However defendant is aware that Kristina Field was the purported CFO and was
tasked to provide proof of funds.

133. Paragraph 133 is confirmed by the defendant.

134. Paragraph 134 is confirmed by the defendant.

135. Paragraph 135 is denied by defendant. The statement "As even Douglas now
admits" is misleading as it can be construed to mean Douglas knew at the time of
the even, which is false.

136. The defendant lacks sufficient knowledge to confirm the statements in Paragraph
136.

137. Plaintiff lacks sufficient knowledge to confirm the statements in Paragraph 137.

138. Paragraph 138 is affirmed by defendant.

139. Paragraph 139 is denied by defendant.

140. Defendant lacks sufficient knowledge to confirm Paragraph 140.

141. Defendant lacks sufficient knowledge to confirm Paragraph 141.

142. Defendant denies the statement in Paragraph 142

143. Defendant lacks sufficient knowledge to confirm the statement in Paragraph 143.

144. Paragraph 144 is denied by defendant..

145. Paragraph 145 is denied by defendant.

146. Paragraph 146 is confirmed by defendant. The language is nothing more than
initial polite language used when meeting people for the first time.

147.  Paragraph 147 is denied by defendant. There we more than two to three trips.

148.  Paragraph 148 is denied by defendant.

149.  Paragraph 149 is denied by defendant.

150.  Paragraph 150 is confirmed by defendant. Tatliadim became involved in the documentary phase of the transaction and was not involved in investor discussions until late in the process.

151.  Paragraph 151 is denied by defendant.

152.  Paragraph 152 is denied by defendant. SJ Global was referred to as a funding source, not a capital partner.

153.  Paragraph 153 is confirmed by defendant. This is expected when structuring a fund for a client.

154.  Paragraph 154 is confirmed by defendant. However that proposal was almost immediately abandoned and replaced by a traditional GP/LP fund structure in which SJ Global was the limited partner and PPMT would be paid an annual management fee as a percentage of assets under management plus a carried interest.

155.  Paragraph 155 is confirmed by defendant. At that stage SJ Global through Walsh, had agreed to move ahead with the FAT Brands deal.

156.  Paragraph 156 is denied by defendant. The structures were standard methods used by fund managers for off-shore investors.  SJ Global WW had minimal input into the structure as they did not have the expertise to create a fund structure.

157.   Paragraph 157 is denied by defendant. "At SJ Global's direction" implied that SJ
       Global directed PPMT. This is not the case. PPMT developed a structure to meet
       the business needs of SJ Global as they would any other off-shore investment
       client.

158.   Paragraph 158 is denied by defendant. Where it is obviously true that the entities
       were not funded, they were to the Defendant's knowledge, formed in a legitimate
       tax efficient structure and were never used or intended to be used by the
       Defendant for fraud.

159.   Paragraph 159 is denied by defendant. SJ Global did not direct formation of
       entities. The plaintiff is attempting to develop a fantastical narrative that PPMT
       somehow formed one off entities for the purpose of aiding SJ Global's fraud.
       First, when these entities were formed they were formed with the advice of a tax
       attorney familiar with offshore investor requirements. And second, PPMT had no
       knowledge at the time that SJ Global was a fraudulent entity.

160.   Paragraph 160 is denied by the defendant. The fund was formed as part of the SJ
       Global client structure.

161.   Paragraph 161 is denied by defendant.

162.   Paragraph 162 is affirmed by defendant. However this was part of the entity
       structure.

163.   Defendant lacks sufficient knowledge to confirm all of the statements in
       Paragraph 163.

164.   Paragraph 164 is affirmed by defendant.

165.    Paragraph 165 is affirmed by defendant.

166.    Paragraph 166 is affirmed by defendant.

167.    Paragraph 167 is affirmed by defendant.

168.    Paragraph 168 is affirmed by defendant.

169.    Paragraph 169 is affirmed by defendant.

170.    Paragraph 170 is confirmed by defendant.

171.    Paragraph 171 is confirmed by defendant.

172.    Paragraph 172 is confirmed by defendant.

173.    Paragraph 173 is denied by defendant. Defendant may have forecasted a projected

        date. However any confirmation of closing dates was dependent upon attorney

        agreement. On several recorded conference calls, attorneys on both sides

        indicated that such dates as October 29 were unlikely.

174.    Paragraph 174 is affirmed by defendant.

175.    Paragraph  175 is affirmed by defendant.

176.    Paragraph 176 is affirmed by defendant.

177.    Paragraph 177 is affirmed by defendant.

178.    Paragraph 178 is affirmed by defendant.

179.    Paragraph 179 is affirmed by defendant.This statement was essentially repeating

        what Defendant was told by Walsh and Samuels.

180.    Paragraph 180 is affirmed by Defendant.

181.    Paragraph 181 is affirmed by defendant.

182.   Paragraph 182 is denied by defendant. Walsh made that comment but did not

direct. Defendant repeated what was said by Walsh.

183.   Defendant denies paragraph 183. SJ Global did not direct PPMT. PPMT

requested status and relayed whatever information they could obtain from SJ

Global.

184.   Defendant does not have sufficient knowledge to confirm the statement in

Paragraph 184. Specifically, Defendant can confirm that SJ Global injected the

need for a legal review after the closing date had come and gone, but that was not

correlated to when SJ Global was disclosed as the source of funds.

185.   Defendant confirms the statement in paragraph 185.

186.   Defendant confirms the statement in paragraph 186. It became clear that Andrew

Tucker, of  Washington DC firm Womble Bond Dickinson, (at the time, currently

with Nelson Mullins et. al.) had a relationship with Michael Edison, and was tasked

with reviewing documents. When PPMT pushed to schedule calls between Womble

Bond Dickinson and Kramer Levin, Walsh and SJ Global began to make various

threats regarding walking from the transaction.

187.   Defendant confirms the statement in paragraph 187. However, the bulk of

knowledge obtained by FAT Brands was provided by PPMT.

188.   Defendant confirms the statement in paragraph 188, based on information obtained

after January 20, 2019.

189.   Defendant confirms the statement in paragraph 188, based on information obtained

after January 20, 2019.

190.   Defendant confirms the statement in paragraph 190.

191.   Defendant confirms the statement in paragraph 191.

192.   Defendant confirms the statement in paragraph 192.

193.   Defendant confirms the statement in paragraph 193.

194.   Defendant confirms the statement in paragraph 194.

195.   Defendant confirms the statement in paragraph 195 with the exclusion of all text
       in inserted: "i. At a Minimum, Douglas Was Willfully Blind to the SJ Global
       Defendants' Conspiracy to Defraud Based Upon His Professed Financial
       Sophistication and Deep Relationships with SJ Global WW for Many Months"

196.   Defendant confirms the statement in paragraph 196.

197.   Defendant denies the statement in paragraph 197.

198.   Defendant denies the statement in paragraph 198.

199.   Defendant denies the statement in paragraph 199.

200.   Defendant denies the statement in paragraph 200.

201.   Defendant denies the statement in paragraph 201. It is not uncommon for family
       offices (which SJ Global claimed to be) to require privacy.

202.   Defendant denies the statement in paragraph 202. Where it is true that several
       deals were intended to be funded by PPMT Fund 1, Fat Brands was the first
       scheduled to close. Therefore, there was no early indicator that there would be a
       problem with SJ Global as a source of funds.

203.   Defendant denies the statements in paragraph 203. Where it is true that Douglas
       congratulated FAT and Edison, the statement was intended as encouragement to

have them move forward on the transaction. At that stage, Douglas was completely victimized by the SJ Global group and was in damage control mode, trying to get the FAT Brands deal funded regardless of his own interests.

204.    Defendant confirms the statement in paragraph 204. However, the context was similar to answer number 204, damage control. Statements of support were superficial and intended to facilitate the parties finding an amicable solution, especially for Fat Brands.

205.    Defendant denies the statement in paragraph 205. After repeated failures to fund and failure to deliver on any milestones that SJ Global agreed to, Douglas was highly skeptical. The context of "look forward to developing the relationship" was one of encouragement to close the transaction for the benefit of FAT Brands. Why would PPMT continue a relationship which was so destructive? There was no financial benefit.

206.    Defendant denies the statement in paragraph 206. This is completely false. It was Douglas that alerted Weiderhorn to the fake bond, specifically stating "there's no such thing as a $500,000,000 denomination bearer bond".

207.    Defendant denies the statements in paragraph 207.

208.    Defendant lacks sufficient knowledge to confirm the statements in paragraph 208.

209.    Defendant confirms the statement in paragraph 209.

210.    Defendant lacks sufficient knowledge to confirm the statements in paragraph 210.

211.    Defendant lacks sufficient knowledge to confirm the statements in paragraph 211.

212.    Defendant denies the statements in paragraph 212.

213.   Defendant denies the statements in paragraph 213.

214.   Defendant denies the statement in paragraph 214.

215.   Defendant denies the statement in paragraph 215.

216.   Defendant confirms the statement in paragraph 216.

217.   Defendant denies the statement in paragraph 217. Specifically, when Walsh
       inquired as to the relationship it was clarified that Ramjeet is not part of PPMT
       Capital and that his business is a separate business that does accounting and
       business advisory.

218.   Defendant denies paragraph 218. Defendant did not solicit permission to use
       pictures/

219.   Defendant denies paragraph 219. Defendant did not require permission to create a
       website.

220.   Defendant denies paragraph 220.

221.   Defendant denies paragraph 221.

222.   Defendant denies paragraph 222.

223.   Defendant denies paragraph 223.

224.   Defendant lacks sufficient knowledge to confirm the statement in paragraph 224.

225.   Defendant denies paragraph 225.

226.   Defendant denies paragraph 227.

227.   Defendant denies paragraph 228. Tatliadim was paid through a payroll service
       and it was not possible to bounce check as payroll had to be funded before it was
       run. To the best of defendant's recollection there was one check in question and it

was related to timing between the start of Taliadim's conversion from manual checks and payroll service checks.

228. Defendant denies the statement in paragraph 228.

229. Defendant confirms the statement in paragraph 229 with the clarification that this was by mutual agreement. Tatliadim was a consultant hired to assist with financial modelling for real estate finance transactions. As the real estate portion of the business began to slow down there was no need for his services. He was encouraged to look for work elsewhere and PPMT offered to provide a reference. Feeling that he was learning about corporate finance outside of real estate finance, and seeing positive prospects at PPMT, he elected to stay and be paid on a success basis.

230. Defendant confirms paragraph 230. However this was in the form on short terms cash that was repaid with one to three days.

231. Defendant denies the statement in paragraph 231.

232. Defendant denies the statement in paragraph 232. Between 2016 and 2018, Defendant completed five transactions of enterprise value in the range of $300M.

233. Defendant denies paragraph 233.

234. Defendant denies paragraph 234.

235. Defendant denies paragraph 235. There was no contingent hiring of Ramjeet's business or other similar understanding. Clients were referred by Douglas to Ramjeet purely based on the quality of service provided by Ramjeet.

236. Defendant denies the statement in paragraph 236. At no time was PPMT exclusive to SJ Global and at no time was SJ Global intended to be the sole source of capital for PPMT Capital. SJ Global was the sole investor in PPMT Fund 1, which as the indication "1" implied was intended to be followed by other funds with other investors.

237. Defendant cannot confirm the statement in paragraph 237 due to its incorrect context. Ramjeet's uncle was introduced to Douglas several years back. The relationship with Oscar Ramjeet too on its own development and did not involve Wesley Ramjeet at all. Further, Oscar Ramjeet was simple a convenient way to establish business relationships in Belize due to his presence there, so this was offered to Walsh as a courtesy, however Oscar Ramjeet never met or communicated with Walsh or any member of SJ Global.

238. Defendant confirms paragraph 238.

239. Defendant denies the statement in paragraph 239. Ramjeet's inclusion in any meetings with PPMT Capital was always as a cross referral opportunity. Ramjeet was not introduced to Weiderhorn as a participant in any funding. He was introduced as a potential service provider that could assist Fat Brands with accounting and SEC requirements should FAT Brands ever have the need.

240. Defendant denies the statement in Paragraph 240. Ramjeet was presented as the CEO of PPMT Strategic Group, Inc. an accounting and business advisory firm with expertise in servicing public companies.

241. Defendant denies the statement in paragraph 241.

242.    Defendant denies the statement in paragraph 242.

243.    Defendant denies the statement in paragraph 243.

244.    Defendant denies the statement in paragraph 244.

245.    Defendant denies the statement in paragraph 245.

246.    Defendant denies the statement in paragraph 246.

247.    Defendant denies the statement in paragraph 247

248.    Defendant denies the statement in paragraph 248 because of incorrect context. The "Binding letter of intent" was not binding in terms of requirement to lend money to FAT Brands. Fat Brands entered into the contract knowing that they would have to agree to an investment structure with PPMT (on behalf of its underlying investor) and that if a structure could not be agreed, PPMT was not required to fund.

249.    Defendant denies the statement in Paragraph 249. There was no specific performance obligation for Royal Gulf or PPMT. The agreement is very clear: *"The parties understand and agree that the provisions of this Letter of Intent are not intended to constitutute, nor will they be construed as an offer subject to acceptance and other than the provision of exclusivity, will not become legally binding on the parties unless and until the **execution and delivery** by the parties of, and then only to the extend reflected in, mutually acceptable Definitive Agreements as hereinafter defined."* Completing the funding was not triggered by completion of Definitive Agreements, but by "execution and delivery", conditions

for which were not stipulated in the LOI, and therefore at the sole discretion of PPMT and its underlying investor.

250. Defendant cannot confirm the statement in paragraph 250. And requirements of FAT Brands were agreed in the Letter of Intent.

251. Defendant lacks sufficient knowledge to confirm the statement in paragraph 251.

252. Defendant cannot confirm the statement in paragraph 252 because of context. The word "committed" was not used in a legal sense. It was used to express the intention. PPMT based on its understanding at the time that SJ Global was a legitimate client and source of funds, was "committed" in terms of resolve to finish the transaction within the terms of the Letter of Intent.

253. Defendant confirms the statement in paragraph 253.

254. Defendant denies the statement in paragraph 254.

255. Defendant denies the statement in paragraph 255.

256. Defendant denies the statement in paragraph 256.

257. Defendant denies the statement in paragraph 257.

258.

259. Defendant denies the statement in paragraph 259. "Supposed" client seems to imply that PPMT had knowledge that its client was fraudulent, in which case the statement is false.

260. Defendant confirms the statement in paragraph 260.

261. Defendant lacks sufficient knowledge to confirm the statement in Paragraph 261.

262. Defendant lacks sufficient knowledge to confirm the statement in Paragraph 262.

263.

264. Defendant denies the statement in Paragraph 264. When PPMT executed the LOI it was with the understanding that PPMT had interest from several investors, among them SJ Global, in the broad terms of the transaction as outlined in the LOI.

265. Defendant denies the statements in Paragraph 265. 1.) PPMT never stated anything about a firm commitment from the Royal Family of Qatar. 2.) PPMT never claimed the availability of $100M to fund the transaction. In fact Plaintiff was aware that the investment as at the discretion on an underlying investos. 3.) PPMT never concealed the identity if the underlying investor. Disclosure on an underlying investor would have required an investor to have committed to fund in advance of completion of due diligence and structuring of the transaction. 4.) Douglas never stated that he had conducted customary due diligence on SJ Global WW which confirmed SJ Global WW's ability to fund $100M. 5.) Douglas never represented that he had a firm and binding commitment from SJ Global. Douglas indicated that he had obtained a fund management agreement from SJ Global and that on numerous occasions, Walsh of SJ Global has indicated the Fat Brands transaction was moving forward.

266. Defendant denies the statement in Paragraph 266. First, FAT Brands never inquired about Douglas financial background. Second, Douglas was not soliciting investment from FAT Brands and was not obligated in any way to offer anything

regarding personal background. Third, FAT Brands was only interested in the source of the capital. For all intents and purposes Douglas background was irrelevant to this transaction. FAT Brands entered into the letter of intent based solely upon the fact that PPMT had access to Middle Eastern and other Family Office funds, and was not induced by Douglas personal financial status.

267.   Defendant denies the statements in Paragraph 267.

268.   Defendant denies the statements in Paragraph 268.

269.   Defendant denies the statement in Paragraph 269.

270.   Defend denies the statement in Paragraph 270.

271.   Defendant denies the statement in Paragraph 271.

272.   Defendant denies the statement in Paragraph 272.

273.   Defendant denies the statement in Paragraph 273.

274.   Defendant denies the statement in Paragraph 274.

275.

276.

277.

278.

279.

280.

281.

282.

283.

284.

285.   Defendant lacks sufficient knowledge to confirm the statement in Paragraph 285.

286.   Defendant denies the statement in Paragraph 286.

287.   Defendant denies the statement in Paragraph 287.

288.   Defendant denies the statement in Paragraph 288

289.   Defendant denies the statement in Paragraph 289.

290.   Defendant lack sufficient knowledge to confirm the statement in paragraph 290.

291.   Defendant denies the statement in paragraph 291.

292.   Defendant denies the statement in paragraph 292.

293.   Defendant denies the statement in paragraph 293.

294.   Defendant lack sufficient knowledge to confirm the statement in Paragraph 294
        due to context. The the best their knowledge Douglas and PPMT represented their
        understanding of the facts as they were understood at the time, and at no time
        knowingly misrepresented anything.

295.   Defendant denies the statement in paragraph 295.

296.   Defendant lacks sufficient knowledge to confirm the statement in Paragraph 296.

297.   Defendant lacks sufficient knowledge to confirm the statement in Paragraph 297.

298.   Defendant denies the statement in Paragraph 298.

299.   Defendant denies the statement in Paragraph 299.

300.   Defendant denies the statement in Paragraph 300.

301.   Defendant lacks sufficient knowledge to confirm the statement in Paragraph 301.

302.   Defendant denies the statement in Paragraph 302.

303.   Defendant denies the statement in Paragraph 303.

304.

305.

306.

307.

308.

309.

310.

311.

312.

313.

314.

315.

316.

317.

318.

319.

320.

321.

322.

323.

324.

325.

326.

327.

328.

329.

330.

331.

332.

333.

334.

335.

336.

337.

338.

339.

340.

341.


<u>First Defense</u>

The Complaint fails to state a claim upon which relief can be granted.


<u>Second Defense</u>

The Complaint fails to plead fraud with particularity.

### Third Defense

The Complaint fails to allege the existence of any material misstatement or

omission.

### Fourth Defense

Neither Mr. Douglas not PPMT defendants has the duty to disclose any allegedly

omitted information.

### Fifth Defense

The Complaint fails to allege that Mr. Douglas acted with the requisite scienter or

mental state that is necessary under the circumstances for him to be held liable.

### Sixth Defense

The purported claims against Mr. Douglas and the PPMT defendants and the allegations
upon which they are based are improperly vague, ambiguous and confusing, and omit critical
facts.

### Seventh Defense

Mr. Douglas cannot be held liable for any misrepresentations or omissions that he

did not make.

### Eighth Defense

The purported claims against Mr. Douglas are based solely on alleged actions and

omissions concerning information to which Mr. Douglas was not privy, and which discovered

about SJ Global defendants after the events of the claim.  Mr. Douglas, a British citizen and

investment banker by training, reasonably relied on statements made by SJ Global and other

members of SJ Global, to ensure adequate legal review and disclosure of material information, and cannot be held liable for any alleged fraud originated by SJ Global defendants.

<u>Ninth Defense</u>

Mr. Douglas lacks knowledge or information at this time sufficient to form a belief as to whether he may have additional and as yet unstated defenses. Mr. Douglas reserves the right to assert additional defenses.

PRAYER FOR RELIEF

Based upon the foregoing, Mr. Douglas prays that this Court deny any relief or request for judgment on behalf of the Fat Brands, and dismiss this action against Mr. Douglas and the PPMT Defendants in its entirety, with prejudice. Mr. Douglas prays for such other and further relief as may be appropriate, or that the Court deems just and proper.

Dated: April 24, 2020                                  Respectfully submitted,

_____

Karl Douglas Pro

se.

<u>Defendant's contact information</u>:

Karl Douglas

1304 Ridge Rd

Syosset, NY 11791

516-993-5368

Karlbdouglas@gmail.com