UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
FAT BRANDS, INC.,

Case No.: 19-cv-10497 (JMF)

                        Plaintiff,

       -against-

PPMT CAPITAL ADVISORS, LTD., ROYAL
GULF CAPITAL CORPORATION, KARL
DOUGLAS, WESLEY RAMJEET, SJ GLOBAL
INVESTMENTS WORLDWIDE, LTD., SJ
GLOBAL INVESTMENTS LTD, PETER
SAMUEL, NEIL WALSH, KRISTINA FIELDS,
AND MICKEY EDISON,
                        Defendants.
-----------------------------------------------------------x


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR A DEFAULT JUDGMENT AGAINST THE DEFENDANT PPMT CAPITAL ADVISORS, LTD**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND................................................................. 3

I.    The Court Has Entered A Default Against PPMT ........................................................... 3

II.   FAT Brands' Claim against PPMT For a Breach of the Duty to Negotiate in Good Faith
      ......................................................................................................................................... 3

      a.   Background ............................................................................................................... 3

      b.   The Letter Of Intent.................................................................................................. 4

      c.   PPMT Advised FAT Brands That It Wished To Close The Transaction and PPMT
           Extended the Exclusivity Period During Which Time FAT Brands Prepared
           Comprehensive Documents To Close The Transaction................................................ 5

      d.   The Botched Closing................................................................................................. 8

      e.   FAT Brands Subsequently Confirms PPMT's Breach of Its Duty to Negotiate In Good
           Faith ......................................................................................................................... 9

LEGAL ARGUMENT ............................................................................................................... 11

I.    The Standard For Awarding A Default Judgment ......................................................... 11

II.   FAT Brands Has Established A Prima Facie Case Of Liability Against PPMT............. 12

      a.   PPMT Was Subject To A Duty To Negotiate In Good Faith....................................... 12

      b.   PPMT Breached Its Duty to Negotiate In Good Faith .............................................. 16

III.  There Is No Just Reason To Delay Entering A Default Judgment Against PPMT on
      FAT Brands's First Cause of Action. ............................................................................. 16

      a.   The Rule 54(b) Standard .......................................................................................... 17

      b.   The Court Should Enter A Default Judgment As To Liability on the First Claim ........ 18

      c.   The Court Should Enter A Final Judgment As To Damages On the First Claim .......... 19

i

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                          <u>Page</u>

*Albany Molecular Research, Inc. v. Waterville Valley Techs., Inc.*,
    323 F.R.D. 489 (N.D.N.Y. February 15, 2018) ................................................................ 22, 23

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ...................................................... 12

*AT&T Corp. v. Voice Stream Network, Inc.*,
    2017 U.S. Dist. LEXIS 15714 (S.D.N.Y. February 2, 2017)................................................... 23

*Balde v. Istanbul Turkish Grill, Inc.*,
    2015 U.S. Dist. LEXIS 60289 (N.D.N.Y. May 8, 2015) ........................................................ 19

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ...................................................... 12

*Bleecker v. Zetian Sys.*,
    2013 U.S. Dist. LEXIS 157883 (S.D.N.Y. Oct. 3, 2013) ............................................ 17, 18, 20

*Brown v. Cara*,
    420 F.3d 148 (2d Cir. 2005)..................................................................................................... 14

*Butler v. Balolia*,
    2017 U.S. Dist. LEXIS 84662 ................................................................................................. 16

*CapLOC, LLC v. McCord*,
    2018 U.S. Dist. LEXIS 99321 (S.D.N.Y. June 12, 2018)................................................. 14, 15

*City of New York v. Mickalis Pawn Shop, LLC*,
    645 F.3d 114 (2d Cir. 2011)..................................................................................................... 11

*Denil v. deBoer, Inc.*,
    650 F.3d 635 (7th Cir. 2011)................................................................................................... 16

*EQT Infrastructure Ltd. v. Smith*,
    861 F.Supp.2d 200 (S.D.N.Y. Mar. 9, 2012) ................................................................... 14, 15

*Frow v. De La Vega*,
    82 U.S. 552, 21 L. Ed. 60 (1872).  ......................................................................................... 18

*Gas Natural, Inc. v. Iberdrola, S.A.*,
    33 F. Supp. 3d 373 (S.D.N.Y. July 17, 2014) ......................................................................... 16

*In re Uranium Antitrust Litig.*,
    617 F.2d 1248 (7th Cir. 1980).................................................................................................. 18

*Int'l Controls Corp. v. Vesco*,
    535 F.2d 742 (2d Cir. 1976)............................................................................................... 18, 19

*Int'l Gemmological Inst., Inc. v. Rafaeil*,
    2005 U.S. Dist. LEXIS 19288 (S.D.N.Y. August 17, 2005)........................................ 18, 20, 22

*Johannes Baumgartner Wirtschafts Und Vermogensberatung GmbH v. Salzman*,
    2010 U.S. Dist. LEXIS 105676 (E.D.N.Y. September 30, 2010)..................................... 20, 22

*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. N.Y. June 1, 2011)......................................................................... 13, 16

*Micro Fines Recycling Owego LLC v. Ferrex Eng'g, Ltd.*,
    2020 U.S. Dist. LEXIS 30828 (N.D.N.Y. February 24, 2020) .................................................. 2

*New York v. Green*,
    420 F.3d 99 (2d Cir. 2005)....................................................................................................... 11

*P.A. Bergner & Co. v. Martinez*,
    823 F. Supp. 151 (S.D.N.Y. 1993).......................................................................................... 13

*Penguin Grp. (USA) Inc. v. Steinbeck*,
   2009 U.S. Dist. LEXIS 27446, 2009 WL 857466 (S.D.N.Y. Mar. 31, 2009) ......................... 13
*Powerserve Int'l, Inc. v. Lavi*,
   239 F.3d 508 (2d Cir. 2001) ................................................................................................... 22
*Rolls-Royce PLC v. Rolls-Royce USA, Inc.*,
   688 F. Supp. 2d 150 (E.D.N.Y. 2010) .................................................................................. 11
*S.E.C. v. Razmilovic*,
   738 F.3d 14 (2d Cir. 2013) ..................................................................................................... 11
*Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*,
   670 F. Supp. 491 (S.D.N.Y. 1987). ....................................................................................... 12
*U.S. v. Kocher*,
   468 F.2d 503 (2d Cir. 1972) ................................................................................................... 17
*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
   96 F.3d 275 (7th Cir. 1996) .................................................................................................... 13
*WowWee Grp. Ltd v. Meirly*,
   2019 U.S. Dist. LEXIS 51905 (S.D.N.Y. Mar. 27, 2019) ............................................ 11, 12

**Statutes and Rules**

NY CPLR 5001 ............................................................................................................................ 23
NY CPLR 5229 ............................................................................................................................ 20
Fed. R. Civ. P. Rule 54(b) ...................................................................................................... 17, 18
Fed. R. Civ. P. Rule 55 .............................................................................................................. 1, 11
Fed. R. Civ. P. Rule 55(b)(2) ......................................................................................................... 1
Fed. R. Civ. P. Rule 69 ................................................................................................................ 20

**Other Authorities**

Moore's Federal Practice § 55.36 (3d ed. 2018) ......................................................................... 18

Plaintiff FAT Brands, Inc. ("FAT Brands") files this motion pursuant to Fed. R. Civ. P. Rule 55(b)(2) for a default judgment against the Defendant PPMT Capital Advisors, Ltd. ("PPMT") with respect to FAT Brands' First Claim For Relief for breach of the duty to negotiate in good faith.

## PRELIMINARY STATEMENT

FAT Brands' Amended Complaint sets forth claims against ten Defendants: PPMT, Royal Gulf Capital Corporation ("Royal Gulf"), Karl Douglas ("Douglas"), [1] Wesley Ramjeet ("Ramjeet"), SJ Global Investments Worldwide, Ltd., SJ Global Investments, Ltd., Peter Samuel, Neil Walsh, Kristina Fields and Mickey Edison.  (DE 97).[2]  On July 28, 2020, the Clerk of the Court issued a Certificate of Default against the Defendants PPMT and Royal Gulf (DE 125).  On the same date, this Court issued an Order directing FAT Brands to explain in any motion seeking the entry of a final default judgment "why default judgment should be entered now as opposed to waiting until the pending motions filed by the other Defendants are resolved and/or until final judgment has been entered."  (DE 126).

Here, FAT Brands requests that the Court enter judgment for FAT Brands against PPMT on its First Cause of Action alleging that PPMT breached its duty to negotiate in good faith arising under a Letter of Intent negotiated by the parties, which PPMT then extended and asked FAT Brands to perform under ("First Claim").  There is no risk of inconsistent judgments being issued as to liability because PPMT is the only Defendant named in the First Claim.

---

[1] PPMT, Royal Gulf, and Douglas, are collectively referred to as the PPMT Defendants.
[2] The SJ Global companies, Edison, Walsh, Samuel and Fields are collectively referred to as the SJ Global Defendants.

Moreover, upon considering FAT Brands' allegations of fact to be true, and drawing all inferences in its favor, FAT Brands has properly alleged a cognizable claim that PPMT breached a duty to negotiate in good faith to reach the framework for the transaction outlined in the binding Letter of Intent.  Here, PPMT's duty to negotiate in good faith was triggered by its receipt of a $100,000 due diligence fee ("Due Diligence Fee"), its direction to FAT Brands to prepare over a hundred pages of definitive agreements, PPMT's extension of the LOI's binding "Exclusivity Period," and PPMT's inducement of FAT Brands to take the burdensome steps necessary to perform an entire "whole business securitization."

Pursuant to the interests of the parties, the Court should decline to postpone assessing damages on the First Claim to avoid the possibility of  inconsistent damage determinations.  "The plaintiff in this case has suffered a significant monetary injury. Postponing the inquest would delay—and perhaps jeopardize—its recovery since a plaintiff cannot begin to collect on a judgment until it is final." *Micro Fines Recycling Owego LLC v. Ferrex Eng'g, Ltd.*, 2020 U.S. Dist. LEXIS 30828, *12, (N.D.N.Y. February 24, 2020).  Here, FAT Brands is willing to limit its recovery on the First Claim to certain liquidated damages that are easily calculable, while deferring consideration of other damages.  Delay creates risk that PPMT will be able to frustrate any judgement granted to FAT Brands. Thus, FAT Brands' interest in a timely damage assessment outweighs the potential for mild administrative inconvenience should a jury issues a damages award inconsistent with the damages awarded during an inquest.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.      The Court Has Entered A Default Against PPMT**

On November 18, 2019, FAT Brands served the Summons and Complaint in this action on

PPMT (DE 31).   On December 4, 2019, the Defendants Karl Douglas, Royal Gulf and PPMT,

through counsel, jointly requested an extension of time to respond to the Complaint (DE 29).   On

January 7, 2020, Douglas requested a further extension of his time to Answer the Complaint (DE

46).

On or about February 10, 2020, Douglas, proceeding pro se, filed an answer on behalf of

himself (DE 89).   On April 3, 2020, FAT Brands filed an Amended Complaint in this action against

Douglas, PPMT, Royal Gulf and other defendants named in the caption (DE 97).   On April 27,

2020, Defendant Karl Douglas, proceeding pro se, attempted to file an Answer on behalf of himself

and on behalf of Royal Gulf and PPMT (DE 100).   On April 29, 2020, this Court, sua sponte,

issued an Order striking this Answer as to Royal Gulf and PPMT, because neither defendant had

entered a notice of appearance by counsel (DE 101).

On July 28, 2020, the Clerk for the Southern District of New York issued a Certificate of

Default against PPMT and Royal Gulf.  (DE 125).   On the same day, this Court issued an Order

scheduling a default judgment briefing and order to show cause hearing.  (DE 126).

**II.     FAT Brands' Claim against PPMT For a Breach of the Duty to Negotiate in
         Good Faith**

**a.  Background**

FAT Brands' Amended Complaint asserts eleven causes of action against ten defendants.

As set forth below, FAT Brands only seeks for a default judgment to be entered against PPMT

with respect to the First Cause of Action, alleging PPMT's breach of the duty to negotiate in

3

good faith ("First Claim").  PPMT is the only defendant named in the First Claim (AC ¶¶ 247-257).

FAT Brands is a global franchising company (¶ 1).  In April 2018, FAT Brands retained two investment advisory firms to assist it with raising financing (¶ 47).

PPMT claimed to be a multi-family office that sources and structures transactions on behalf of primarily Asian and Middle Eastern family offices and small institutions (¶ 51).  Karl Douglas served as the Managing Partner and Chief Investment Officer of PPMT (¶ 54).  Onur Tatliadim served as PPMT's Managing Director (¶¶ 66, 224).  Wesley Ramjeet is the founder and CEO of a number of companies within the PPMT family of companies and he helped Douglas establish PPMT (¶¶ 208-214).  Ramjeet served as PPMT's CFO and Treasurer (¶ 216).  As Douglas explicitly represented, Ramjeet also was his partner in PPMT (¶¶ 17, 217).

In or around June 2018, FAT Brands was informed by its investment bankers that PPMT had clients lined up with the capacity to finance a deal with FAT Brands and was interested in arranging said deal (¶ 49).  On or about June 8, 2018, FAT Brands created a 'data room' to enable PPMT to review FAT Brands' confidential financial information and business plans (¶ 50).

### b.  The Letter Of Intent

In July 2018, Douglas informed FAT Brands that a family office in the Middle East, backed by the Al Thani Family, the royal family of Qatar, was interested in lending $60 million to Fat Brands through a whole business securitization transaction, with the money being funded through Royal Gulf Capital Corporation (¶¶ 67-69).  Douglas assured Fat Brands that this family office, with $8.5 billion in assets, had approved the business terms (¶¶ 70-71).

On August 7, 2018, PPMT entered into a "Binding Letter of Intent" ("LOI") with FAT Brands pertaining to Royal Gulf, or another of PPMT's affiliates, lending up to $60 million to FAT (¶ 72, AC Ex. A).  Douglas executed the LOI as PPMT's Chief Investment Officer and agreed to be bound by the LOI's "terms and conditions" (AC Ex. A). The LOI outlines the terms for a complex transaction under which FAT Brands would form a new company, Fat Brands Licensing, LLC ("FBL"), to effectuate the whole business securitization (the "Transaction") (AC ¶ 73).  The LOI required FAT to pay to PPMT a $100,000 fee "to fund [the] completion of legal due diligence, prepare closing documents and establish the Grantor Trust" ("due diligence fee").

The LOI states that:

> This Letter of Intent if executed by both parties, shall terminate and be null and void on August 31, 2018, unless on or before 5:00 o'clock p.m. EST on August 31, 2018, (i) PPMT notifies FBL that it wishes to complete the Transaction.  If PPMT notifies FBL prior to the above date and time that it wishes to complete the Transaction, then and in that event, the parties shall complete the Definitive Agreements and the Transaction shall be closed on or before 5:00 o'clock p.m. EST on September 30, 2018 (the "Closing Date" "Exclusivity Period") unless extended by mutual agreement.

> If the Transaction is not completed on or before September 30, 2018, (unless extended by mutual agreement) this Letter of Intent shall terminate and be null and void….[The]parties understand and agree that the provisions of this Letter of Intent are not intended to constitute, nor will they be construed as an offer subject to acceptance and other than the provision of exclusivity, will not become legally binding on the parties unless and until the execution and delivery by the parties of, and then only to the extent reflected in, mutually acceptable Definitive Agreements, as hereinafter defined.

The LOI further states that the "parties each understand that this Letter of Intent constitutes a firm proposal.  The parties shall be bound to a standstill but will not incur obligations with respect to the Transaction until the Definitive Agreements have been negotiated, executed and approved as expressly provided herein."

### c.   PPMT Advised FAT Brands That It Wished To Close The Transaction and PPMT Extended the Exclusivity Period During Which Time FAT Brands Prepared Comprehensive Documents To Close The Transaction

By no later than August 19, 2018, PPMT advised FAT Brands that Royal Gulf wished to complete the transaction and that FAT Brands should prepare the definitive documents and take

the other steps necessary to effectuate the proposed securitization (AC ¶ 78).  On August 31, 2018, Andrew Wiederhorn ("Wiederhorn"), the President and Chief Financial Officer of FAT Brands, told Douglas that he wanted to make sure everyone was on board before the lawyers ran up large bills drafting the complex agreements (¶ 80).  On September 4, 2018, Douglas confirmed that "both sides are in conceptual agreement on structure" (¶ 81).

Throughout the Exclusivity Period, Douglas repeatedly assured FAT Brands that he had procured a $500 million commitment from the Al Thani family,  through Royal Gulf, to invest in FAT Brands and in oil and energy investments in the United States (¶ 79).  On or about September 12, 2018, Wiederhorn met with Ramjeet, Douglas and Tatliadim at PPMT's office in New York (¶ 82).  During the meeting, Tatliadim and Ramjeet corroborated Douglas's boasts that he procured firm commitment from the Royal Family to invest in FAT Brands and in other deals.  Ramjeet and Tatliadim further confirmed that the client investing in FAT Brands had more than $8 billion in assets (*Id.*).

Throughout September 2018, Douglas continued to advise FAT Brands as to the detailed terms to be included in the transaction documents for the whole business securitization (¶ 83).  By the end of September 2018, FAT Brands' counsel, Loeb and Loeb LLP ("Loeb"), had prepared a draft credit agreement, schedules comprising more than 100 pages, and  dozens of ancillary documents, to document and structure the complex deal proposed by PPMT (¶ 84).  In addition, Loeb prepared and executed a complex restructuring of FAT in order to prepare it for the proposed securitization transaction (*Id.*).  Loeb also researched and drafted two highly technical legal opinions to be delivered at the closing, including a 60-page "Non-Consolidation and True Sale Opinion," which is customarily given by issuer's counsel in securitization transactions (*Id.*).

Finally, so that FAT Brands would be properly structured to close the deal, Loeb invested significant resources to prepare an early termination of FAT Brands' existing credit facility and to consolidate and license FAT Brands' extensive library of trademarks (¶ 85).

Throughout October and November, the PPMT Defendants continued to exhaustively negotiate the detailed terms of the transaction documents, through the retention of a sophisticated national law firm, while vouching for their desire and capacity to close the deal (¶ 86). The PPMT Defendants, based upon their actions, extended the LOI's exclusivity period (¶ 87). At all times, PPMT and its counsel conducted themselves and dealt with FAT Brands and Loeb as if the securitization transaction was certain to close, and did not raise any red flags or indicate that funding of the transaction was uncertain or might not be committed from reputable sources (¶ 88).

On November 12, 2018, PPMT told FAT Brands in a recorded call that "Andy/FAT and PPMT have an agreement on all of the business terms" pertaining to the $60 million loan and that only "documentation" remained to be tackled (¶ 91). PPMT stated during the call that "we need to get the legal side of things in line" but "everything has been agreed upon from a business point of view" (¶ 91).

On or about November 15, 2018, Douglas, in his capacity as the Chief Investment Officer of Royal Gulf Capital, received a Quality of Earnings report for FAT Brands (¶ 92). In November 2018, Douglas advised FAT Brands that Royal Gulf wished to increase its investment by purchasing $40 million in a new series of preferred stock from FAT Brands, in addition to consummating the securitization transaction to lend $60 million to FAT Brands (¶ 93). Douglas claimed that his "investors" had committed to investing $500 million into his fund (*Id.*).

In November 2018, Douglas advised FAT Brands that PPMT Fund I, LP should be substituted for Royal Gulf as the counterparty to the transaction (¶ 94). Douglas represented that capital for the PPMT Fund still would be provided by several of the wealthy Middle East family offices that he represented, including the Al Thani family (¶ 95). Douglas protested that he could not disclose the specific investors in the PPMT Fund until after the closing of the deal but vouched for the PPMT Fund's ability and intent to close once the transaction documents were finalized (¶ 96). On or about December 3, 2018, Douglas and Tatliadim met with Wiederhorn in New York to negotiate the terms for the equity purchase (¶ 97).

### d. The Botched Closing

By early December, PPMT had agreed to all of the language contained in the transaction documents, on behalf of themselves and their supposed investors  They further agreed to schedule a closing of the transaction for December 20, 2018, after which the deal would be funded (¶100). On December 17, 2018, Douglas told Wiederhorn to "not worry, it's funding next couple days 100%" (¶ 101).

On a December 20, 2018 conference call regarding the closing, with counsel participating, the parties agreed to exchange photocopies of their signatures to the various agreements to demonstrate their commitment to closing, even though the agreements were not to become binding until the original signatures were formally released by counsel upon the funding of the transaction (¶ 102). The 102-page long Credit Agreement is executed by Mr. Tatliadim as the Authorized Signatory of: i) PPMT Strategic Group, Inc. as the Paying Agent; ii) PPMT Strategic Group, Inc. as the Administrative Agent and Lender; and iii) PPMT Fund I GP, LLC, the General Partner of

the Lender PPMT Fund I, LP. Mr. Tatliadim's signature appears on the Subscription Agreement relating to the equity investment (¶103).

On December 21, 2018, PPMT advised FAT Brands that the $100 million was available to be "wired today," but that it needed to be converted from Euros to dollars (¶ 104). Mr. Tatliadim still refused to disclose the name of the family office supposedly funding the transaction but again swore that they had the money (¶ 105). On December 21, 2018, when FAT Brands raised the issue of PPMT's failure to fund the transaction, Douglas threatened FAT Brands (¶ 106). On December 31, 2018, Douglas represented "I got definitive word. We will fund on Tuesday the 8th at the latest." (¶ 107). To date, FAT Brands has not received a single penny of the $100 million in financing that was required to be paid under the executed Transaction Documents (¶ 108).

### e. FAT Brands Subsequently Confirms PPMT's Breach of Its Duty to Negotiate In Good Faith

For weeks after the botched closing, PPMT promised FAT Brands that PPMT's investor would be wiring the funds imminently to the United States. Due to pressure from FAT Bands, Douglas finally identified SJ Global WW, the supposed private equity arm of the alleged Samuel Jones Trust, as the investor that supposedly had committed $500 million to PPMT's fund: not the Al Thani Family (¶ 109).

Strikingly, PPMT has admitted that the SJ Global Defendants made "countless misrepresentations" while conspiring with each other to harm FAT Brands (DE 100 ¶ 196).[3] PPMT further has admitted that the SJ Global Defendants, when pressed by FAT Brands for their proof of funds, forged a safe keeping receipt to falsely claim their possession of $19 billion in US

---

[3] This Court's striking of the PPMT answer, because it was not filed by counsel, does not alter the fact that the answer filed on PPMT's behalf constituted PPMT's written admission of the facts contained therein.

bearer bonds (*Id.*).   Douglas has admitted on behalf of himself, and PPMT, almost all of the allegations contained in the Amended Complaint at paragraphs 138 through 195, to the extent that these allegations pertain to the SJ Global Defendants' conduct.   Thus, there is no dispute between these parties that SJ Global misrepresented its origins, legitimacy, and wherewithal to finance the transaction.   Further, there is no dispute between the parties that the SJ Global Defendants had been actively negotiating with PPMT regarding the FAT Brands transactions and other transactions since the Summer of 2018, and persistently provided false explanations to PPMT and then directly to FAT Brands to stall for more time.

The Amended Complaint alleges that PPMT knew, or was willfully blind, to the fraud being perpetrated by SJ Global (¶¶ 196-244), while still representing to FAT Brands that the deal was certain to close because PPMT had a legitimate client with the wherewithal to finance the deal.   In particular, the Amended Complaint alleges that:

- On October 31, 2018, Douglas told Walsh "I have FAT Brands with a boot on my neck bro."   Douglas further warned that there "will be major issues if we cannot close" because "PPMT had made commitments to do these deals based on Samuel's word."   Douglas stated that PPMT relied on Samuel having "committed to close" by September 29 (¶ 174);

- On November 1, 2018, Douglas told Walsh in a voicemail that his response to his message that he would speak with Samuel was "bizarre."   Douglas forewarned "if we don't close we are going to have a lawsuit" because PPMT had "made representations to FAT based on" PPMT's dealings with SJ Global.   Douglas further estimated that FAT Brands had probably spent $300,000 in legal fees (¶ 175);

- On January 15, 2019, Douglas spoke with Walsh about their "lack of credibility" because they had been representing repeatedly that the funds were ready to be wired.   Douglas advised Walsh that the "banks, companies and lawyers" believe this is some sort of stalling tactic because SJ Global WW does not have the money or the deal was never approved.   Douglas forewarned Walsh: "In the event we don't close the ramifications for everyone will be disastrous.   We'll be in depositions for years." (¶ 123).

## LEGAL ARGUMENT

### I.    <u>The Standard For Awarding A Default Judgment</u>

Fed. R. Civ. P. Rule 55 sets forth a two-step procedure to be followed for the entry of judgment against a party who fails to defend: the entry of a default, and the entry of a default judgment. *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005).  The first step, entry of a default, simply "formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011). "The second step, entry of a default judgment, converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled."  *Id*., 645 F.3d 114, 128.

Here, the first step has been completed.  FAT Brands notified the clerk by declaration that PPMT had failed to plead or otherwise defend the action, and the Clerk, as required by Fed. R. Civ. P. Rule 55(a), entered a default against PPMT by issuing a certificate of default.

Entry of default judgment at the second step is proper where "the allegations against the defaulting party are well-plead." *WowWee Grp. Ltd v. Meirly*, 2019 U.S. Dist. LEXIS 51905, *12 (S.D.N.Y. Mar. 27, 2019).  Once found to be in default, the defendant is deemed to have admitted all of the well-pleaded factual allegations contained in the complaint. *S.E.C. v. Razmilovic*, 738 F.3d 14, 19 (2d Cir. 2013).  Even though the well-pleaded allegations are deemed admitted, the Court has a "responsibility to ensure that the factual allegations, accepted as true, provide a proper basis for liability and relief." *Rolls-Royce PLC v. Rolls-Royce USA, Inc.*, 688 F. Supp. 2d 150, 153 (E.D.N.Y. 2010).  "The legal sufficiency of these claims is analyzed under the familiar plausibility

standard enunciated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), *mod. Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), aided by the additional step of drawing inferences in the movant's favor." *WowWee Grp. Ltd v. Meirly*, 2019 U.S. Dist. LEXIS 51905, *13.

## II.     FAT Brands Has Established A Prima Facie Case Of Liability Against PPMT

Upon drawing all inferences in FAT Brands' favor, the First Cause of Action plausibly alleges a claim for relief against PPMT for breach of the duty to negotiate in good faith.  FAT Brands alleges that the LOI represented a binding preliminary commitment that obligated PPMT to negotiate the Transaction in good faith.  Under the LOI, PPMT triggered its obligation to negotiate in good faith by notifying PPMT that it wished to complete the transaction. This created an Exclusivity Period during which the parties extensively negotiated complicated agreements and FAT Brands restructured its company at PPMT's behest to accomplish the deal.  PPMT's actions in demanding the payment of the diligence fee, extending the Exclusivity Period, and negotiating the complex Definitive Agreements did not bind PPMT to fund the transaction. However, it did bind PPMT to negotiate in good faith during the Exclusivity Period.

### a.  PPMT Was Subject To A Duty To Negotiate In Good Faith

Under New York law, parties who enter into binding preliminary agreements "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement . . . ." *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987). These agreements "do not commit the parties to reach their ultimate contractual objective; instead, such agreements create an obligation to negotiate the open issues in good faith in an attempt to

reach the . . . objective within the agreed framework. *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430, (2d Cir. N.Y. June 1, 2011).

"In effect, an agreement to agree buys a party an assurance that the transaction will falter only over a genuine disagreement, thus allowing a party strapped for time or money to go ahead with arrangements with a sufficient degree of confidence in the outcome." *P.A. Bergner & Co. v. Martinez*, 823 F. Supp. 151, 156 (S.D.N.Y. 1993); *see also Penguin Grp. (USA) Inc. v. Steinbeck*, 2009 U.S. Dist. LEXIS 27446, 2009 WL 857466, at \*2 (S.D.N.Y. Mar. 31, 2009) ("The linchpin of negotiation is not that one side capitulates to the other, but that there is a good faith, honest, articulation of interests, positions, or understandings."); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 96 F.3d 275, 278 (7th Cir. 1996) ("The parties may want assurance that their investments in time and money and effort will not be wiped out by the other party's foot-dragging or change of heart or taking advantage of a vulnerable position created in the negotiation.").

Federal Courts within the Second Circuit use the following framework for determining when preliminary agreements impose an obligation to negotiate in good faith:

> Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract. "In some circumstances, however, preliminary agreements can create binding obligations." The extent of the obligations created depend on the type of preliminary agreement in question, and in general, "binding preliminary agreements fall into one of two categories:" Type I and Type II. A "Type I" contract is "complete," reflecting a meeting of the minds on "all the issues perceived to require negotiation." Because it is complete, a Type I preliminary agreement "binds both sides to their ultimate contractual objective." *Id.* Type II agreements, by contrast, are "binding only to a certain degree," reflecting agreement "on certain major terms, but leav[ing] other terms open for further negotiation." Although a Type I preliminary agreement is fully binding as to the final contractual goal, a Type II agreement "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework."

13

*CapLOC, LLC v. McCord*, 2018 U.S. Dist. LEXIS 99321, *30-31 (S.D.N.Y. June 12, 2018) (internal citations omitted).

Here, FAT Brands contends that the LOI constituted a binding Type II agreement. To determine whether a preliminary agreement is a binding Type II agreement, courts evaluate the following factors: (1) whether the intent to be bound is revealed by the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions. *Brown v. Cara*, 420 F.3d 148, 157 (2d Cir. 2005). For a Type II agreement to exist, the language need only evidence "an intention to be bound to the document as a general framework in which the parties will proceed in good faith toward the contractual goal." *Id.* (explaining that the factors are applied differently in the context of Type I and Type II agreements).

*EQT Infrastructure Ltd. v. Smith*, 861 F.Supp.2d 200 (S.D.N.Y. Mar. 9, 2012) is instructive. *EQT* held that a binding exclusivity clause in an otherwise non-binding term sheet created an obligation to negotiate in good faith during the "exclusivity period," and that there were questions of fact as to whether the good faith duty extended after the exclusivity period expired. *EQT* explained that the defendants' contention that the letter of intent contemplates "the execution of a Definitive Agreement" "misses the point" because the plaintiff claims that the defendants have breached their obligation to negotiate in good faith, not an obligation to reach a Definitive Agreement. *Id.* at 228-229.

*CapLoc LLC v. McCord*, 2018 U.S. Dist. LEXIS 99321, is also on point. *CapLoc* held that a cognizable claim for a Type II Preliminary Agreement was alleged because the Term Sheet obligated the parties to negotiate exclusively over a period of time and sets out a general framework

14

of material terms in non-binding fashion. *Id.* *34. There, the Term Sheet stated that except for the exclusivity provision, "this term sheet does not constitute or create, and shall not be deemed to create, any legally binding or enforceable obligation on the party of any party." *Id.*

As in *EQT* and *CapLoc*, the letter of intent here states that the exclusivity provision is binding. FAT Brands does not claim that PPMT was contractually committed to provide $100 million in financing absent the execution of definitive agreement. Rather, FAT Brands claims that PPMT contractually committed itself to negotiate in good faith. Under the LOI, PPMT's duty to negotiate in good faith was triggered by: i) its demand of the $100,000 diligence fee, ii) its direction to FAT Brands to prepare definitive agreements, which were ultimately executed and held in escrow; iii) its direction to FAT Brands to take the steps to be prepared to close upon the whole business securitization; and iv) the extension of the Exclusivity Period. The LOI explicitly contemplated that FAT Brands would need to undertake these expensive and burdensome steps to close upon the whole business securitization transaction detailed in the LOI.

Here, the context of the negotiations, and FAT Brands' extensive partial performance, strongly weighs in favor of finding that a duty to negotiate in good faith existed. Based upon the expectation of PPMT's good faith, FAT Brands paid hundreds of thousands of dollars for its attorneys to draft hundreds of pages of agreements and to take the necessary steps to be able to effectuate the whole business securitization upon closing. *See, e.g.*, *EQT*, 861 F. Supp.2d 220, 230 ("Here, the LOI contemplated that Plaintiff would 'expend significant time, effort and expense in connection with the Possible Transaction…' and FAT Brands did so after the LOI was executed, hiring lawyers, accountants and consultants, at a total cost of $1.5 million so far, to conduct due diligence and draft documents necessary to complete the Possible Transaction. This effort weighs

15

in favor of finding that Plaintiff and Defendants were bound to continue to negotiate in good faith);

*Gas Natural, Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373  (S.D.N.Y. July 17, 2014)(the extending

of the negotiation period for 45 days, and the exchange of confidential information, supported the

finding of a Type II agreement).

### b.  PPMT Breached Its Duty to Negotiate In Good Faith

At a minimum, good faith requires ***'honesty in fact.'"*** *Butler v. Balolia*, 2017 U.S. Dist.

LEXIS 84662, *10-11 (D. Mass. June 1, 2017) (emphasis added); *Denil v. deBoer, Inc.*, 650 F.3d

635, 639 (7th Cir. 2011) ("'Good faith in contract law means honesty plus refraining from

opportunistic conduct that exploits the other side's sunk costs").  The Second Circuit has held

that a breach of the duty of good faith occurred where a party purposefully engaged in "dilatory

tactics" and made false misrepresentations that it would negotiate the terms in good faith.  *L-7*

*Designs*, 647 F.3d 419, 432 (2d Cir. 2011).

Here, PPMT failed to display honesty in fact with respect to the identity of its client and

its purported client's ability and to intent to close upon the transaction.  Further, PPMT knew that

the SJ Global Defendants were providing "bizarre" excuses for failing to close in October, but

PPMT engaged in stalling tactics and misrepresentations in the hopes that PPMT could hold on

to the deal by finding a real client.  PPMT's conduct plainly bespeaks bad faith.

### III.    There Is No Just Reason To Delay Entering A Default Judgment Against PPMT on FAT Brands's First Cause of Action

In this Court's July 28, 2020 Order, the Court directed FAT Brands to address in its motion

"why default judgment should be entered now as opposed to waiting until the pending motions

filed by the other Defendants are resolved and/or until final judgment has been entered."  As set

forth below, awarding judgment to FAT Brands against PPMT now on the First Cause of Action

is proper because PPMT is the only defendant being charged with a breach of the duty to negotiate in good faith.  Hence, there is no risk of inconsistent liability judgments presented by awarding FAT Brands a default judgment now on that claim.

Plus, there is no reason to stay the determination of damages to avoid the possibility of conflicting judgments because FAT Brands is willing to limit the damages recoverable on this claim to specific liquidated sums consisting of the amounts invoiced by its attorneys to negotiate the deal and the due diligence fee paid to PPMT.  On the other hand, if the awarding of judgment is delayed, FAT Brands will be significantly prejudiced because it cannot begin to collect on a judgment until it is final.

### a.  The Rule 54(b) Standard

Fed. R. Civ. P. Rule 54(b), titled "Judgment on Multiple Claims or Involving Multiple Parties" states:

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

F.R.C.P Rule 54 (b) "leaves the decision of when to enter a final judgment entirely to the discretion of the trial court."  *Bleecker v. Zetian Sys.*, 2013 U.S. Dist. LEXIS 157883, *13-14 (S.D.N.Y. Oct. 3, 2013).  There are "no fixed criteria" to this decision. *Id*; *U.S. v. Kocher*, 468 F.2d 503, 508-10 (2d Cir. 1972) (directing entry of final judgment before the resolution of other claims because the adjudicated claims were independent from the remaining claims and immediate recovery would not lessen that partial recovery); *Int'l Gemmological Inst., Inc. v. Rafaeil*, 2005

U.S. Dist. LEXIS 19288 (S.D.N.Y. August 17, 2005)(entering a judgment against one defaulting defendant after balancing the equities and considering the minimal judicial strain of proceeding).

For the reasons set forth below, there is no just reason for delaying the entry of final judgment against PPMT on the First Cause of Action.

### b.  The Court Should Enter A Default Judgment As To Liability on the First Claim

In *Frow v. De La Vega*, decided in 1872, the Supreme Court explained that in a multi-defendant case where defendants are alleged to be "jointly liable," entering a default judgment runs the risk of inconsistent judgments. 82 U.S. 552, 554, 21 L. Ed. 60 (1872).  A claim is one for joint liability where "as a matter of law, no one defendant may be liable unless all defendants are liable, or . . . when the nature of the relief demanded is such that, in order to be effective, it must be granted against each and every defendant." 10 James Wm. Moore et al., *Moore's Federal Practice* § 55.36 (3d ed. 2018).

Courts in this Circuit have routinely declined to apply *Frow* in cases asserting "joint and several liability," and instead proceeded to decide the default judgment motion while other parties are litigating. *See, e.g., Bleecker v. Zetian Sys., Inc.*, No. 12-CV-2151, 2013 U.S. Dist. LEXIS 157103 (S.D.N.Y. Nov. 1, 2013) (deciding both liability and damages as to one defaulting defendant); *see also Int'l Controls Corp. v. Vesco*, 535 F.2d 742, 746 n.4 (2d Cir. 1976) ("We think it is most unlikely that *Frow* retains any force subsequent to the adoption of Rule 54(b) . . . [A]t most, *Frow* controls in situations where the liability of one defendant necessarily depends upon the liability of the others.").  The "several" in "joint and several" liability refers to individual liability, a liability not dependent on the actions of others. *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1257 (7th Cir. 1980).

Here, PPMT is the *single* defendant sued in the First Count.  Thus, PPMT's liability is not "necessarily dependent upon the liability of the others."  *Vesco*, 535 F.2d 742, 746 n.4.  For instance, PPMT's liability for the breach of contract claim is not dependent upon its ability to prove its various tort claims against Douglas.

Nor do the motions filed by Wesley Ramjeet or the SJ Global Defendants impact this Court's ability to enter judgment against PPMT on the First Count.  The SJ Global Defendants principally claim that this Court lacks personal jurisdiction over them, and they also contend that the Amended Complaint contains insufficient allegations that the SJ Global Defendants issued false statements of fact to FAT Brands.  Ramjeet contends that he should not be held personally liable for any of PPMT's or Douglas's wrongs because: i) he had no duty to supervise PPMT or Douglas; ii) he was not Douglas's partner and iii) he did not engage in any act that created for FAT Brands the appearance that Douglas had the authority to act on his behalf.  FAT Brands' ability to prove PPMT's liability for the First Claim does not depend upon it defeating these motions.  In other words, there is no inconsistency, for instance, between PPMT's liability for the First Count and the SJ Global Defendants hypothetically showing that there is no jurisdiction over them, or Ramjeet showing that he was not Douglas's partner.

### c.  The Court Should Enter A Final Judgment As To Damages On the First Claim

The Court should decline, pursuant to the interests of the parties, to postpone assessing damages on the First Claim to avoid the possible problem of dealing with potentially inconsistent damage determinations.[4]  FAT Brands' interest in a timely damage assessment outweighs the

---

[4] In different circumstances, courts have entered judgment "solely as to liability and not as to the amount of damages to be assessed against the defaulting party, since a separate determination of damages would pose the prospect of inconsistent judgments." *Balde v. Istanbul Turkish Grill, Inc.*, 2015 U.S. Dist. LEXIS 60289, *4 (N.D.N.Y. May 8, 2015)

"mild administrative inconvenience" potentially to arise *if* a jury issues a verdict inconsistent with the damages awarded pursuant to an inquest. *Bleecker v. Zetian Sys.*, 2013 U.S. Dist. LEXIS 157883, *15 (concerns about inconsistent rulings do not warrant delaying a determination as to damages); *Int'l Gemmological Inst., Inc. v. Rafaeil*, 2005 U.S. Dist. LEXIS 19288 (S.D.N.Y. August 17, 2005). Because FAT Brands cannot seek to enforce a judgment until it is final, postponing a damages judgment would afford PPMT "ample opportunity to spend, secrete, or otherwise protect [its] ill-gotten gains." *Johannes Baumgartner Wirtschafts Und Vermogensberatung GmbH v. Salzman*, 2010 U.S. Dist. LEXIS 105676, *3-4, (E.D.N.Y. September 30, 2010).

FAT Brands cannot begin to enforce its judgment against PPMT, such as by serving restraining notices under CPLR 5229, or engaging in discovery under Fed. R. Civ. P. Rule 69 to locate PPMT's assets, until the judgment becomes final. In this complex case involving ten other claims filed against nine other defendants, located throughout the world, a final judgment may not be rendered for several years. There is a serious risk that PPMT has taken steps, and will take further steps, to render meaningless any judgment issued at that later date.

Subsequent to FAT Brands filing suit, PPMT apparently shut its offices, and its website and other social media pages have been removed from the internet. Douglas now advertises his services being performed through a new entity. PPMT's deals consisted of investments with Middle Eastern family offices. Thus, there is a significant risk that PPMT is insolvent and will attempt to frustrate any judgement and avoid liability by moving its assets (business opportunities and deals) to a new entity or overseas. *See, e.g.*, *Bleecker*, 2013 U.S. Dist. LEXIS 157883, *14 (S.D.N.Y. October 3, 2013) (declining to defer damages hearing based upon allegations that the

defendant is insolvent and is seeking to avoid liability by creating a New York corporation to which it transferred its assets).

Strikingly, PPMT's website, before being shut down, boasted that it had completed "over $300M" in direct investments in the last 24 months and currently has mandates for nearly $1.5 billion in specified investments.  Despite purportedly closing on and working on such massive deals, PPMT shuttered its doors with no indication thatit retained this income .

Judge Francis has explained why under such circumstances the "slight strain on judicial resources" must "give way to the interests of the parties in proceeding with the inquest":

> It is undisputed that the amount of damages that a plaintiff may recover from defaulting and non-defaulting defendants in a case based on joint and several liability should not differ.  However, it is unclear why the mere possibility that such a circumstance may come to pass should prevent this Court from assessing damages. If a jury returns a verdict for a different amount than is assessed during this inquest, my ruling will be set aside and the jury's finding will prevail. This mild administrative inconvenience is clearly outweighed by the interests of the parties in proceeding with the damage assessment at this time.

> The plaintiff in this case has suffered a significant monetary injury. Postponing the inquest would delay -- and perhaps jeopardize -- its recovery since a plaintiff cannot begin to collect on a judgment until it is final. During the potentially protracted litigation against the non-defaulting defendants, the defaulting defendants would have ample opportunity to spend, secrete, or otherwise protect their ill-gotten gains. If they are successful in doing so, the delayed inquest could permanently prevent the plaintiff from being made whole.

> The non-defaulting defendants could also be injured by a postponed assessment of damages. If the defaulting parties are able to insulate themselves from judgment during the continuing litigation, the non-defaulting parties could be forced to satisfy the entire damage award without the possibility of contribution from the defaulting defendants. On the other hand, any fears that the non-defaulting parties have about the precedential effect of this inquest are baseless. It will have none...

> The only parties that may experience prejudice from assessing damages now are the defaulting defendants, who could be temporarily deprived of an amount greater than the jury ultimately awards. However, it is also possible that the damages assessed by a jury will be the same as or greater than those assessed by this Court, in which case such prejudice would not come to pass. In any event, the interests of these defaulting defendants

21

> -- who have failed to respond and thereby admitted liability -- are significantly weaker than those of the plaintiff they injured, and any prejudice to the defaulting defendants could be easily corrected.
>
> The mere possibility of inconvenience to the defaulting defendants should not require this Court to delay, and threaten, the plaintiff's recovery. Therefore, assessing damages is not premature and I will proceed with the inquest at this time.

*Int'l Gemmological Inst.*, 2005 U.S. Dist. LEXIS 19288, *7-9 (internal citations omitted); *see also*, *Johannes Baumgartner Wirtschafts und Vermogensberatung GMBH v. Salzman*, 2010 U.S. Dist. LEXIS 105676, (E.D.N.Y. Sept. 30, 2010) (entering default judgment against defaulting defendants because [1] "no Defendant ha[d] . . . answered the Complaint or otherwise contested its merits[,]" [2] "Plaintiffs . . . agreed to deposit any money recovered from [the defaulting defendants] with the Court, pending th[e] litigation's final resolution[,]" [3] "the Court believe[d] that the risk of the defaulting Defendants squirreling away assets [wa]s high[,]" and [4] "Plaintiffs' motion for a partial default judgment s[ought] only liquidated damages that [we]re easily calculable, while deferring consideration of other damages"); *Powerserve Int'l, Inc. v. Lavi*, 239 F.3d 508, 515, (2d Cir. 2001) (approved of the conditioning of the vacatur of defaults or default judgments on the posting of security for payment of all or part of an eventual adjudicated judgment).

To further reduce the risk of inconsistent damages awards, FAT Brands is willing to only recover against PPMT on the First Claim "liquidated damages that [are]re easily calculable, while deferring consideration of other damages." *Salzman*, 2010 U.S. Dist. LEXIS 105676; *Albany Molecular Research, Inc. v. Waterville Valley Techs., Inc.*, 323 F.R.D. 489, 494-495, (N.D.N.Y. February 15, 2018) (court exercised its discretion to determine damages in a default in a multi-defendant case, where the damages sought were easily determined without a need for a hearing, and there was a high risk of the defendant "squirreling away" assets).

22

FAT Brands has submitted two declarations to demonstrate its entitlement to the damages that it seeks in this default judgment. The Declaration of Russell Bogart evidences that FAT Brands paid a $100,000 due diligence fee to PPMT. The Declaration of Allen Z. Sussman evidences that FAT Brands incurred $534,100 in legal fees to have Loeb to negotiate and structure the transaction with PPMT. Additionally, FAT Brands is entitled to the award of statutory prejudgment interest in the amount of nine percent per annum on these amounts under NY CPLR 5001. *Albany Molecular*, 323 F.R.D. at 495. Thus, the Court need not conduct a hearing to determine the amount of damages because FAT Brands' evidence establishes the basis for the damages "with reasonable certainty." *AT&T Corp. v. Voice Stream Network, Inc.*, 2017 U.S. Dist. LEXIS 15714 (S.D.N.Y. February 2, 2017).

Dated:  August 18, 2020
        New York, New York

KAGEN, CASPERSEN & BOGART PLLC

By:  _____
     Russell Bogart, Esq.
     Stuart Kagen, Esq.
     757 Third Avenue, 20th Fl.
     New York, NY 10017
     Telephone: (212) 880-2045
     Fax: (646) 304-7879
     rbogart@kcbfirm.com

     *Attorneys for Plaintiff*

23