UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                   :

FAT BRANDS INC.,                            :

                                         :

                       Plaintiff,         :

                                         :                19-CV-10497 (JMF)

       -v-                      :

                                       :              <u>OPINION AND ORDER</u>

PPMT CAPITAL ADVISORS, LTD., et al.,    :

                                       :

                    Defendants.      :

                                       :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        This case concerns an alleged scheme to deceive and defraud Plaintiff FAT Brands Inc.

("FAT Brands" or "FAT") as part of a financing deal gone awry.  FAT Brands brings contract

and fraud claims against the alleged co-conspirators, namely PPMT Capital Advisors, Ltd.

("PPMT"), Royal Gulf Capital Corporation ("Royal Gulf"), and Karl Douglas (collectively, the

"PPMT Defendants"); Wesley Ramjeet; and SJ Global Investments Worldwide, Ltd. ("SJ Global

WW"), SJ Global Investments Ltd. ("SJ Global US"), Peter Samuel, Neil Walsh, Kristina Fields,

and Mickey Edison (collectively, the "SJ Global Defendants" and, together with the PPMT

Defendants and Ramjeet, "Defendants").  The SJ Global Defendants and Ramjeet now move,

pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, to dismiss the claims against

them.  For the reasons that follow, both motions are granted.

<strong>BACKGROUND</strong>

        The following facts are drawn from the Complaint and documents that are attached to,

integral to, or incorporated by reference into, the Complaint, and are assumed to be true for

purposes of these motions.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir.

2010); *see also, e.g.*, *Sullivan v. Walker Constr., Inc.*, No. 18-CV-9870 (AJN), 2019 WL

2008882, at *1 (S.D.N.Y. May 7, 2019) (noting that a court may look beyond the complaint and related documents in deciding a motion to dismiss for lack of personal jurisdiction).[1]

FAT Brands is a restaurant franchising company that develops, markets, acquires, and franchises predominantly fast casual restaurant concepts around the world. ECF No. 97 ("Compl."), ¶ 46. In April 2018, FAT Brands retained two investment advisory firms to assist it in obtaining financing. *Id.* ¶¶ 47-48. In July 2018, FAT Brands entered into a loan and security agreement with FB Lending, LLC ("FB Lending"), through which it borrowed $16 million at a 15% annual interest rate. *Id.* ¶ 67.[2] Upon learning of the loan from FB Lending, Douglas, PPMT's managing partner and chief investment officer, contacted FAT Brands and indicated that PPMT could lend FAT Brands up to $60 million at a lower interest rate. *Id.* ¶¶ 54, 68.

PPMT represented itself as a successful money manager that sourced and structured transactions on behalf of a number of wealthy family offices and small institutions, located primarily in Asia and the Middle East. *Id.* ¶¶ 49, 51-53. PPMT is one of at least fifteen entities operating with the PPMT name. *Id.* ¶ 65. At all relevant times, Ramjeet served as chief executive officer for most of these entities, but not for PPMT itself; for PPMT itself, he served as treasurer and chief financial officer. *Id.* ¶¶ 65, 216. Ramjeet "provided PPMT with several offices located within office space that Ramjeet had leased at 1001 Avenue of the Americas for

_____

[1]    Ramjeet and the SJ Global Defendants cite repeatedly to the answers filed by Douglas. *See, e.g.*, ECF No. 103 ("Ramjeet Mem."), at 4 n.*, 20-21, 24; ECF No. 105 ("SJ Global Mem."), at 3, 23; ECF No. 115 ("Ramjeet Reply"), at 7. Although Ramjeet argues that "this court may take judicial notice of the pleadings in which . . . admissions are found," Ramjeet Reply 7, he cites — and the Court has found — no authority for the proposition that a court may take notice of allegations in another defendant's answer when considering the sufficiency of a complaint on a Rule 12(b) motion. Accordingly, the Court does not consider Douglas's answers, ECF Nos. 89, 100, in deciding the present motions.

[2]    The Complaint also refers to FAT Brands's lender as "JMB Lending" or "JB Lending," but these references appear to be to the same entity as FB Lending. *See id.* ¶ 246.

the PPMT entities operated by Ramjeet." *Id.* ¶ 222. This support was apparently provided pursuant to an agreement that Ramjeet and Douglas had entered into sometime in the summer of 2017, pursuant to "which Ramjeet agreed to support, promote, subsidize and legitimize Douglas in his establishment and operation of PPMT." *Id.* ¶ 311. "In return, Douglas agreed to compensate Ramjeet by hiring one or more of Ramjeet's companies to provide services on any completed transaction and by giving Ramjeet a percentage of the profits." *Id.* ¶ 312.

When Douglas contacted FAT Brands, he claimed to represent "a family office in the Middle East, backed by the Royal Family of Qatar," which "would provide the capital for the [$60 million] loan through Royal Gulf." *Id.* ¶ 69. Douglas claimed that Royal Gulf, a New York corporation for which he also served as chief investment officer, *id.* ¶¶ 15, 92, "was owned and controlled by the Royal Family and used by it for investment purposes," *id.* ¶ 69. Not long after, Douglas represented to FAT Brands that he had cleared the terms of a proposed deal with the family office he purported to represent, and he began drafting a proposed term sheet; FAT Brands, in turn, created a data room to provide PPMT with access to the company's confidential financial information and business plans. *See id.* ¶¶ 50, 71.

On August 7, 2018, PPMT entered into a "binding Letter of Intent" with FAT Brands pertaining to Royal Gulf's anticipated $60 million loan. *Id.* ¶ 72; ECF No. 97-1 ("LOI"). The Letter of Intent outlined the terms of a complex transaction pursuant to which FAT Brands would undertake a restructuring and form a new company, which would then license FAT Brands's intellectual property and receive the loan from Royal Gulf. Compl. ¶ 73. The Letter of Intent provided that "[t]he parties understand and agree that the provisions of this Letter of Intent are not intended to constitute, nor will they be construed as an offer subject to acceptance and other than the provision of exclusivity, will not become legally binding on the parties unless and

until the execution and delivery by the parties of, and then only to the extent reflected in, mutually acceptable" definitive agreements. LOI 1. The Letter of Intent was to "terminate and be null and void on August 31, 2018," unless PPMT notified FAT Brands that it wished to complete the transaction, in which case, the parties were to complete definitive agreements and close the transaction by September 30, 2018, "unless extended by mutual agreement." *Id.* The Letter of Intent further required FAT Brands to "fund an expense deposit of $100,000 to fund completion of legal due diligence." *Id.* at 5,

On August 9, 2018, FAT Brands paid the $100,000 due diligence fee and provided PPMT with access to the data room containing its confidential financial information. Compl. ¶ 77.[3] Ten days later, "PPMT advised FAT Brands that Royal Gulf wished to complete the transaction and that FAT Brands should prepare the definitive documents and take the other steps necessary to effectuate the proposed securitization" described in the Letter of Intent. *Id.* ¶ 78. During an earnings call later that month, FAT Brands announced that it anticipated obtaining new and cheaper financing by October 2018 and, over the next several weeks, its lawyers went to work drafting documents in anticipation of restructuring FAT Brands, terminating its existing credit facility, and consummating the deal with PPMT and Royal Gulf. *See id.* ¶¶ 83-85, 246. During this period, Douglas repeatedly reassured FAT Brands that the investors he allegedly represented — members of the Qatari royal family — were on board with the deal's terms. *See id.* ¶¶ 79-82.

Unbeknownst to FAT Brands, however, Douglas had, at or about the same time, entered into discussions about funding the deal with a different foreign investor, SJ Global WW. *See id.* ¶¶ 146-47. SJ Global WW is a British corporation, which represented that it was the private

---

[3]     The Complaint alleges that FAT Brands made the due diligence payment and provided PPMT access to the data room on August 9, *2019*, but this appears to be a typographical error.

equity arm of a trust with more than $50 billion in assets (the "SJ Global Trust").  *Id.* ¶¶ 18, 20, 38.  At all relevant times, Walsh was the 50% owner and managing director of SJ Global WW, *id.* ¶¶ 21, 37; Fields owned the other half of SJ Global WW and served as its chief financial officer and as a director, *id.* ¶ 22; Samuel was a former part owner and member of the board of directors of SJ Global WW and represented himself as chairman of the SJ Global Trust, *id.* ¶¶ 20, 138; and Edison was represented as a trustee of the SJ Global Trust, *id.* ¶¶ 23, 138. Walsh, Fields, Samuel, and Edison are all foreign residents.  *Id.* ¶¶ 20-23.  By September 2018, PPMT's discussions with SJ Global WW had progressed to the point that the two entities had begun reviewing the terms of the FAT Brands deal.  *See id.* ¶ 127.

Despite Douglas's ongoing communications with the SJ Global Defendants, PPMT continued to indicate to FAT Brands that the funds for the planned transaction would be provided by the Qatari royal family.  On September 12, 2018, FAT Brands's chief executive officer met with Douglas and Ramjeet at PPMT's office in New York, where Ramjeet "corroborated Douglas's boasts regarding his procurement of a firm commitment from the Royal Family to invest in FAT Brands."  *Id.* ¶¶ 82, 238.  "Throughout September 2018, Douglas continued to advise FAT Brands as to the detailed terms to be included in the transaction documents for the whole business securitization" and, by the end of the month, FAT Brands's counsel had finished drafting several of the relevant documents.  *Id.* ¶¶ 83-84.

Meanwhile, PPMT's discussions with SJ Global WW were progressing to the point that, by the fall of 2018, they "had formed a partnership under which SJ Global WW would serve as the capital partner and PPMT would be the general partner."  *Id.* ¶ 151.  On September 28, 2018, Douglas wrote to Samuel and Walsh to confirm an earlier discussion about forming a new entity, SJG PPMT Holdings 1 Limited, to "become the 50/50 joint venture between SJG and PPMT."

*Id.* ¶ 154.  Douglas's email described this entity as the proposed vehicle for the $60 million loan with FAT Brands and for two other deals that PPMT was working on for an additional $150 million.  *Id.* ¶ 155.  Douglas also provided Walsh and Samuel with links to Dropbox folders that contained FAT Brands's sensitive financial information and business plans to enable SJ Global WW to perform its own due diligence.  *Id.* ¶ 166.

The negotiations between FAT Brands and PPMT continued through October and into November 2018.  *See id.* ¶¶ 86-91.  At some point in November 2018, "SJ Global WW told PPMT that it wished to expand the FAT Brands transaction to also provide for the purchasing of $40 million in [FAT Brands] stock."  *Id.* ¶ 177.  Douglas advised FAT Brands that Royal Gulf was interested in purchasing $40 million in stock in addition to the $60 million loan.  *Id.* ¶ 93.  Soon thereafter, however, Douglas told FAT Brands that PPMT Fund I LP should be substituted for Royal Gulf as the counterparty, although he claimed that the capital would still be coming from wealthy Middle East family offices.  *Id.* ¶¶ 94-95.  In fact, PPMT Fund I LP, now defunct, was never funded and was operated by Douglas out of PPMT's New York office, apparently pursuant to a limited partnership agreement executed by the SJ Global Defendants "through a Cayman Island entity that SJ Global WW had asked PPMT to create for it."  *Id.* ¶ 130; *see id.* ¶ 160.

At some point in December 2018, Walsh "requested" that PPMT form SJ Global US, incorporated under Wyoming law, "on the behalf of SJ Global WW."  *Id.* ¶¶ 161-62.  Walsh "directed" a PPMT employee to list himself as the owner of the shares in SJ Global US "with the understanding" that the employee "would transfer all of the shares to Mr. Walsh after the bank accounts were opened."  *Id.* ¶ 19; *see id.* ¶ 163.  Walsh then served as SJ Global US's managing director.  *Id.* ¶ 19.  "PPMT and SJ Global WW determined for tax reasons" that SJ Global US

"should serve as SJ Global WW's remittance or transfer agent to allow SJ Global WW to onshore funds to an entity owned or controlled by it before funding PPMT Fund 1 on behalf of SJG PPMT Holdings 1 LTD." *Id.* ¶ 161.

Meanwhile, by early December 2018, "PPMT had agreed to all of the language contained" in the documents negotiated with FAT Brands "on behalf of themselves and their supposed investors, and agreed to schedule a 'closing' of the transaction for December 20, 2018, at which point the deal would be funded." *Id.* ¶ 100. On December 20, 2018, the parties conducted a conference call "regarding the closing" and "agreed to exchange photocopies of their signatures to the various agreements to demonstrate their commitment to closing, even though the agreements were not to become binding until the original signatures were formally released by counsel upon the funding of the transaction." *Id.* ¶ 102. But the supposed closing day came and went without the promised funds materializing. On December 21, 2018, PPMT told FAT Brands that $100 million (accounting for both the $60 million loan and $40 million in equity) was available to be wired that day, but that it first needed to be converted from Euros to dollars. *See id.* ¶ 104. That same day, FAT Brands's CEO wrote to Douglas "to demand the disclosure of the investor and proof of funds in light of PPMT's failure to fund the transaction," *id.* ¶ 113 (internal quotation marks omitted), but PPMT "refused to disclose the name of the family office supposedly wiring the funds other than to swear the family office ha[d] the money," *id.* ¶ 115.

Finally, on January 5, 2019, PPMT revealed to FAT Brands that SJ Global WW was the source of the funds. *Id.* ¶ 116. Six days later, Walsh and Samuel communicated to FAT Brands that a wire payment would be forthcoming "within a few days." *Id.* ¶ 122. On January 16, 2019, however, Douglas told FAT Brands that while the SJ Global Trust had the funds to close the

deal, SJ Global's lawyers first needed to review the transaction documents.  *Id.* ¶ 126.  Finally, on January 27, 2019, FAT Brands's chief executive officer met with Douglas, Samuel, Walsh, and Edison in Zurich, Switzerland.  *Id.* ¶ 128.  At the meeting, "SJ Global claimed that it had never committed in writing or otherwise to PPMT to invest in FAT through its PPMT Fund" and "further claimed that it did not approve of the deal's structure," but "would be interested in a 'direct deal' with FAT" instead.  *Id.* ¶ 129.  Following this meeting, "SJ Global finally agreed to provide FAT Brands with proof that it had sufficient funds to close the transaction."  *Id.* ¶ 131.  Fields then texted to FAT Brands a photograph of a "Safe Keeping Receipt" purporting to show that SJ Global WW held $19 billion worth of Federal Reserve bearer bonds.  *See id.* ¶¶ 132-33.  But the receipt bore several indicia of inauthenticity, *see id.* ¶¶ 134, prompting FAT Brands to begin raising questions; in turn, Douglas "purportedly report[ed] SJ Global WW to the authorities," *id.* ¶ 206.  "To date, FAT has not received a single penny of the $100 million in financing that was required to be paid under the executed Transaction Documents."  *Id.* ¶ 108.

FAT Brands filed this lawsuit on November 12, 2019, s*ee* ECF No. 1, and filed the operative amended complaint ("Complaint") on April 3, 2020, Compl.  FAT Brands alleges various claims against the PPMT Defendants, which are not relevant to the present motions.[4] FAT Brands brings two claims against the SJ Global Defendants, for fraud and conspiracy to commit fraud and tortious interference with contract (Counts IV and VII), Compl. ¶¶ 275-84,

---

[4]    Douglas, proceeding without counsel, answered the Complaint on April 27, 2020.  *See* ECF No. 100.  Although the answer purported to be on behalf of PPMT and Royal Gulf as well, the Court struck the answer as to those Defendants because of the well-established principle that corporate entities may appear in federal court only through licensed counsel.  *See* ECF No. 101. To date, neither PPMT nor Royal Gulf has responded to the Complaint or otherwise appeared in this action.  On October 13, 2020, the Court entered default judgment on FAT Brands's first claim for relief against PPMT "in the amount of $738,075, together with any post-judgment interest as permitted by law."  ECF No. 148, at 2.

296-300; and three claims against Ramjeet, for liability under a partnership agreement, negligent

supervision, and apparent authority (Counts IX, X, and XI), *id*. ¶¶ 304-41.

## RAMJEET'S MOTION TO DISMISS

The Court will begin with Ramjeet's motion to dismiss for failure to state a claim

pursuant to Rule 12(b)(6).  In evaluating a Rule 12(b)(6) motion, a court must accept all facts set

forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See,*

*e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  A

claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient

"to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  A

plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*,

and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.

If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable

to plausible, [the] complaint must be dismissed."  *Id.* at 570.

The Complaint names Ramjeet in three counts — Count IX, Liability Under a Partnership

Agreement; Count X, Negligent Supervision; and Count XI, Apparent Authority — each of

which "seeks to hold Ramjeet vicariously liable for [Douglas's] tortious conduct."  ECF No. 110

("Pl.'s Ramjeet Opp'n"), at 1; *see* Compl. ¶¶ 304-41.  The Court will consider each claim in turn.

## A.  Partnership Agreement

First, FAT Brands argues that "Ramjeet is liable for Douglas's tortious conduct because

he and Douglas were partners."  Pl.'s Ramjeet Opp'n 11.  "Under New York law, the party

'pleading the existence of a partnership has the burden of proving its existence.'"  *Nuevo Mundo*

*Holdings v. Pricewaterhouse Coopers LLP*, No. 03-CV-0613 (GBD), 2004 WL 112948, at *7

(S.D.N.Y. Jan. 22, 2004) (quoting *Cent. Nat'l Bank, Canajoharie v. Purdy*, 671 N.Y.S.2d 866,

868 (App. Div. 1998)).  The elements of a partnership are: (1) the parties' sharing of profits and

losses; (2) the parties' joint control and management of the business; (3) the contribution by each

party of property, financial resources, effort, skill, or knowledge; and (4) the intention of the

parties to be partners.  *See Ardis Health, LLC v. Nankivell*, No. 11-CV-5013 (NRB), 2012 WL

5290326, at *5 (S.D.N.Y. Oct. 23, 2012); *Estate of Albin v. Mertz, LLC*, No. 05-CV-3440

(KMW) (KNF), 2006 WL 8461442, at *8 (S.D.N.Y. Mar. 15, 2006).  "Although none of these

factors is determinative . . . an agreement to share losses is 'indispens[a]ble' to partnership

formation."  *Ardis Health*, 2012 WL 5290326, at *5 (quoting *Steinbeck v. Gerosa*, 4 N.Y.2d 302,

317 (1958)); *accord Dinaco, Inc., v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003).

Measured against these standards, the Complaint fails to state a claim against Ramjeet on

a partnership theory because it does not allege an agreement to share losses.  FAT Brands argues

that "Ramjeet largely subsidized Douglas's business, paying for his office space, website and

marketing" and that, "[i]f PPMT Capital failed to close any deals, Ramjeet stood to lose the costs

of those expenses."  Pl.'s Ramjeet Opp'n 13.  But these kinds of losses do not suffice.  A

partnership requires "a mutual promise or undertaking of the parties to share in the profits of the

business *and submit to the burden of making good the losses*."  *Dinaco*, 346 F.3d at 68 (emphasis

in original) (quoting *Steinbeck*, 4 N.Y.2d at 317).  Thus, "the mere fact that an individual stands

to lose the value of his or her services rendered in connection with a collaborative business effort

does not transform that person into a partner."  *Growblox Scis., Inc. v. GCM Admin. Servs., LLC*,

No. 14-CV-2280 (ER), 2015 WL 3504208, at *8 (S.D.N.Y. June 2, 2015); *accord Ardis Health*,

2012 WL 5290326, at *6 (collecting cases).  At bottom, that is all FAT Brands alleges here.  To be sure, Ramjeet "had an interest in seeing [PPMT] succeed."  *Dinaco*, 346 F.3d at 68.  But he "never guaranteed or agreed to guaranty [PPMT's] financial or contractual obligations," which is the key to a partnership.  *Id.* (explaining that "providing PEMI with various administrative services and office amenities, and the forgiveness of past due rent indicate[d] that Time supported and extended business courtesies to PEMI" but did "not establish that Time agreed to accept the risk of PEMI's video business, or that Time agreed to submit to the burden of making good the losses of PEMI" sufficient to establish the existence of a partnership (internal quotation marks omitted)).  Without this "indispensable" element, FAT Brands fails to state a claim against Ramjeet for liability under a partnership agreement.

## B.  Negligent Supervision

Second, FAT Brands contends that "Ramjeet is liable for injuries resulting from Douglas's tortious conduct" under a theory of negligent supervision.  Pl.'s Ramjeet Opp'n 16.  In *Ehrens v. Lutheran Church*, 385 F.3d 232 (2d Cir. 2004) (per curiam), the Second Circuit held that, "[t]o state a claim for negligent supervision . . . under New York law, in addition to the standard elements of negligence, a plaintiff must show" three elements: "(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels."  *Id.* at 235 (internal quotation marks and citations omitted).  The

Second Circuit reaffirmed these elements of a negligent supervision claim as recently as last year. *See Rich v. Fox News Network, LLC*, 939 F.3d 112, 129 (2d Cir. 2019).

Here, there is no real dispute that the first of these elements is lacking as the Complaint does not allege the existence of an employer-employee relationship between Ramjeet and PPMT. Instead, relying primarily on a handful of state lower court cases, FAT Brands argues that New York law does not actually require an employer-employee relationship. *See* Pl.'s Ramjeet Opp'n 17-20. But "[w]hile a more recent decision regarding New York law from the New York Court of Appeals would trump an earlier decision from the Second Circuit, where the Second Circuit is merely interpreting existing New York cases, the Court is bound by Second Circuit precedent, even on issues of state law." *Adebiyi v. Yankee Fiber Control, Inc.*, 705 F. Supp. 2d 287, 291 n.4 (S.D.N.Y. 2010) (Sullivan, J.) (internal quotation marks, citations, and alterations omitted); *see also, e.g.*, *Danaher Corp. v. Travelers Indem. Co.*, 414 F. Supp. 3d 436, 457 (S.D.N.Y. 2019) (collecting cases); *Granite Enters. Ltd. v. Virgoz Oils & Fats Pte. Ltd.*, No. 09-CV-4534 (RWS), 2010 WL 532310, at *1 (S.D.N.Y. Feb. 11, 2010) ("[T]he Court is bound by Second Circuit precedent, even on issues of state law."). Thus, the cases on which FAT Brands relies are irrelevant for this Court's purposes. Unless and until either the New York Court of Appeals or the Second Circuit says otherwise, this Court is bound by *Ehrens* and FAT Brands's claim must be dismissed for failure to plead the existence of an employer-employee relationship. *See, e.g.*, *Naughright v. Robbins*, No. 10-CV-8451 (RWS), 2014 WL 5315007, at *8 (S.D.N.Y. Oct. 17,

2014); *Corley v. Jahr*, No. 11-CV-9044 (RJS) (KNF), 2014 WL 772253, at *9 (S.D.N.Y. Feb. 10, 2014) (Sullivan, J.).[5]

## C. Apparent Authority

Finally, FAT Brands argues that "Ramjeet is liable for the injuries resulting from Douglas's tortious conduct because Douglas was acting as Ramjeet's agent in connection with the FAT transaction" under the doctrine of apparent authority.  Pl.'s Ramjeet Opp'n 22.  "Apparent authority arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have an act done on his behalf by the person purporting to act for him."  *Dinaco*, 346 F.3d at 69 (internal quotation marks and alterations omitted).  "Essential to the creation of apparent authority" under New York law "are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction."  *Hillair Capital Invs., LP v. Smith Sys. Transp., Inc.*, 640 F. App'x 49, 52 (2d Cir. 2016) (summary order) (quoting *Hallock v. State*, 64 N.Y.2d 224, 231 (1984)).  That is, "apparent authority is created only by the representations of the principal to the third party"; thus, "the agent cannot confer authority upon himself or make himself an agent simply by saying that he is one."  *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 286-87 (S.D.N.Y. 2014) (first quoting

---

[5] In a footnote in its opposition brief, FAT Brands suggests that, "[t]o the extent that the Court finds that the existence of an employer-employee relationship is necessary element [sic] of a negligent supervision claim, the Amended Complaint states a claim for common law negligence based on Ramjeet having directed Douglas's tortious conduct, with knowledge of the circumstances."  Pl.'s Ramjeet Opp'n 20 n.2.  It is well established, however, that a court need not consider allegations made for the first time in papers opposing a motion to dismiss.  *See, e.g.*, *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 322 (S.D.N.Y. 2012) (collecting cases).  Nor must a court consider an argument made only in a footnote.  *See, e.g.*, *City of Philadelphia v. Bank of Am. Corp.*, Nos. 19-CV-1608 (JMF) et al., 2020 WL 6430307, at *12 (S.D.N.Y. Nov. 2, 2020) (collecting cases).  The Court therefore declines to consider this cursory argument.

*Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir. 1989); then quoting *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F. Supp. 2d 155, 161 (S.D.N.Y. 2007)).

Applying these standards here, and focusing only on Ramjeet's own representations to FAT Brands, the Court concludes that the Complaint fails to plausibly allege the existence of apparent authority.  The Complaint alleges only that, during the September 2018 meeting with Douglas and FAT Brands, "Ramjeet, by his actions, words and acquiescence to Douglas' statements, conveyed to [FAT Brands] that Ramjeet, as the head of the PPMT family of companies, exercised supervisory authority over PPMT, including with respect to the FAT Brands transaction."  Compl. ¶ 241.  But the conclusory nature of this allegation aside, the mere fact that Ramjeet conveyed that he "exercised supervisory authority" over PPMT does not permit an inference that Ramjeet "induce[d] [FAT Brands] to believe that [PPMT] ha[d] been authorized to act on [his] behalf."  *Highland Capital Mgmt. v. Schneider*, 607 F.3d 322, 328 (2d Cir. 2010) (internal quotation marks omitted); *see Brown v. Marriott Int'l, Inc.*, No. 14-CV-5960 (SLT) (MDG), 2017 WL 4484194, at *12 (E.D.N.Y. Sept. 29, 2017) ("Plaintiff has not alleged what in these . . . communications gave her this impression.  Therefore, the Court cannot draw a reasonable inference that Plaintiff has sufficiently alleged . . . that it was Defendant's words or conduct that gave Plaintiff the impression that the Defendant controlled and in all ways was responsible for the Hotel." (internal quotation marks and citations omitted)); *4C Foods Corp. v. Package Automation Co.*, No. 14-CV-2212 (CM), 2014 WL 6602535, at *6 (S.D.N.Y. Nov. 18, 2014) ("[N]either the original nor the proposed amended complaint contains a single non-

conclusory allegation about any representation that either Tishma or AGR ever made to 4C."). The Complaint thus fails to state a claim of apparent authority as well.

## THE SJ GLOBAL DEFENDANTS' MOTION TO DISMISS

The SJ Global Defendants move to dismiss on two grounds. First, all of them other than SJ Global US move to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2).[6] Second, all of them move to dismiss for failure to state a claim pursuant to Rule 12(b)(6). The Court will begin, as it must, with the question of personal jurisdiction. *See, e.g.*, *In re Rationis Enters., Inc. of Pan.,* 261 F.3d 264, 267-68 (2d Cir. 2001).

## A.  Personal Jurisdiction

When responding to a Rule 12(b)(2) motion, "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *JCorps Int'l, Inc. v. Charles & Lynn Schusterman Family Found.*, 828 F. App'x 740, 742 (2d Cir. 2020) (summary order) (internal quotation marks omitted). The showing required "varies depending on the procedural posture of the litigation," on a "sliding scale." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (internal quotation marks omitted). "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations. After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Id.* at 84-85. Still, on a motion to dismiss, the court must "construe the pleadings and affidavits in

---

[6]     Although the SJ Global Defendants move to dismiss for lack of *personal* jurisdiction, their papers actually invoke Rule 12(b)(1), which pertains to *subject-matter* jurisdiction. *See* ECF No. 104; SJ Global Mem. 1. Rule 12(b)(2) is the correct provision.

the light most favorable to [the plaintiff], resolving all doubts in [its] favor," *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (per curiam), although "conclusory" allegations are "insufficient for specific personal jurisdiction purposes," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 676 (2d Cir. 2013).  "Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial."  *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981).

Where, as here, subject-matter jurisdiction is premised on diversity of citizenship, personal jurisdiction over a non-resident defendant is a function of the law of the forum state.  *See, e.g.*, *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006).  Thus, to decide whether personal jurisdiction over SJ Global WW, Samuel, Walsh, Fields, and Edison is proper, the Court must decide "(1) whether there is jurisdiction under New York law; and (2) whether the exercise of jurisdiction would be consistent with federal due process requirements."  *Thackurdeen v. Duke Univ.*, 660 F. App'x 43, 45 (2d Cir. 2016) (summary order).  There are "two categories of personal jurisdiction: general and specific personal jurisdiction."  *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014) (internal quotation marks omitted).  The first — general, or all-purpose jurisdiction — "permits a court to hear any and all claims against an entity."  *Id.* (internal quotation marks omitted).  But it is consistent with due process only when the defendant's "affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State," *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (internal quotation marks and alterations omitted), which is not the case for SJ Global WW, Samuel, Walsh, Fields, or Edison.  "Specific jurisdiction, on the other hand, permits adjudicatory authority only over issues that arise out of or relate to the entity's contacts with the forum."  *Gucci America, Inc.*, 768 F.3d at 134 (internal quotation marks and alterations omitted).

1. **Jurisdiction Under New York Law**

With respect to the first prong of the analysis, FAT Brands primarily invokes Section

302(a) of New York's long-arm statute, which provides, in relevant part, as follows:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent:
>
>> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>>
>> 2. commits a tortious act within the state . . . ; or
>>
>> 3. commits a tortious act without the state causing injury to person or property within the state . . . if he
>>
>>> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>>>
>>> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

N.Y. C.P.L.R. 302(a). "In determining whether an agency exists under § 302, courts have

focused on the realities of the relationship in question rather than the formalities of agency law."

*CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986). Specifically, the alleged

agent "must have acted in the state for the benefit of, and with the knowledge and consent of[,]

the non-resident principal." *Id.* (internal quotation marks omitted) "While the principal need not

exercise absolute control over the decisions or acts of the putative agent, a sufficient amount of

control 'may involve the ability of the principal to influence such acts or decisions by virtue of

the parties' respective roles.'" *Cavu Releasing, LLC v. Fries*, 419 F. Supp. 2d 388, 392

(S.D.N.Y. 2005) (citation omitted) (quoting *Scholastic, Inc. v. Stouffer*, No. 99-CV-11480

(AGS), 2000 WL 1154252, at *5 (S.D.N.Y. Aug. 14, 2000)). Significantly, the requirement "is

generally applied flexibly, requiring only 'some measure' of control by the 'principal' over the

'agent.' This minimal level of required control does not need to be formal or direct." *Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*, No. 15-CV-5211 (CM), 2016 WL 7188792, at *9 (S.D.N.Y. Dec. 2, 2016) (citation omitted) (quoting *Mayes v. Leipziger*, 674 F.2d 178, 181 (2d Cir. 1982)).

Applying these standards here, the Court concludes that, at this stage, it may exercise personal jurisdiction over SJ Global WW, Walsh, and Samuel pursuant to Section 302(a)(2). For starters, FAT Brands indisputably alleges that Douglas and PPMT committed tortious acts in New York within the meaning of the statute. And, mindful that the burden to establish agency for purposes of Section 302 at pleading stage is "modest," *Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418, 431 (E.D.N.Y. 2012), the Complaint adequately alleges that they acted as agents of SJ Global WW, Walsh, and Samuel. Among other things, it alleges that:

- In the fall of 2018, SJ Global WW and PPMT "formed a partnership under which SJ Global WW would serve as the capital partner and PPMT would be the general partner," but "in actuality" the SJ Global Defendants "exerted tremendous control over the partnership, based upon [their] supposed provision of the funding desperately needed by Douglas, as evidenced by Neil Walsh being appointed the Managing Director of many of the joint entities created by the Partnership," Compl. ¶ 151;

- On September 28, 2018, Douglas wrote to Walsh and Samuel "to discuss SJ Global WW investing $60 million in FAT Brands," offered to connect SJ Global WW's legal team with FAT Brands's lawyers, and provided SJ Global WW with links to a Dropbox folder containing FAT Brands's sensitive financial information, *id.* ¶¶ 165-66, 169;

- SJ Global WW demanded that changes be made to the transaction documents between FAT Brands and PPMT, *id.* ¶ 172;

- Douglas met with Walsh and Samuel on November 12, 2018, in London "to discuss the FAT Brands transaction," *id.* ¶ 176;

- "In November 2018, SJ Global WW told PPMT that it wished to expand the FAT Brands transaction" to purchase equity "based upon the belief that the loan

[would] inflate the value of the stock," a condition that PPMT subsequently negotiated with FAT Brands "[a]t Walsh's instruction," *id.* ¶ 177-78;

- Leading up to the scheduled December closing date, Walsh and Samuel repeatedly told PPMT that SJ Global WW would wire $100 million to a U.S. bank account to fund PPMT Fund I LP, *id.* ¶ 180;

- "Walsh directed Douglas to threaten to terminate the deal" when FAT Brands raised concerns about PPMT's failure to fund, *id.* ¶ 182;

- In December 2018, Walsh directed PPMT to form SJ Global US for the purpose of enabling SJ Global WW to onshore funds to invest into PPMT Fund I LP — a limited partnership between SJ Global WW and PPMT — which in turn signed a credit agreement with FAT Brands, *id.* ¶¶ 130, 159-60, 162.

Taken together, these allegations plausibly establish that Douglas and PPMT acted "for the benefit of, with the knowledge and consent of, and under some control by" SJ Global WW, Walsh, and Samuel. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (internal quotation marks omitted); *see Fischman v. Mitsubishi Chem. Holdings Am., Inc.*, No. 18-CV-8188 (JMF), 2020 WL 7388654, at *2 (S.D.N.Y. Dec. 16, 2020). It follows that, for purposes of this motion, the Court may exercise personal jurisdiction over SJ Global WW, Walsh, and Samuel pursuant to Section 302(a)(2).[7]

Fields and Edison, however, are another matter. FAT Brands argues that a corporation's jurisdiction-conferring in-state activities "may be imputed" to its officers where the officers exercise "some control over those activities." Pl.'s SJ Global Opp'n 35 (quoting *Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, No. 18-CV-2897 (JPO), 2018 WL 5118638, at *4 n.2 (S.D.N.Y. Oct. 22, 2018)). But "[i]t is 'well established that individual officers and employees of a corporation are not automatically subject to personal jurisdiction . . . simply because a court

---

[7]     In light of that conclusion, the Court need not and does not address FAT Brands's alternative theories for personal jurisdiction over SJ Global WW, Walsh, and Samuel. *See* ECF No. 111 ("Pl.'s SJ Global Opp'n"), at 30-45.

can exercise jurisdiction over the corporation.'" *In re Lyman Good Dietary Supplements Litig.*,
No. 17-CV-8047 (VEC), 2018 WL 3733949, at *8 (S.D.N.Y. Aug. 6, 2018) (quoting *Pilates,
Inc. v. Pilates Inst., Inc.*, 891 F. Supp. 175, 180-81 (S.D.N.Y. 1995)). Instead, "[j]urisdiction
over a corporation's . . . officer . . . , in his or her individual capacity, must be premised on the
defendant's *own* personal contacts with the forum." *Bidonthecity.com LLC v. Halverston
Holdings Ltd.*, No. 12-CV-9258 (ALC) (MHD), 2014 WL 1331046, at *5 (S.D.N.Y. Mar. 31,
2014) (emphasis added). "[E]ach individual defendant must be shown to have personally
engaged in relevant and intentional transactions in New York" — in this case, through their
agents — "to warrant the exercise of personal jurisdiction." *King County v. IKB Deutsche
Industriebank, AG*, 769 F. Supp. 2d 309, 315 (S.D.N.Y. 2011). "At the heart of this inquiry is
whether the out-of-state corporate officers were primary actors in the transaction in New York
that gave rise to the litigation . . . ." *Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 323 (S.D.N.Y.
1998) (internal quotation marks and alterations omitted).

FAT Brands fails to allege that Fields and Edison acted in a way that would permit the
Court to exercise personal jurisdiction over them. In fact, the Complaint is virtually devoid of
non-conclusory allegations concerning Fields and Edison's involvement in the relevant conduct
beyond their positions in SJ Global WW and the SJ Global Trust. Their alleged involvement
boils down to (1) Edison's attendance at the January 27, 2019 meeting in Zurich with FAT
Brands, Samuel, and Walsh, during which "SJ Global claimed that it had never committed in
writing or otherwise to PPMT to invest in FAT through its PPMT Fund" and "further claimed
that it did not approve of the deal's structure and would be interested instead in a 'direct deal'
with FAT," Compl. ¶¶ 128-29; and (2) Fields's sending by text the photograph of a receipt that
purported to verify that SJ Global WW held $19 billion in bearer bonds, *id.* ¶¶ 132-33. Notably,

these actions occurred at a point when the alleged principal-agent relationship between SJ Global WW and the PPMT Defendants had arguably broken down.  But regardless, these allegations, on their own, are plainly insufficient to impute the Court's exercise of jurisdiction over SJ Global WW to Fields and Edison.  *See King County*, 769 F. Supp. 2d at 320-21 ("[P]laintiffs do not establish that either defendant directed [the corporation] to perform any act in New York.  Aside from the mere fact of their positions within the corporation, plaintiffs do not offer any evidence to indicate that either [individual defendant] exercised control over [the corporation's] activities in New York." (footnotes omitted)).  Accordingly, FAT Brands's claims against Fields and Edison must be and are dismissed for lack of personal jurisdiction.

### 2.  Due Process

The exercise of personal jurisdiction over SJ Global WW, Walsh, and Samuel also satisfies due process.  The due process analysis "consists of two separate components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012).  The minimum contacts test asks whether a defendant has engaged in "purposeful availment" — i.e., whether the contacts indicate the defendant's intent to invoke the benefits and privileges of New York law.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985).  The second part of the due process analysis asks "whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice — that is, whether it is reasonable under the circumstances of the particular case."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (internal quotation marks omitted).

In light of the discussion above, the Court has no trouble concluding that, through Douglas and PPMT, SJ Global WW, Walsh, and Samuel "purposefully availed" themselves "of

the privilege of doing business [in New York] and could foresee being haled into court there."
*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) ("*Licci II*") (internal quotation marks omitted); *see also, e.g.*, *Fischman*, 2020 WL 7388654, at *2; *LaChapelle v. Torres*, 1 F. Supp. 3d 163, 178 (S.D.N.Y. 2014).  And given that FAT Brands makes a threshold showing of minimum contacts, the Court cannot say that requiring SJ Global WW, Walsh, and Samuel to appear in this District would be unreasonable.  *See, e.g.*, *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 165 (2d Cir. 2010) (explaining that "the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts," and the defendant must "present[] 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable'" (quoting *Burger King*, 471 U.S. at 477).  In short, this is not one of the "rare" cases in which jurisdiction is proper under Section 302(a) but nonetheless violates due process.  *Licci II*, 732 F.3d at 170.

## B.  Failure to State a Claim

With that, the Court turns to the remaining SJ Global Defendants' motion to dismiss for failure to state a claim.  The Complaint alleges two claims against the SJ Global Defendants: (1) fraud and conspiracy to commit fraud; and (2) tortious interference with contract.  The Court has already described the standards relevant to a Rule 12(b)(6) motion.  To the extent that FAT Brands alleges fraud, however, it must also meet the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure.  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  The Second Circuit has specified that, where a claim is subject to Rule 9(b), "the complaint must allege the time, place, speaker, and sometimes even the content of the alleged

misrepresentation." *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir. 1990).  Moreover,

"[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should

inform each defendant of the nature of his alleged participation in the fraud."  *DiVittorio v.*

*Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)*; see also Mills v. Polar*

*Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the

complaint vaguely attributes the alleged fraudulent statements to 'defendants.'").

### 1.  Fraud and Conspiracy to Commit Fraud

First, FAT Brands alleges that the SJ Global Defendants committed fraud and conspiracy

to commit fraud by, "directly and through PPMT Capital, ma[king] false representations to FAT

regarding the source and certainty of funding for the FAT financing transaction, from August

2018 through January 2019."  Pl.'s SJ Global Opp'n 10.  Under New York law, to state a claim

for fraud, a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact;

(2) which the defendant knew to be false; (3) which the defendant made with the intention of

inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to

the plaintiff.  *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (per curiam).  "To state a

proper claim for conspiracy to defraud the plaintiff must allege both [the] primary tort [of fraud]

and also show the four elements of a conspiracy: (1) a corrupt agreement between two or more

parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation

in the furtherance of a plan or purpose; and (4) resulting damage or injury."  *Kottler v. Deutsche*

*Bank AG*, 607 F. Supp. 2d 447, 463 (S.D.N.Y. 2009) (internal quotation marks omitted).

Here, the communications that the SJ Global Defendants are alleged to have made

directly to FAT Brands are insufficient to sustain a claim for fraud or conspiracy to commit

fraud.  The only such communications are those in January 2019: during the Zurich meeting,

when the SJ Global Defendants claimed they had not agreed to any deal negotiated by PPMT, but might be interested in making a direct investment in FAT Brands; and the picture of the safe-keeping receipt that Fields texted to FAT Brands. *See* Pl.'s SJ Global Opp'n 14-15. But FAT Brands does not, and cannot, establish the necessary elements of reliance and causation on these communications. By January 2019, the financing deal that FAT Brands had hoped to consummate was long past the date on which it was supposed to close. And rather than relying to its detriment on the safe-keeping receipt, FAT Brands appears to have done the opposite: "raising questions" about the deal after receiving it. Compl. ¶ 206. Notably, FAT Brands does not actually claim otherwise; its arguments with respect to reliance and causation rely exclusively on statements and omissions made during 2018 by Douglas to FAT Brands or by the SJ Global Defendants to Douglas, prior to the commencement of direct communications between FAT Brands and the SJ Global Defendants. *See* Pl.'s SJ Global Opp'n 15-20. Thus, it is on these communications that FAT Brands's fraud and conspiracy to commit fraud claim rises or falls.

These communications do not support a fraud claim. First, the statements and omissions that Douglas or PPMT made to FAT Brands — the vast majority of the statements and omissions alleged in the Complaint — can support a claim against the SJ Global Defendants only if Douglas or PPMT were acting as their agents in making them. *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012) ("[P]rincipals may be held liable for torts committed by their agents when such agents act within the scope of their agency."). Significantly, however, agency in this context requires more than the comparatively lenient "some control" standard for agency that was required for personal jurisdiction. Instead, to find the SJ Global Defendants liable for fraud under an agency theory, the "formalities" of agency law must be observed. *See, e.g., Steinhardt*

*v. Shadow*, No. 16-CV-4222 (RJS), 2018 WL 4278335, at *1-2 (S.D.N.Y. Apr. 11, 2018)

(Sullivan, J.) (describing the different standards).  That law provides "that an agency relationship

results from a manifestation of consent by one person to another that the other shall act on his

behalf and subject to his control, and the consent by the other to act."  *Bigio*, 675 F.3d at 175

(quoting *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001)).

"Essential to the finding of an agency is a determination that the agent acts subject to the

principal's direction and control."  *Oparaji v. Atl. Container Line*, No. 07-CV-2124 (GEL), 2008

WL 4054412, at *11 (S.D.N.Y. Aug. 28, 2008) (Lynch, J.) (internal quotation marks omitted);

*accord Nuevo Mundo Holdings*, 2004 WL 112948, at *5 (collecting cases).  That said, "[c]ontrol

alone is insufficient to establish the existence of an agency relationship . . . .   The agent's power

to alter legal relations between the principal and third persons is also an essential element of the

agency relationship."  *Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 422

(S.D.N.Y. 2007) (citing *Tip Top Farms, Inc. v. Dairylea Coop., Inc.*, 497 N.Y.S.2d 99, 105

(App. Div. 1985)); *see also, e.g.*, *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 89 (S.D.N.Y. 2010)

("Under New York law, 'an agent must have authority . . . to bind his principal.'" (quoting

*Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998))).

The allegations listed above allowed the Court to infer for purposes of personal

jurisdiction that Douglas and PPMT acted "for the benefit of, and with the knowledge and

consent of," SJ Global WW, Walsh, and Samuel, and that the SJ Global Defendants had some

ability "to influence" the PPMT Defendants' actions.  *Cavu Releasing*, 419 F. Supp. 2d at 392

(internal quotation marks omitted).  But they do not indicate that the SJ Global Defendants "ever

manifested to" the PPMT Defendants their "intent" that the PPMT Defendants "would be

authorized to bind them by [their] transactions."  *Spagnola*, 264 F.R.D. at 90.  Nor is "the fact

that" SJ Global WW, Walsh, and Samuel "may have approved and authorized [the PPMT Defendants'] allegedly wrongful actions . . . enough to manifest the requisite consent between" the two sets of Defendants to indicate that the PPMT Defendants "would 'act on [their] behalf and *subject to [their] control*.'" *Maung Ng We v. Merrill Lynch & Co*, No. 99-CV-9687 (CSH), 2000 WL 1159835, at *9 (S.D.N.Y. Aug. 15, 2000) (emphasis in original) (quoting *In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984)).  At bottom, FAT Brands's primary allegation of control is premised on SJ Global WW's "promis[e] to advance hundreds of millions of dollars to the partnership" between SJ Global WW and PPMT "given Douglas' desperate need for investments."  Compl. ¶ 30.  But such financial support does not establish the requisite level of control necessary to support a finding of agency for liability purposes — particularly where, as here, no such financial support was ever actually provided.  *See, e.g.*, *Bigio*, 675 F.3d at 175 ("Plaintiffs' assertions that Defendants invested in CCE, did (and continue to do) business with CCE, and advised CCE in some unspecified manner on the subject of profitability simply do not suggest that Defendants had the power to control CCE's conduct."); *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 702-03 (2d Cir. 1990) (finding no agency where purported principal "did provide financing" to purported agent, but purported agent "was meant to, and did, operate independently").

Alternatively, FAT Brands contends that it need not demonstrate an agency relationship between the SJ Global and PPMT Defendants to hold the former liable for the misleading statements or omissions of the latter because "[u]nder New York law '[a] third party can recover damages for a fraudulent misrepresentation if he can establish that he relied upon it to his detriment, and that the defendants intended the misrepresentation to be conveyed to him.'"  Pl.'s SJ Global Opp'n 13 (quoting *Peerless Mills, Inc. v. AT&T Co.*, 527 F.2d 445, 450 (2d Cir.

1975)).  But the cases that FAT Brands cites in support of this argument involved a defendant's liability for *its own* misstatements or omissions, not statements that were made by a third party. *See, e.g.*, *Peerless Mills*, 527 F.2d at 451 ("[T]here is no showing that the appellees intended that Cohn convey *their representations* to the Fines." (emphasis added)).  Absent an agency relationship, then, only the SJ Global Defendants' own statements are relevant to the claim of fraud against them.  To be sure, these statements need not have been made directly to FAT Brands, but they must have been "made with the intent that [they] be communicated to the plaintiff and that the plaintiff rely on [them]."  *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 828 (2016).  FAT Brands must also show its *own* reliance.  That is, it is not sufficient under New York law to plead that the PPMT Defendants relied on the SJ Global Defendants' statements and that FAT Brands was injured as a result.  *See id.* at 829.  And, of course, because FAT Brands alleges fraud, it must satisfy the heightened pleading standards of Rule 9(b).

The Complaint fails to meet these standards.  As examples of indirectly conveyed misstatements, FAT Brands cites the following allegations (1) that "Douglas told Walsh that 'PPMT had made commitments to do these deals based on Samuel's word' and that PPMT Capital had relied on Samuel having 'committed to close' by September 29th"; (2) that "Douglas told Walsh that 'if we don't close we are going to have a lawsuit' because Douglas had 'made representations to FAT based on' his dealings with SJ Global"; and (3) that "Walsh directed Douglas to tell FAT that funding for the transaction would be wired imminently."  Pl.'s SJ Global Opp'n 13 (citing Compl. ¶¶ 174-75, 183).  To the extent the first two allegations even involve statements made by Walsh or Samuel (rather than vague references by Douglas to prior communications), there is no indication that they intended the statements to be conveyed to FAT

Brands.  As for the third allegation, contrary to the characterization in FAT Brands's brief, the

Complaint actually alleges that, "[i]n the weeks before and after the scheduled closing, *SJ Global*

*WW* directed PPMT to tell FAT Brands that a $100 million wire or a $250 million wire will

arrive in an entity in the United States imminently."  Compl. ¶ 183 (emphasis added).  Even if

the requisite intent to convey this statement to FAT Brands could be inferred here, this allegation

falls far short of Rule 9(b)'s requirement that "the complaint must allege the time, place, speaker,

and sometimes even the content of the alleged misrepresentation."  *Ouaknine*, 897 F.2d at 79.

### 2. Tortious Interference with Contract

FAT Brands also brings a claim of tortious interference with contract against the SJ

Global Defendants.  The parties dispute whether New York or California law governs this claim,

*compare* Pl.'s SJ Opp'n 22, *with* ECF No. 114, at 19, but the Court need not resolve their dispute

because FAT Brands's claim fails under either state's law, *see Nestor v. Pratt & Whitney*, 466

F.3d 65, 70 (2d Cir. 2006) (avoiding decision on whether "the issue of preclusion is governed by

federal law or Connecticut law" because the plaintiff's "action survives either way").

"Under New York law, the elements of tortious interference with contract are (1) 'the

existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's

knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's

breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages

resulting therefrom.'"  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006)

(quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)).  "Under

California law, "[t]he elements which a plaintiff must plead to state the cause of action for

intentional interference with contractual relations are (1) a valid contract between plaintiff and a

third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed

to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 995-96 (9th Cir. 2019) (quoting *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990)). Notably, "[u]nder California law, tortious interference with contract claims are not limited to circumstances in which the defendant has caused the third party with whom the plaintiff has contracted to breach the agreement . . . [because] the rule is also applicable where the plaintiff's performance has been prevented or rendered more expensive or burdensome." *Id.* at 996 n.8 (internal quotation marks omitted).

As FAT Brands appears to concede, *see* Pl.'s SJ Opp'n 22-24, the Complaint plainly does not state a tortious interference claim under New York law because it does not allege that the SJ Global Defendants intentionally procured breach of a contract with FAT Brands by a third party. Instead, FAT Brands's theory is that the SJ Global Defendants caused FAT Brands *itself* to terminate a contract — namely, its existing credit facility. That theory might be valid under California law. But the Complaint fails to allege the second and third elements of tortious interference under California law by the SJ Global Defendants because it relies on the knowledge and intentional conduct of *Douglas*, not the SJ Global Defendants. *See* Pl.'s SJ Opp'n 23 (citing Compl. ¶¶ 29, 68)); Compl. ¶ 68 ("Upon learning of the FB Loan, *Douglas* advised FAT that PPMT was interested in lending up to $60 million to FAT . . . ." (emphasis added)). As discussed above, FAT Brands cannot impute Douglas's knowledge and activities to the SJ

Global Defendants for purposes of establishing liability.  Accordingly, the motion to dismiss must be and is granted as well with respect to the claim of tortious interference.

## CONCLUSION

For the foregoing reasons, Defendants' motions are GRANTED.  Specifically, FAT Brands's claims against Fields and Edison are dismissed pursuant to Rule 12(b)(2) for lack of personal jurisdiction, and its claims against Ramjeet, SJ Global WW, SJ Global US, Walsh, and Samuel are dismissed with prejudice pursuant to Rule 12(b)(6) for failure to state a claim.[8]

The Court declines to *sua sponte* grant FAT Brands leave to amend to cure the defects in its Complaint.  Although leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), and although "[d]istrict courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007), it is "within the sound discretion of the district court to grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  FAT Brands already amended its complaint, and it neither seeks leave to amend again nor suggests that it possesses any additional facts that could cure the defects in its dismissed claims.  *See, e.g.*, *Fischman*, 2019 WL 3034866, at *7 (declining to grant leave to amend as to certain claims in the absence of any suggestion that additional facts could remedy defects in the plaintiff's pleading).

That failure is all the more significant with respect to FAT Brands's fraud and tortious interference claims against the SJ Global Defendants because FAT Brands was on notice of the

---

[8]     Technically, the dismissal as to Fields and Edison is without prejudice to re-filing in a district where there would be personal jurisdiction over them, *see Smith v. United States*, 554 F. App'x 30, 32 n.2 (2d Cir. 2013) (summary order)), but, for the reasons discussed above, any new claims against Fields and Edison are unlikely to be successful.

SJ Global Defendants' arguments when it filed the Complaint, as the SJ Global Defendants' original motion to dismiss raised the same arguments.  *See* ECF No. 65.[9]  Moreover, while the presumption in favor of granting leave to amend is stronger in the case of dismissal pursuant to Rule 9(b), only FAT Brands's fraud claims against the SJ Global Defendants were subject to those standards, and the primary defect in those claims was not Rule 9(b), but the failure to plead a principal-agent relationship for liability purposes between the SJ Global and PPMT Defendants.  Finally, when granted leave to amend in response to the earlier motion, FAT Brands was expressly warned that it would "not be given any further opportunity" to amend its complaint "to address issues raised by either motion to dismiss."  ECF No. 62; *see, e.g.*, *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first." (alteration and internal quotation marks omitted)).  In light of these circumstances, the Court will not grant leave to amend.

The initial pretrial conference is REINSTATED for the remaining parties and adjourned to **February 4, 2021** at **3:30 p.m.**  Counsel for FAT Brands should be prepared to address how it intends to proceed with respect to Defendants PPMT Capital and Royal Gulf.

On December 14, 2020, counsel for the SJ Global Defendants moved to withdraw.  *See* ECF No. 149.  In light of the dismissal of all claims against the SJ Global Defendants, that motion is denied as moot.

---

[9]     Ramjeet's original motion to dismiss raised different arguments, *see* ECF No. 68, because the claims of liability under a partnership agreement, negligent supervision, and apparent authority were alleged for the first time in the Amended Complaint, *compare* ECF No. 17, at 1, 31 (defining Ramjeet as a "PPMT Defendant" and alleging eight counts), *with* Compl. ¶¶ 304-41 (alleging Counts XI, X, and XI against Ramjeet alone).

Plaintiff shall serve a copy of this Opinion and Order on Defendants Douglas, PPMT Capital, and Royal Gulf no later than **January 8, 2021**, and shall file proof of such service on the docket no later than **January 12, 2021**.

The Clerk of Court is directed to terminate Wesley Ramjeet, SJ Global Investments Worldwide, Ltd., SJ Global Investments Ltd., Peter Samuel, Neil Walsh, Kristina Fields, and Mickey Edison as Defendants and to terminate ECF Nos. 102, 104, and 149.

SO ORDERED.

Dated: January 5, 2021
New York, New York

_____
JESSE M. FURMAN
United States District Judge